1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

---

PHILLIP WAYNE KOGER,              *
                                  *   **ORIGINAL**
        Plaintiff,                *
                                  *
                                  *   CIVIL ACTION
-vs-                              *   FILE NO:
                                  *   4:18-cv-00053-HLM
GREGGORY CARSON, individually;    *
STEPHEN BAGLEY, individually;     *
TODD COOK, individually;          *
JAMES DAVIS, individually;        *
DYLON FLOYD, individually; and    *
ANTHONY LAWSON, individually,     *
                                  *
        Defendants.               *
                                  *

---

THE DEPOSITION OF
SERGEANT GREGGORY THOMAS CARSON
June 19, 2019

---

Sue Anne Vaughn, Court Reporter
Angel & Associates Court Reporting
1043 Executive Drive, Suite 102
Hixson, Tennessee  37343
Telephone 423-876-4435 and 800-298-DEPO (3376)

2

1                        INDEX OF EXAMINATION
2   SERGEANT GREGGORY THOMAS CARSON

    Examination by Ms. Parker................................5
3   Examination by Ms. Havlik...............................59
    Examination by Mr. Exum.................................61
4   Examination by Mr. Stone................................63
    Reexamination by Mr. Exum...............................64
5   Reexamination by Ms. Havlik.............................64
    Reexamination by Ms. Parker.............................65

6
7
                        INDEX OF EXHIBITS
8
    1 - Cook's video......................................52
9
    2 - Smith's video.....................................52
10
    3 - Cannon's video....................................52
11
    4 - Davis's video.....................................52
12
13
14  APPEARANCES:
15              FOR THE PLAINTIFF:
16              HEATHER G. PARKER, ESQUIRE
                heatherparker@bfhelaw.com
17              MICHAEL HIBDON, ESQUIRE
                michaelhibdon@bfhelaw.com
18              Bulloch, Fly, Hornsby & Evans
                302 North Spring Street
19              P.O. Box 398
                Murfreesboro, Tennessee  37133
20              (615) 896-4154
21
                FOR DEFENDANT GREGGORY CARSON:
22
                BRYAN HOSS, ESQUIRE
23              bryan@davis-hoss.com
                Davis & Hoss, PC
24              850 Fort Wood Street
                Chattanooga, Tennessee  37403
25              (423) 266-0605

3

```
 1    APPEARANCES (Cont'd):
 2
              FOR DEFENDANT STEPHEN BAGLEY, JAMES DAVIS
 3            and DYLON FLOYD:
 4            KEVIN R. STONE, ESQUIRE
              kstone@fmglaw.com
 5            Freeman Mathis & Gary, LLP
              100 Galleria Parkway, Suite 1600
 6            Atlanta, Georgia  30339
              (770) 303-8643
 7
 8            FOR DEFENDANT TODD COOK:
 9            JAMES F. EXUM, III, ESQUIRE
              jfexum@chamblisslaw.com
10            Chambliss, Bahner & Stophel, P.C.
              Liberty Tower
11            605 Chestnut Street, Suite 1700
              Chattanooga, Tennessee  37450
12            (423) 757-0233
13
              FOR DEFENDANT ANTHONY LAWSON:
14
              GWENDOLYN HAVLIK, ESQUIRE
15            ghavlik@deflaw.com
              Drew, Eckl & Farnham, LLP
16            303 Peachtree Street NE, Suite 3500
              Atlanta, Georgia  30308
17            (404) 885-1400
18
19
20
21
22
   _____
23
24
25
```

4

1          The deposition of SERGEANT GREGGORY THOMAS

2     CARSON, called as a witness at the instance of the

3     Plaintiff, for purposes of discovery, pursuant to the

4     Federal Rules of Civil Procedure, taken by notice on the

5     19th day of June, 2019, at Davis & Hoss, PC, 850 Fort

6     Wood Street, Chattanooga, Tennessee 37403, commencing at

7     9:12 a.m., before Sue Anne Vaughn, Court Reporter and

8     Notary Public.

9

10              S T I P U L A T I O N

11

12          It being agreed between counsel for the

13     respective parties that Sue Anne Vaughn, Notary Public

14     and Shorthand Reporter, may swear the witness, take his

15     deposition in machine shorthand, afterwards reducing the

16     same to typewriting.

17          All objections, except as to the form of the

18     question and responsiveness of the answer, are reserved

19     to on or before the hearing.

20          It being further agreed that all formalities

21     as to notice, caption, certificate, transmission,

22     et cetera, are expressly waived.  (Signature reserved.)

23     /////

24     /////

25     /////

1          SERGEANT GREGGORY THOMAS CARSON,

2   called at the instance of the Plaintiff, being first duly

3   sworn, was examined and testified as follows:

4                        EXAMINATION

5   BY MS. PARKER:

6          Q     Okay.  Would you state your name, please.

7          A     Greggory Thomas Carson.

8          Q     My name is Heather Parker.  I represent the

9   plaintiff.

10         A     Okay.

11         Q     I'm going to be asking you some questions

12  today.  There are a few standard opening questions I'm

13  going to ask you.  Please don't be offended by them, but

14  it's just the standard protocol we go through in every

15  deposition.  Okay?

16         A     Okay.

17         Q     Have you ever given a deposition before?

18         A     In a divorce -- or custody case.

19         Q     Okay.  So you know to answer yes, instead of

20  shaking your head yes or no?

21         A     Yes.

22         Q     You're not under the influence of any

23  medicines or intoxicants that would prevent you from

24  remembering correctly or testifying truthfully?

25         A     No.

6

1     Q    **What is your -- you're a sergeant; is that**

2    **correct?**

3     A    Yes, ma'am.

4     Q    **So I should call you -- Sergeant Carson would**

5    **be the appropriate title?**

6     A    Whatever you want to call me.

7     Q    **Okay.  Tell me where you're employed.**

8     A    At the Hamilton County Sheriff's Office.

9     Q    **And how long have you been employed there?**

10     A    Eighteen years.

11     Q    **And you're a sergeant now.  I'm assuming you**

12    **haven't always been a sergeant.**

13     A    Correct.

14     Q    **Tell me what your job was when you first**

15    **started.**

16     A    I was a patrolman or a patrol deputy.

17     Q    **And what were your duties when you were a**

18    **patrol deputy?**

19     A    Take reports, investigate accidents and just

20    district patrols and arrest all violators.

21     Q    **Okay.  How long were you a patrol deputy?**

22     A    For about six years.

23     Q    **Okay.  And what was the next --**

24     A    A school resource officer, which is

25    still classification as a patrol deputy, but I'm assigned

1    in a school or I was assigned in a school.

2        Q    And how long did you do that?

3        A    Three years, I believe.

4        Q    Okay.  What schools were you at?

5        A    I was at Hixson High School.

6        Q    And that was still with Hamilton County

7    Sheriff's --

8        A    Yes, ma'am.

9        Q    Okay.  And what was your next position?

10       A    I went back to patrol as a corporal.

11       Q    And how long did you do that?

12       A    Probably a little over two years.

13       Q    Did that, being a corporal, add some duties to

14   your job description?

15       A    Being a corporal, you're a patrolman basically

16   until there's an absence of the sergeant, and then you

17   pick up the sergeant's duties and some other leadership

18   roles, more mentoring stuff.

19       Q    So what kind of leadership or mentoring stuff

20   would you be asked to do or would --

21       A    Just working with other officers to help and

22   make sure they get their reports done the right way and

23   check their log sheets; in the absence of the sergeant,

24   just make command decisions on calls as they came.

25       Q    Okay.  And what did you do when you -- after

8

1   that two years was over?

2        A      I went to the Criminal Investigation Division

3   and was a detective.  I worked in child abuse and sex

4   crimes for the majority of my time there, and then

5   towards the end of it I was a fire investigator.

6        Q      **How long were you with the Criminal**

7   **Investigation Division?**

8        A      I would say a little bit over three years.

9        Q      **And why did you leave that position?**

10       A      To promote to sergeant.

11       Q      **And so when you were a detective, would it be**

12  **fair to say you were not out patrolling at that time?**

13       A      That's correct.

14       Q      **Okay.  When you were promoted to sergeant, did**

15  **you go back to a patrol function?**

16       A      Yes, ma'am.

17       Q      **Okay.  And is that what you're currently doing**

18  **now?**

19       A      Yes, ma'am.

20       Q      **Okay.  So tell me what other duties you picked**

21  **up when you became a sergeant.**

22       A      Developing schedules for the team; supervising

23  the subordinates under me, which is anywhere from usually

24  eight officers, but there can be sometimes six on duty at

25  a time if we have shortages going on; and making the

1       schedule or check payroll; pre-reports; oversee the

2       general day-to-day operations; and I'm also a firearms

3       instructor with the agency as well.

4                THE COURT REPORTER:  Firearms instructor with

5       what?

6                THE WITNESS:  Firearms instructor for the

7       sheriff's office or agency.

8       BY MS. PARKER:

9            Q      So when you say there would be somewhere

10      between six and eight subordinates at a time, is that --

11      are you in like a particular zone and those people are

12      just assigned to you?  I'm assuming that's not the whole

13      shift.

14           A      That's the whole -- we have east side of the

15      county and west side of the county that work the

16      unincorporated areas of the county.  I think Hamilton

17      County has 11 municipalities.  Some have police

18      departments; some don't.  So any area that doesn't have a

19      police department, they either contract with another

20      agency or we cover it.  So I was working -- when I

21      started as sergeant, I was working the east side of the

22      river, which goes from Rhea County and Bradley -- or I'm

23      sorry, Meigs County and Bradley County line all the way

24      down to Georgia, which I believe would be Catoosa County

25      or Walker County, depending on what area you go in.

1       **Q      Okay.  I may be going back to the beginning,**

2   **but tell me what training that you've had through your**

3   **employment with Hamilton County.**

4       A      There's a bunch.  I know -- I'm going to give

5   this disclaimer:  I will not be able to remember all of

6   it right off the bat.

7       **Q      Sure.**

8       A      I didn't prepare for those answers.  We

9   have -- every year we have a 40-hour in-service training,

10  which includes -- every year it includes use of force and

11  firearms or defensive tactics and firearms, and then it

12  would cover other various stuff, whatever they want to

13  put in that year.

14              I went to officer survival school when I

15  worked with another agency, and I went to Chattanooga's

16  Basic SWAT School.  I went to a five-day instructor

17  program for gas and less lethal munitions and basic

18  criminal investigations, basic traffic investigations and

19  advanced traffic investigations, sex crimes and deviant

20  criminal behavior, origin and cause for fire

21  investigations, and about three interview/interrogation

22  and one courtroom testimony.

23      **Q      And I believe at the beginning you said one of**

24  **those was with another agency.  That was the officer**

25  **survival school?**

11

1      A      Yes, ma'am.

2      **Q      And what agency were you with when you did**

3   **that?**

4      A      I was with Walden Police Department, and also

5   I was with Red Bank Police Department when I went to the

6   basic SWAT school in Chattanooga.

7      **Q      You said Red Bank?**

8      A      Yes, ma'am.

9      **Q      Okay.  Do you have any other certain types of**

10  **certification?  I know that you mentioned that you're a**

11  **firearms instructor.**

12     A      Yeah.  I've got a certification for that.  I

13  had to -- I went to an NRA patrol rifle instructor class,

14  and then I went to the State's basic firearms instructor

15  class after that at Donelson.

16     **Q      How long ago was it that you did the State**

17  **basic firearms instructor class?**

18     A      About six years ago.

19     **Q      You mentioned that the 40-hour in-service**

20  **every year always contains training on the use of force;**

21  **is that correct?**

22     A      Use of force, defensive tactics and firearms.

23     **Q      Okay.  And is that based on Hamilton County's**

24  **use of force policies?**

25     A      Yes --

12

1    **Q      Okay.**

2         A      -- and the philosophy that we train under,

3    MDTS.  Prior to that, we had some training that was done

4    by just an individual for defensive tactics.  It was

5    Barry Bennett.

6         **Q      Was that for you to learn how to use defensive**

7    **tactics or for you to recognize someone else who's doing**

8    **that?**

9         A      Both.  It's mainly -- we go over the

10   procedures or the policies in reference to use of force,

11   and then there's a day of activities, or at least an

12   afternoon of activities, where you're doing all of the

13   maneuvers with a baton and hand-to-hand stuff.  And then

14   I think a couple of years of in-service they set up a

15   two-minute drill where we had to fight someone physically

16   for two minutes with no batons or anything, no physical

17   strikes.  So it was more like we had to wrestle them for

18   two minutes and try and take them into custody.

19        **Q      Okay.  Is that 40-hour in-service something**

20   **that everybody in the Hamilton County Sheriff's Office**

21   **does or is it just sergeants or certain classifications**

22   **and below or --**

23        A      Everybody in Hamilton County does it.  Every

24   law enforcement officer in Tennessee does a 40-hour

25   in-service training every year to keep their

13

1    certification as a police officer.

2        **Q    Is that 40 hours done all in one chunk, or is**

3    **it kind of split up into days here and there?**

4        A    At our agency, it's done in one chunk.

5        **Q    Okay.**

6        A    And then if you miss something, you have to

7    make it up in the very next class.

8        **Q    Have you already done that 40 hours this year**

9    **or is it upcoming?**

10       A    I already did this year.

11       **Q    Okay.  Fair to say that you're familiar with**

12   **Hamilton County's use of force policies?**

13       A    Yes, ma'am.

14       **Q    Based on those policies and your training, are**

15   **there differences in how you should treat someone who's**

16   **handcuffed versus not handcuffed?**

17       A    Our policy is that we can use necessary force

18   to effect a legal objective or a lawful objective.

19       **Q    So I guess the answer then is maybe not --**

20   **maybe there's not a difference, depending on what your**

21   **lawful objective is?**

22       A    Say, if you look at Koger specifically, where

23   he was still resisting when I was trying to pat him down,

24   that's why force came in on him on my part.  And then

25   there have been other issues where -- like up here in

14

1    Chattanooga about five years ago, Officer Tim Chapin

2    was -- or Sergeant Tim Chapin, he was sitting at a

3    Starbucks.  A burglar alarm coming down the street from

4    where he was at or robbery alarm, he canceled one of his

5    officers, and he gets there.  A guy comes out the door

6    shooting at him.

7              So one of the other officers, as they're

8    responding, sees him shooting at him, hits the suspect

9    with the car, knocks him down.  The suspect goes to the

10   ground.  The gun is laying over here (indicating).

11   Chapin goes up to cuff him.  And when he grabbed his

12   right arm and spinned him over, the suspect came up with

13   a second gun and shot him in the eye and killed him.  So

14   it's whatever force is reasonable to effect the goal, we

15   can use, is the way our policy goes.

16        **Q     Okay.  You started talking about Mr. Koger, so**

17   **let's just -- let's just dive into that.  I want to talk**

18   **to you specifically about March 8th, 2017.**

19        A     Okay.

20        **Q     You're familiar with the allegations in the**

21   **complaint in this case which all deal with that date;**

22   **correct?**

23        A     I am.

24        **Q     Okay.  So prior to your interaction with him**

25   **on that date, did you know Phillip Koger?**

1    A    No.

2    Q    Okay.  You had never arrested him or

3    interacted with him before, as far as you know?

4    A    No.

5    Q    Okay.  At what point on March 8th did you

6    learn that this person's name is Phillip Koger?

7    A    Sometime during that traffic stop.  I don't

8    know if it was -- it was probably a few minutes into it,

9    after the use of force, I believe.

10   Q    So after his car came to a stop, once people

11   were hands on with him, is when you think you learned

12   what his name was?

13   A    Yes, ma'am.

14   Q    At that point in time you didn't know if he

15   had a criminal history; correct?

16   A    Correct.

17   Q    Didn't know if he had any specific gang

18   affiliations or anything like that?

19   A    Correct.

20   Q    Okay.  So on March 8th, talk to me about when

21   you first became involved in the incident with Mr. Koger,

22   whether it was the chase or after his car was stopped.

23   Just take me through that.

24   A    I heard the pursuit coming over the radio, so

25   I started managing and heading that way with spike strips

1    and trying to direct other cars with spike strips that

2    way and requested assistance from the Georgia agencies.

3    And I arrived on the scene, I believe, about two minutes

4    after the crash had occurred, and Koger was outside the

5    car laying face down in some rubble and glass, and I

6    believe there was a gun on the ground there.

7               And at that point I said we need to get him

8    up, pat him down, and put him in the car.  So I went to

9    pick him up.  He started to play limp and not get up.  I

10   told him to get his fat ass up.  Another officer

11   assisted, picked him up.  And when we got him stood up,

12   then he starts stiff-legged walking, like trying to walk

13   backwards against us, which is a form of active

14   resistance.

15              And then when we get to the back of the car,

16   someone said, there's a seat for him here.  And I said,

17   well, hang on, we've got to pat him down first.  Then the

18   next thing I know, he's kind jerking out of my hand.  And

19   so Bennett takes him and puts him over the back over the

20   trunk of the car.  Bennett had his right side.  I had his

21   left.

22              So Bennett has got him leaned over the car.

23   And Bennett is a pretty big boy.  He's probably over 250

24   pounds and close to 6 foot tall.  And he's trying to hold

25   him down.  Koger is raising him up off of the car, so I

1   gave two elbows -- or first two punches to the lower left

2   part of Mr. Koger's back for pain compliance.  They

3   didn't seem to have an effect.  And I turned my wrist on

4   the second one, so I transitioned to elbow strikes to the

5   same target area and delivered two elbow strikes, which

6   at one point you could see his knees buckle on the video

7   if you watch it.  That got his attention.

8           I stepped back for a minute, figuring Bennett

9   would pat him down at that point.  Well, when Bennett

10  didn't pat him down, I stepped back up and start to pat

11  him down.  And as soon as I get squatted down -- I said,

12  let's pat him down.  I squatted down behind him, and I

13  started at his ankles, which is pretty standard to start

14  patting someone down, especially if you've already got

15  them restrained there.  And then he -- he kicks his butt

16  backwards, and he tries to stand up again.

17          So when he did that, I'm already in a down

18  motion.  I have a problem with my knee, so I don't like

19  to be fighting down low when I have to fight with

20  somebody.  So I scooped him and run one hand up between

21  his legs in front of his groin area and the other on his

22  left hip and picked him up onto the trunk of the car and

23  then accomplished the pat-down, and then he slid off the

24  other side of the truck -- the trunk of the car.  And

25  then they took him over between some other cars.  There

1  were several officers watching.  I went and made a phone

2  call.

3     Q     **Was that kind of your last interaction with**

4  **him, once he got in between the cars and you made that**

5  **phone call?**

6     A     I made the phone call.  I had to call our

7  magistrate because I had some questions about whether we

8  could bring him back.  We never lost sight of him and

9  stuff like that.

10     I could hear Koger over there saying I can't

11  breathe the whole time.  I knew he could breathe because

12  he's saying I can't breathe.  So when someone that's

13  screaming I can't breathe, they're breathing quite well.

14     So I make my way over to him, and I kneel down

15  beside him.  I see some hand sanitizer on a car near us.

16  That's the only thing I had to start cleaning him up

17  with.

18     I said, hey, buddy, I'm going to try and clean

19  you up a little bit.  And he acknowledged okay or

20  something to that effect.  I don't remember the exact

21  words.  Then I started cleaning him up and asked for

22  someone to get paper towels out of my car because it just

23  made a mess with -- the combination of the rubbing

24  alcohol and blood made it a slick mess on his face, so I

25  was going to clean it up with a towel.  And then at that

1   point I realized the ambulance had showed up.

2          I said, Mr. Koger, I'm going to get you up and

3   take you to the ambulance.  He got up, no resistance.  We

4   walked to the ambulance.  Then they were working on

5   Officer Smith, so they told us to get in line, they'd get

6   to him next.  I think I told him just sit down right

7   there, they'll get to him, and stayed in the area.

8          Q     So when you told him to sit down, was that

9   just on the ground outside the ambulance or near the

10  ambulance?

11         A     I might have even told him to stand right

12  there.  I told him just hang out right here in this area

13  and they'll get to you, and I was still close.  I don't

14  remember the exacts of that part, but it was by the

15  ambulance.

16         Q     So when you first arrived on the scene, I

17  think you said that Koger was face down on the ground or

18  outside of his car; is that correct?

19         A     Uh-huh.

20         Q     Was he already handcuffed when you first saw

21  him?

22         A     He was.

23         Q     Okay.  And how many minutes between when you

24  arrived on the scene and when you decided let's stand him

25  up and move him?

20

1     A       Pretty much went straight to him and got him

2  and moved him because I wanted to get him into a car.

3  It's the safest place for him.

4     Q       **Okay.**

5     A       But then once we saw how bad he was bleeding

6  from his head, I didn't want to put him in one car and

7  have to decontaminate it and then put him into another

8  one, so that's why I went and called the magistrate.

9     Q       **Okay.  Did you talk to anybody on the scene,**

10 **any of the other officers, before you approached Koger?**

11    A       If I did, it would have been to ask Bennett

12 and Smith if they were okay, but I don't remember.  I

13 remember getting on the radio and canceling any of my

14 other officers.  And I had talked to one on the radio

15 about the wreck and whether it was a single vehicle or

16 what, and that was it.

17    Q       **How many officers, when you arrived on the**

18 **scene, could you see that were there?**

19    A       I didn't count.  There was a bunch.

20    Q       **Okay.  So you knew that Bennett and Smith were**

21 **there; correct?**

22    A       Uh-huh.

23    Q       **Did you know whether anybody else from**

24 **Hamilton County was there when you first arrived?**

25    A       I believe I knew Todd Cook was there from

1    radio traffic as well.

2        **Q      Okay.  And then I think you had mentioned that**

3    **you had radioed for some assistance from some Georgia**

4    **agencies?**

5        A      Uh-huh.

6        **Q      So did you know that they were going to be**

7    **there as well?**

8        A      We had gotten on the same radio channel at one

9    point, so I knew that some Georgia agencies were there.

10       **Q      Okay.  Perhaps not how many but --**

11       A      Right.

12       **Q      -- that someone was there?**

13       **Okay.  Do you know whether or not he was**

14   **patted down while he was laying on the ground before you**

15   **arrived?**

16       A      I don't.  But I was taught in the academy to

17   never take for granted that someone has been patted down,

18   so anytime you take custody of someone to pat them down

19   to ensure your safety and theirs.

20       **Q      Were any of the other Hamilton County officers**

21   **standing with Koger whenever you first arrived?**

22       A      I would say Bennett was close since he was the

23   one that helped me get him up.  My intention was to pick

24   him up by myself and take him back and pat him down and

25   put him in the car.  But since Bennett grabbed ahold of

1   him, I guess he was there, right there with me.

2        **Q     It was dark outside; correct?**

3        A     Uh-huh.

4        **Q     So you mentioned that you didn't -- that you**

5   **noticed later on that he was bleeding and some other**

6   **things; correct?  You didn't notice that when you first**

7   **approached him?**

8        A     No.  And really there's several officers

9   standing around right where he's at.  And in my

10  experience, it's best just to get someone up and get them

11  into a car after a pursuit, because if they wind up start

12  talking trash or the cops talk trash, it winds up not

13  good, you know, not good things said.  And so I wanted to

14  get him up and out of that crowd of officers and get him

15  into a car where he was safe and secure.

16       **Q     When you arrived, nobody was hands on with**

17  **Koger at that time?**

18       A     Right.  I think someone might have had a foot

19  on him, but...

20       **Q     Okay.  He wasn't actively resisting while he**

21  **was laying on the ground when you saw him; is that true?**

22       A     That's true.

23       **Q     Did someone tell you that he pulled a gun on**

24  **officers?**

25       A     Bennett at some point told me that he had

 1    reached for a gun after -- he had his hands out the

 2    window (indicating), and then as Bennett approached, he

 3    brought his hands back down and reached for a gun in the

 4    center console, but I can't say if that was before or

 5    after I picked Koger up.

 6         Q      Okay.  I think you said this already.  But it

 7    was your decision to pick -- let's pick him up and put

 8    him in the car; is that correct?

 9         A      Uh-huh.

10         Q      When you were at the back of the trunk, did

11    you give him any verbal commands?

12         A      I believe I told him stop resisting, but I

13    don't remember exactly what else I said.

14         Q      Do you recall if you advised him that you were

15    going to pat him down for weapons?

16         A      I know I said, at the back door of the car,

17    we're going to pat him down.  That's when he jerked away.

18         Q      Okay.  Were you saying that to him or just

19    generally to the other officers around?

20         A      To another officer, the one that said, there's

21    a seat for him right here.  And I said, we're going to

22    pat him down first.

23         Q      Did you ask him, hey, do you have anything in

24    your pockets that might hurt me or anything like that?

25         A      I don't think I did.

1    Q    Okay.  Is that something that you typically

2  say or sometimes say to people when you're patting them

3  down for weapons?

4    A    Not always, but sometimes.

5    Q    Okay.  It depends on --

6    A    If it's someone I suspect being a needle user,

7  then I'll ask them, but that's not generally one that I

8  ask.

9    Q    When Mr. Koger was laying on the ground

10  outside of his vehicle, was the situation under control

11  at that point?

12    A    What was going on -- they were in control of

13  what was going on.  Koger still was not contained to a

14  vehicle yet, so...

15    Q    Was he in custody at that point?

16    A    Yes.

17    Q    Okay.  Whose custody he was in may be a

18  question, right, because there was all kind of --

19    A    There was a little confusion there crossing

20  the state line and a couple of jurisdictions, I think.

21    Q    Okay.  When you were at the back of the trunk,

22  do you recall making a statement about Mr. Koger's groin

23  area?

24    A    No.

25    Q    Do you recall anybody else making a statement

1    to that effect?

2         A     No.

3         Q     **Who all was at the back of the car with you?**

4         A     Well, I know for sure Bennett and Smith were.

5         Q     **Okay.**

6         A     And then there were some other Georgia

7    officers kind of in the area.

8         Q     **Other than the officers who worked for**

9    **Hamilton County, do you know -- or did you know before**

10   **that night any of the other officers that ended up being**

11   **on the scene?**

12        A     I had met Lieutenant John McGrath on a call

13   before.  They had a carjacking.  The suspects came to

14   Hamilton County, and we caught them on 153, on Highway

15   153, and he came up and interviewed them.

16        Q     **Other than that, you didn't know any of those**

17   **people?**

18        A     No.

19        Q     **Okay.  So you wouldn't be able to recognize**

20   **them perhaps and say who they are, by name anyway?**

21        A     No.

22        Q     **Okay.  How does the -- do you have audio or**

23   **video recording in your unit that you were in on**

24   **March 8th, 2017?**

25        A     No.

1   **Q      So there wasn't any recording device on your**

2   **person?**

3        A      Right.

4        **Q      Okay.  I think that we're going to try to see**

5   **if we can watch a little bit of some of these videos with**

6   **you, and we'll see if we can get that to work.  And I**

7   **just -- my objective is to see if you can show me where**

8   **you are on the videos.  Okay?**

9        A      Okay.  I'm the tall one.

10       **Q      So I believe this first video is from Officer**

11   **Cook's car.**

12             **(To Mr. Hibdon) Wait.  Don't start it yet.**

13   **Wait for them to get around here.**

14             THE WITNESS:  Looks more like Jason Smith's

15   car, but go ahead.

16             MR. HOSS:  This is Cook's video?

17             MR. HIBDON:  Yes.

18             MR. HOSS:  Okay.

19             (Video being played and viewed.)

20             THE WITNESS:  Okay.  Yeah.  Cook made it past

21   the (unintelligible.)

22             THE COURT REPORTER:  Wait a minute.  Do you

23   want me to put what he's saying right now,

24   because it's --

25             THE WITNESS:  I was verifying this is Cook's

27

1    video.  I'll shut up.  I'm sorry.

2              MR. HOSS:  Stop, stop.  Just wait.

3              (Whereupon, an off-the-record discussion was

4    had.)

5              MR. HOSS:  Let's go back on the record.  Don't

6    talk when the video is playing.

7              THE WITNESS:  Okay.

8              MR. HOSS:  If you need to say something, maybe

9    raise your finger and she'll hit pause, and then you can

10   speak.

11             MS. PARKER:  Perfect.

12             MR. HOSS:  Does that sound good?

13             MS. PARKER:  Yes.

14             (Video being played and viewed.)

15   BY MS. PARKER:

16        Q    At this point in the video, you have not

17   arrived yet; is that correct?

18        A    Correct.

19        Q    And it looks like, based on the video timer,

20   we're at 23:13:07.

21             MR. HOSS:  And that is Todd Cook's video?

22             MS. PARKER:  Yes.

23             MR. HOSS:  Okay.

24        Q    (By Ms. Parker) Before we go on, which side of

25   the car wreck does your car approach from?

1     A    Directly behind it -- well, looking forward
2   down this lane past the crash, I'll come straight up that
3   lane in the opposing direction and stop --
4        **Q    So from this --**
5     A    -- about four cars back.  Then I'll walk in
6   between the Camaro and Bennett's car, which is the one
7   directly behind the car.
8              MS. PARKER:  Okay.  Let's restart.
9              (Video being played and viewed.)
10       **Q    (By Ms. Parker) Do you see yourself yet on**
11   **this video?**
12     A    Huh-uh.
13       **Q    Okay.  We're at 23:14:38.**
14     A    And you'll probably hear me canceling any
15   Hamilton County unit that's not there, and then shortly
16   after that I'll walk between the cars --
17       **Q    Okay.**
18     A    -- if they're on the same radio channel at
19   that point.
20              (Video being played and viewed.)
21              THE WITNESS:  That's me canceling them,
22   probably the second one that comes through the cars
23   there.  It looks like that one was closer.
24              MR. HOSS:  What time was that on the video?
25              THE WITNESS:  I can't see it -- oh, on that

29

1   video, 23:15:05.

2            (Video being played and viewed.)

3            THE WITNESS:  And right now I came through.

4   BY MS. PARKER:

5        Q      **This right here (indicating)?**

6        A      Yeah.  At 23:15:09 is when I passed between

7   the cars and turned towards where they were.

8            THE COURT REPORTER:  Turned towards what?

9            THE WITNESS:  Turned towards where the

10   officers were.

11            (Video being played and viewed.)

12        Q      **(By Ms. Parker) So at this point on the video,**

13   **can you tell that there's a number of officers there**

14   **other than the Hamilton County officers; is that correct?**

15        A      Uh-huh.

16        Q      **Is that a yes?**

17        A      Yes.

18        Q      **Okay.  And as you stated earlier, other than**

19   **the folks who work for Hamilton County, you didn't know**

20   **those other folks?**

21        A      Right.

22            MS. PARKER:  Okay.

23            (Video being played and viewed.)

24        Q      **(By Ms. Parker) This is 23:15:34.  And you can**

25   **see in that shot Mr. Koger appears to have on a white or**

30

1    **light colored shirt; is that correct?**

2        A    Yes.

3        **Q    And you are the officer to his --**

4        A    On the far side of this picture, so I would

5    be --

6        **Q    On his left?**

7        A    Yes.

8        **Q    Okay.  So who is on his right?**

9        A    I believe it's Bennett.

10       **Q    Okay.**

11       A    I know it was Bennett when we got to the back

12   of the car.

13           MR. HOSS:  I'm sorry.  You were saying that

14   Bennett is on Koger's right-hand side?

15           THE WITNESS:  Yes.

16           MR. HOSS:  Okay.

17           (Video being played and viewed.)

18   BY MS. PARKER:

19       **Q    There's another officer that's kind of**

20   **trailing behind you-all.  Do you know who that is?**

21       A    I'm not sure who it is.  I know at some point

22   Jason Smith got involved in taking control of one of his

23   legs when I picked him up on the trunk of the car, but I

24   don't remember if that was him walking that close.

25           MS. PARKER:  Okay.

31

1          (Video being played and viewed.)

2      Q     (By Ms. Parker) It may be hard to see on the

3  video.  But can you tell how many officers are at the

4  back of the car there?  Let me put the time in for you.

5  It's 23:15:59.

6      A     I see at least three.

7      Q     Okay.  And did you see on the video the hand

8  strikes and the elbow strikes that you talked about

9  earlier?

10     A     Yes, ma'am.

11     Q     You were able to see that on this video?

12     A     Yes, ma'am.

13     Q     Okay.  Did you -- well, go ahead.  Let's

14  finish this up.

15          (Video being played and viewed.)

16     Q     (By Ms. Parker) At this point we're at

17  23:16:28.  Are you aware of where Todd Cook is at that

18  point?

19     A     I have no idea where Todd Cook is at.

20     Q     Okay.  He wasn't at the back of the trunk with

21  you, as far as you know?

22     A     I don't think so.

23     Q     Okay.

24     A     His job there would be to do the in-house part

25  for crash investigation since two of our cars hit, but I

1  don't know if that's what he was doing at that time or

2  not.

3      Q      Okay.  Do you know what he would have been

4  wearing?

5      A      Our patrol navy uniform, I believe.  Sometimes

6  they wear something different, but I think that's what he

7  was wearing that night.

8             (Video being played and viewed.)

9      Q      (By Ms. Parker) Are you able to see Mr. Koger

10  anymore at this point in the video?

11     A      No, ma'am.

12     Q      Okay.  We'll go ahead and stop then.  That's

13  23:17:09 on that video.

14             Let me ask you this:  When y'all are at the

15  back of the trunk, was Mr. Koger saying anything?  Was he

16  making any statements or --

17     A      I think Bennett was giving him loud verbal

18  commands to stop fighting or stop resisting.  He said,

19  you need to quit.

20             And Koger said, I am quit.

21             But what he was saying and doing was two

22  different things.  He was acting like someone that was

23  high on meth and you're having to fight with them.

24     Q      Okay.  Other than whatever talking you and the

25  other officers were doing, other than that, was it quiet

1    on the scene, loud on the scene?

2         A     There was noise going on.

3         THE COURT REPORTER:  Wait a minute.  There was

4    what going on?

5         THE WITNESS:  There was noise going on.  There

6    were other officers talking and doing their thing, and

7    all the cars were still running and just chatter, other

8    officers doing other things.

9         Q     (By Ms. Parker) Okay.  Did you have any

10   problems hearing what Koger was saying because the

11   background noise was too loud?

12        A     No.  I don't remember, while the force was

13   going on, hearing anything, hearing Koger say anything.

14        Q     Okay.  The next video is going to be from

15   Officer Smith's vehicle, I believe.  Have you reviewed

16   all these videos?

17        A     Some more than others, but yes.

18        Q     Okay.  So it looks like we're going to be

19   starting this one at 23:12:36.

20             (Video being played and viewed.)

21        Q     (By Ms. Parker) Did you recognize those two

22   deputies there?

23        A     I mean, I know one of them was Bennett just

24   because he had stopped, but, no, I didn't recognize him

25   on the video.

1      **Q      Okay.  So you can't tell from this video**
2   **exactly who that is?**
3      A      Play it back and let me see, and I might can
4   pick them out.
5           MS. PARKER:  So we'll start at 23:12:43.
6           (Video being played and viewed.)
7      **Q      (By Ms. Parker) Did that help any?**
8      A      I can't tell who they are.
9      **Q      Okay.  If you would, let me know whenever you**
10  **see yourself walk in, and we'll stop it.**
11          **(Video being played and viewed.)**
12     A      I'm already back there.  That's me picking him
13  up.
14     **Q      (By Ms. Parker) Okay.  Which side?  Are you on**
15  **his left or right?**
16     A      I'm on his left.
17     **Q      Okay.  So that's kind of closest to you, where**
18  **the video is being taken from?**
19     A      Uh-huh.
20     **Q      Okay.  Let's see if we can back it up and let**
21  **you rewatch it and get a time whenever you walk in.**
22          MR. HIBDON:  How far back do you want to go?
23          MS. PARKER:  Let's restart it at 23:15:23.
24          (Video being played and viewed.)
25          MS. PARKER:  That wasn't far enough back.

35

```
 1            THE WITNESS:  That's me picking him up, but it
 2   wasn't back to when I came in the picture.
 3            MS. PARKER:  So we're just at 23:15:00.
 4            THE WITNESS:  (To Mr. Hibdon) You're not on
 5   the play button.  You're on the dot.
 6            (Video being played and viewed.)
 7            THE WITNESS:  There I go.
 8   BY MS. PARKER:
 9       Q    So that's right about 23:15:10; is that
10   correct?
11       A    Yes, ma'am.
12            MS. PARKER:  Okay.
13            (Video being played and viewed.)
14       Q    (By Ms. Parker) We're at 23:15:43.  After this
15   point, you do not bring Mr. Koger back within view of
16   this camera; is that correct?
17       A    Correct.
18       Q    Okay.  So we'll stop that one.
19            And after having watched that now, did you at
20   any point recognize Bennett or Smith or Cook in that
21   video?
22       A    I recognized Bennett.  There was another
23   officer that assisted me picking Koger up off the ground,
24   but then Bennett took place --
25       Q    Stepped in?
```

36

```
 1        A      -- for him.
 2               MS. PARKER:  Okay.
 3               MR. HIBDON:  The next one?
 4               MS. PARKER:  Uh-huh.
 5               (Video being played and viewed.)
 6               MS. PARKER:  Which one is this?
 7               MR. HIBDON:  This is the view of the trunk of
 8    the passenger's side.
 9               MS. PARKER:  Okay.  Just so everybody knows,
10    this one is -- we don't know whose car it came from
11    because it wasn't labeled in the discovery, but it shows
12    the --
13               THE WITNESS:  The passenger's side of
14    Bennett's trunk?
15               MS. PARKER:  Yes.
16               THE WITNESS:  That's Sergeant Cannon's video.
17               MS. HAVLIK:  Say that again.  Cannon?
18               THE WITNESS:  Sergeant Cannon.
19               MR. HOSS:  Can we go off the record real
20    quick?
21               (Whereupon, an off-the-record discussion was
22    had.)
23               (Video being played and viewed.)
24    BY MS. PARKER:
25        Q      If you would, whenever you see yourself walk
```

1    on camera, just let us know so we can get that time.

2         A    Okay.

3              (Video being played and viewed.)

4              MR. HOSS:  Can we pause real quick?  So this

5    is from a different agency, and their time is different

6    than Hamilton County's time.

7              MS. PARKER:  Okay.

8              MR. HOSS:  In the other videos, the wreck

9    happened like at 23:12:43.  And here this is 23:11:23,

10   and the wreck has already occurred.  So you've got two

11   different clocks.

12             MS. PARKER:  Yeah.  I'm just describing it by

13   whatever timer is on the actual video.

14             MR. HOSS:  All right.

15             MS. PARKER:  That's what we'll go with.

16             MR. HOSS:  Okay.

17             (Video being played and viewed.)

18   BY MS. PARKER:

19        Q    Do you recognize who that is right there

20   (indicating)?

21        A    No.  I can tell there's a female officer.  Is

22   that the one you're pointing at?

23        Q    Sorry.  This gentleman who walked towards the

24   camera and then walks off.

25        A    I have no idea who he is.

38

```
1              MS. PARKER:  Okay.

2              (Video being played and viewed.)

3              THE WITNESS:  That's me right there walking

4    up.

5         Q    (By Ms. Parker) Okay.  So by the timer on this

6    video, that looks like 23:13:10; is that correct?

7         A    Yes.

8         Q    So far have you been able to recognize anyone

9    else in the video?

10        A    No.

11             MS. PARKER:  Okay.

12             (Video being played and viewed.)

13        Q    (By Ms. Parker) Is that your voice asking

14   Bennett are you okay?

15        A    Probably.

16        Q    Okay.  You're not sure?

17        A    Well, it could be John McGrath too because I

18   think he knows Bennett from a ways back.  If you want to

19   back it up, I can say for sure whether it was me or not.

20             (Video being played and viewed.)

21             THE WITNESS:  Yeah.  I think it was me that

22   said, Bennett, are you okay?  It wasn't me before that

23   saying, whoever, do you need a medic unit, though.

24             MS. PARKER:  Okay.

25             (Video being played and viewed.)
```

1      Q     (By Ms. Parker) Can you see on this video him

2  standing up and walking to the back of the trunk?

3      A     Uh-huh.

4      Q     Yes?

5      A     Yes, ma'am.

6          (Video being played and viewed.)

7      Q     (By Ms. Parker) So did you see the strikes

8  that you referenced earlier in your testimony?

9      A     Yes, ma'am.

10     Q     And it appears that you took a step back, like

11  you stated earlier; is that correct?

12     A     Yes.

13     Q     Is that when you say that you -- was it

14  Bennett that you thought would do the search once you

15  stepped back?

16     A     Yes.

17     Q     Okay.  So that's what we just watched here on

18  the video?

19     A     Yeah, because if you -- on VLC, you can see it

20  easier, and you might can on this if you look for it.

21  The first elbow strike buckled Koger's knee, which

22  indicated maybe he was done fighting.  The second one was

23  just from momentum of being in a fight.  So as soon as I

24  realized he had stopped, I stepped back so Bennett can

25  finish the pat-down with Bennett still holding him down

1   on the trunk, and I guess he didn't realize...

2       Q       So from this video angle, Bennett is on the

3   right side of Koger, on the right side of the screen?

4       A       Towards the camera, center of the screen.

5               MS. PARKER:  Okay.  Go ahead.

6               (Video being played and viewed.)

7       Q       (By Ms. Parker) Did you hear that, something

8   about right in the groin?

9       A       No, I didn't hear that.

10      Q       Did you hear it today?

11      A       I heard right in the gourd.  I've heard that

12  plenty of times in the video, and that's someone -- I

13  think it's Bennett saying, I'd put one right in your

14  gourd.

15      Q       Do you know what that means?

16      A       I think it means he's going to put a bullet in

17  his gourd, or would have.

18      Q       What's a gourd?

19      A       Head (indicating).

20              MS. PARKER:  Okay.

21              (Video being played and viewed.)

22      Q       (By Ms. Parker) From this angle, can you tell

23  how many officers are standing at the back on the trunk?

24      A       If we go back and watch it, I can.  It seemed

25  like there were a few that passed by the area.  I could

41

1    see one Georgia officer in the lighter color uniform

2    standing there while we were doing that.

3                MS. PARKER:  So we're going to restart it at

4        23:14:01.

5                (Video being played and viewed.)

6        Q       (By Ms. Parker) It looks like there's somebody

7    with a tan shirt on kind of standing right behind you,

8    doesn't it?

9        A       Uh-huh.

10       Q       Did you -- at the time you may not have known

11   that person was standing there; is that true?

12       A       Right.

13       Q       But you can see him today?

14       A       Yes.

15       Q       Okay.

16       A       And then that could be Jason Smith in front of

17   me there because he has the right style haircut and the

18   right color uniform.

19       Q       Okay.

20                MR. HOSS:  And you're indicating 23:14:08 on

21       the video?

22                THE WITNESS:  Uh-huh.

23                MS. PARKER:  Thank you.

24                (Video being played and viewed.)

25       Q       (By Ms. Parker) So I can see at least two

1   other people here (indicating) other than you and

2   Bennett; is that correct?  Do you see more than two or

3   less than two?

4        A    I can see two.  I'm not going to say more.

5        Q    I'm not trying to trick you.

6        A    I know.  I'm not going to walk into an answer

7   that I can't see.  I do confirm and agree that there's at

8   least two more people there.

9        Q    Okay.  And, you know, when you're in the

10  moment of the event, you may not realize that those

11  people are there; is that true?

12       A    Uh-huh.

13       Q    Is that a yes?

14       A    Yes, ma'am.

15            (Video being played and viewed.)

16       Q    (By Ms. Parker) Do you know who that is that's

17  closest to the camera right now?

18       A    I don't know him.  I saw him.  And if he was

19  in a lineup, I could pick him out, but I don't know him.

20       Q    You don't know his name?

21       A    Right.

22            MS. PARKER:  Okay.  We're at 23:14:47.

23            (Video being played and viewed.)

24            THE WITNESS:  Might could even stipulate --

25  no.  That's a corporal.  I was going to say might could

43

1    even stipulate that was a sergeant, but someone just

2    addressed him as corporal, so...

3              (Video being played and viewed.)

4         **Q     (By Ms. Parker) Is this Koger over here**

5    **(indicating) that seems to be in the front passenger's**

6    **side panel of the black car that's directly in front of**

7    **the video?**

8         A     I believe so.

9         **Q     Y'all took him off the trunk and kind of sat**

10   **him down there; is that correct?**

11        A     Uh-huh.

12        **Q     Okay.  Did you see yourself in that camera**

13   **angle?**

14        A     Not at that moment.  Here in a little bit

15   you'll see me walk across.  I'm on my phone, and I'll go

16   to the guardrail on the shoulder.

17             MS. PARKER:  Okay.  We're at 23:15:22.

18             (Video being played and viewed.)

19             THE WITNESS:  That wasn't me.  That wasn't me

20   that said that.

21        **Q     (By Ms. Parker) That wasn't you that said**

22   **what?**

23        A     You ain't done.  Shut up.

24             MS. PARKER:  Okay.

25             (Video being played and viewed.)

44

1       Q       (By Ms. Parker) So during this period of time,
2   are you still standing next to Koger?
3       A       I think that's me on the telephone right --
4       Q       Toward the right side of the screen?
5       A       The closest officer you can see in that
6   picture at 23:16:24.
7               (Video being played and viewed.)
8       Q       (By Ms. Parker) Is this you here in the
9   right-hand corner of the screen (indicating)?
10      A       I think so.
11      Q       It looks like you've got -- you're still on
12  the phone perhaps?
13      A       Yeah.
14              MS. PARKER:  Okay.  That's at 23:18:24.
15              (Video being played and viewed.)
16      Q       (By Ms. Parker) Do you recall what position
17  Koger was in?  Is he sitting, standing, laying?
18      A       I believe he was laying on his back.
19      Q       Laying on his back?
20      A       Uh-huh.
21              MS. PARKER:  Okay.
22              (Video being played and viewed.)
23      Q       (By Ms. Parker) Is that -- do you recognize
24  that voice that's talking in the video?
25      A       It's one of the Georgia guys, I think.

1          MS. PARKER:  Okay.  We're at 23:20:09.

2          (Video being played and viewed.)

3          THE WITNESS:  Right there is where I kneeled

4     to try to clean Koger up.  And you can hear me slightly

5     before the pause say, All right.  We're going to wipe you

6     and clean you up, something to that effect.

7     **Q      (By Ms. Parker) Okay.  And so where we see you**

8     **bent down, that would be in the area of his head,**

9     **Mr. Koger's head?**

10         A      Yes.

11         MS. PARKER:  Okay.  23:20:27 is where we

12    stopped it.

13         (Video being played and viewed.)

14         THE WITNESS:  And then the ambulance pulls up

15    at 23:20:54.

16         (Video being played and viewed.)

17    **Q      (By Ms. Parker) Do you recognize that voice on**

18    **the video?**

19         A      No, other than a Georgia officer.

20         MS. PARKER:  That's 23:21:18.

21         (Video being played and viewed.)

22    **Q      (By Ms. Parker) Do you know where you are at**

23    **this point in time?**

24         A      Somewhere in the area of Koger.  I had taken

25    him over to the EMS people and tried to hand him to them.

46

1    They said they're working on the officer right now.

2    They'll get to him in a little bit.  And I said -- I

3    don't remember.  I told him to have a seat or stand

4    there, but I'm close by there.

5        Q    Okay.  So somewhere in the middle of the

6    screen here?

7        A    Yeah, back by the rear of Bennett's car, which

8    is in the middle of the screen.

9             MS. PARKER:  Okay.  That's 23:20:40.

10            (Video being played and viewed.)

11            THE WITNESS:  Okay.  Now I'm backed away from

12   him.

13       Q    (By Ms. Parker) Is this you on the right-hand

14   side of the screen?

15            THE COURT REPORTER:  Wait a minute.  Say that

16   again.  I'm sorry.

17            THE WITNESS:  Okay.  I'm backed away from him.

18       Q    (By Ms. Parker) Is that you on the right-hand

19   side?

20       A    Yes, ma'am.

21       Q    That's at 23:24:35.

22            At that point in time, do you have any more

23   interaction with Koger after that time?

24       A    Only when he's leaving in the back of the

25   police car and I told him to enjoy prison.

47

Q       **Whose police car does he leave in?**

A       I believe it's Sergeant Cannon's car.

Q       **The one that --**

A       This camera or the car in front of it.  It's
one of those two.

MS. PARKER:   Okay.

(Video being played and viewed.)

Q       **(By Ms. Parker) When you back away from him,
is there some protocol for who's supposed to stay with
him or who's in charge of him at that time point from a
law enforcement standpoint?**

A       Generally whoever has got him under arrest,
but there were so many officers there.  I think when he's
at the ambulance that it's -- I think we already
determined he wasn't going to be in my custody.  So when
he's at the ambulance, if there was a Fort O officer
there, they'd take custody of him than it would be to
leave him with them.

Q       **Did you say Fort Oglethorpe?**

A       Yes.

Q       **Okay.  So you -- did you instruct anybody from
Hamilton County to stay with him at this point in time
when being checked out from EMS?**

A       Not that I remember.

(Video being played and viewed.)

1       Q       (By Ms. Parker) I think we can stop here.

2   We'll stop it at 23:24:51.

3               Sorry.  I know this is tedious.  I think we've

4   got only one more.

5       A       I've watched them plenty.

6               MS. PARKER:  And what is this video?

7               MR. HIBDON:  This is the Davis video.

8       Q       (By Ms. Parker) We're going to start this one.

9   The timer says 23:11:18, and this is the Davis video.

10      A       Okay.

11      Q       And if you would, the same as the others.  If

12  you see yourself on the screen, let us know, and we'll

13  mark the time.

14              (Video being played and viewed.)

15      Q       (By Ms. Parker) So you mentioned earlier that

16  you said something to the effect of get your fat ass up.

17  On the video, did you hear yourself say that just now?

18      A       Yes, ma'am, I did.

19      Q       Okay.  And that was around 23:13:42.

20              Did you hear another officer talking on the

21  video just then?

22      A       Uh-huh.

23      Q       Was that whoever was helping you get him up?

24  Do you know who that was?

25      A       I don't know.  I just heard a growling voice

49

1    in the background.  I really wasn't paying attention to

2    who it was or what they were saying.

3               MS. PARKER:  Okay.

4               (Video being played and viewed.)

5         Q    (By Ms. Parker) Did you see yourself walking

6    to the left side of the frame there?

7         A    Uh-huh.  Yes.

8         Q    We're at 23:13:56.

9         A    Also you can hear me saying, let's lean him

10   over the car at that point.  And I already see that Koger

11   is starting to push back when he was leaning him over the

12   car.

13              (Video being played and viewed.)

14              THE WITNESS:  That was Bennett.

15        Q    (By Ms. Parker) What was Bennett?

16        A    "You need to quit, you piece of fucking shit."

17        Q    Okay.  And he was on one side of Koger, and

18   you were on the other side.  So you and he were pretty

19   close; is that correct?

20        A    Yeah.

21        Q    Okay.  If this is Davis's video, would it be

22   true that your voices would be coming through Davis's

23   microphone, as far as you know?

24        A    I would suspect, yeah.  I mean, there's some

25   that might link systems together, but I would suspect

50

1    that it's probably from Davis's.

2                   MS. PARKER:   Okay.

3                   (Video being played and viewed.)

4                   THE WITNESS:   I don't know who that was.

5                   (Video being played and viewed.)

6        Q       (By Ms. Parker) Did you hear that statement

7    about right in the fucking gourd again?

8        A       Uh-huh.

9        Q       And that was Bennett, you believe?

10       A       I believe so.

11                  MS. PARKER:   That was at 23:14:16.

12                  (Video being played and viewed.)

13       Q       (By Ms. Parker) So at this point, at 23:14:50,

14   he's off of the trunk and appears to have been sat down

15   on the other side of the car, out of view of the camera;

16   is that correct?

17       A       Yes.

18                  MS. PARKER:   Okay.

19                  (Video being played and viewed.)

20       Q       (By Ms. Parker) Did you hear something face

21   down?

22       A       Space them out.

23       Q       Space them out.   Who's that?

24       A       I'm guessing when they space his legs out.

25       Q       Do you know who said that?

1      A      I don't.

2             MS. PARKER:  Okay.

3             (Video being played and viewed.)

4      **Q      (By Ms. Parker) While he's laying on the**

5      **ground, as we've talked about, did you see any other**

6      **physical force used on him?**

7      A      No.

8             MS. PARKER:  Okay.  23:15:24 is where we've

9      stopped the video.  I don't think there's anything else

10     on this one we need to see right now.

11            I can make those four videos an exhibit, if

12     you-all would like, just so we can keep it together.

13            MR. STONE:  That's probably a good idea.

14            MS. PARKER:  You know, it's going to be the

15     same four videos for every officer.  So I don't know if

16     y'all want me to just make a CD to put with each one or

17     if you just want to refer to Exhibit A.  It doesn't

18     matter to me.

19            MR. HOSS:  Let's just do it once.  That seems

20     like it's the easiest, and let's keep them in order.

21            MS. PARKER:  So these on the thumb drive --

22     can we go off the record for a second?

23            (Whereupon, an off-the-record discussion was

24     had.)

25            MS. PARKER:  So we're going to make Cook's

1   video Exhibit 1, Smith's video Exhibit 2, Cannon's video

2   Exhibit 3, and Davis Exhibit 4, and I'll get those to the

3   court reporter after the deposition is concluded.

4           MR. HOSS:  No objection.

5           (Whereupon, the videos referred to above were

6   subsequently marked Exhibit Nos. 1 through 4 and attached

7   hereto.)

8   BY MS. PARKER:

9       Q     Okay.  When you show up, Mr. Koger is already

10  handcuffed.  At that point did you believe that your life

11  was in danger?

12      A     No.

13      Q     Okay.  The rest of the time that you

14  interacted with Koger, did you feel that your life was in

15  danger?

16      A     No.

17      Q     I'm sorry?

18      A     No.

19      Q     Okay.  What about any of the other officers

20  around you while you were interacting with Koger?  At the

21  time when you were present, was their life in danger?

22      A     Not from Koger.  Potentially from a traffic

23  accident that might come down the road but --

24      Q     Not from Mr. Koger; is that true?

25      A     Right.

53

1    Q    Okay.  There's a report that was done by

2    Brandon Bennett.  Are you familiar with that?

3    A    His use of force report --

4    Q    I believe so.  It's a report that --

5    A    -- or response to resistance?  I guess he

6    would have done an offense report too.  Yes, I know that

7    he did some reports.  I'm not familiar with which

8    particular one.

9    Q    Okay.  As sergeant, would you have been

10   responsible for signing off on that report?

11   A    Yes.

12   Q    Well, let me ask you this:  Any of the reports

13   that Officer Bennett did that you would have had to sign

14   on as having reviewed, did they include a recitation of

15   what happened at the trunk of the patrol car with

16   Mr. Koger?

17   A    I don't believe that any of his did.

18   Q    Okay.  Do you know why that would be?

19   A    I don't know.

20   Q    Would it have been your job to correct his

21   report if you saw something in there that was done

22   incorrectly?

23   A    Yes, but I'm not positive I signed off on his

24   use of force in this incident.  I may or may not have.

25   If you've got it, I'll look at it.

54

1        Q       Okay.

2        A       If I don't sign it, my lieutenant can sign it,

3    who was also on the scene.

4        Q       Okay.  Did you yourself do a written use of

5    force report?

6        A       No.

7        Q       And why is that?

8        A       Because at the time policy said that the

9    primary officer would do one and only, if felt necessary,

10   others would be done.

11       Q       Who would have been the primary officer from

12   your point of view?

13       A       Bennett.

14       Q       Okay.  Why did you consider him the primary

15   officer?

16       A       Because he was the primary on the traffic stop

17   and first to go hands on with Mr. Koger.

18       Q       Okay.  Do you know Officer Cook?  I think you

19   said that you do know him, Todd Cook.

20       A       I do.  I've known him for probably 18 years.

21       Q       Okay.  Do you know him through the fact that

22   y'all are both employed with the Hamilton County

23   Sheriff's Office?

24       A       Yes, ma'am.

25       Q       Do you consider him to be an honest person?

55

1     A     Yes, ma'am.

2     Q     **Did you talk to Officer Cook after**

3  **March 8th, 2017, about what had happened that night with**

4  **Mr. Koger?**

5     A     I talked to him on probably a couple of

6  different occasions.

7     Q     **Okay.  What did you-all talk about?**

8     A     I kept it very short.  I told him that I

9  appreciated his honesty and what he thought he saw, but

10 if he wasn't sure, he didn't need to say something like

11 that.  And then another time I showed him the video from

12 Sergeant Cannon's car just so he would understand that

13 point of view of it.

14    Q     **Okay.  And are you considered his superior?**

15    A     Rank-wise I am, but he's not in my chain of

16 command.

17    Q     **Okay.  What about Officer Bennett?  Did you**

18 **talk to him after March 8th, 2017, about the events of**

19 **that night?**

20    A     Uh-huh.

21    Q     **Is that a yes?**

22    A     Yes, ma'am.

23    Q     **Okay.  How many times did you talk to Officer**

24 **Bennett about it?**

25    A     Several.

56

1       Q      And what kind of things did you-all talk

2    about?

3       A     He was upset that it even became an issue

4    because Koger was resisting so hard.  Like I said,

5    Bennett is 250 pounds, and Koger is lifting him up off

6    the trunk.

7            He's like, what do they expect us to do?  Just

8    back up and let him go and stuff to that effect.

9       Q     Okay.  It was just that same kind of

10   conversation that you had with him several times or were

11   there different topics?

12      A    He said at one point that it would have

13   been -- it was a deadly force situation when Koger had a

14   gun, would probably have been a less problem with it if

15   he had shot him.

16      Q    What about Officer Smith?  Did you talk to him

17   after March 8th, 2017, about that occurrence?

18      A    Not that I can remember, no memorable

19   conversation.

20      Q    Okay.  When you -- sorry I may skip around

21   now.  I'm trying to make sure I've gotten everything.

22           When you were at the back of the trunk and you

23   say that Koger was resisting or continued resisting, I

24   guess, did you ask for any other officers to help other

25   than Officer Bennett, who was already assisting you?

57

1      A      No.

2      Q      Okay.  **Was there, in your mind, any exigency**

3   **about the situation that prevented you from asking for**

4   **help?**

5      A      I'm just not used to asking for help.  We had

6   adequate officers to deal with him.  There's only so many

7   officers you can put on a person.  If you pile 20 on

8   them, everyone gets in each other's way.

9      Q      **Okay.**

10      A      And we were able to, with reasonable force,

11   accomplish the task that we were trying to do, which was

12   to pat him down and determine that he did not have any

13   weapons.

14      Q      **Okay.  I think you mentioned in one of your**

15   **statements that you didn't want to take Koger to the**

16   **ground at the back of the trunk in order to effectuate**

17   **that pat-down; is that true?**

18      A      Yes.

19      Q      **And why is that?**

20      A      Well, there's two reasons:  One, if someone's

21   resistance is coming from their feet, it's much easier

22   to -- if I can bring them up onto a table or a trunk of

23   the car, if I could get someone and pat them down and

24   their feet are hanging off the end and their hands are

25   handcuffed behind their back, there's very little they

58

1   can do to resist at that point, so he can't leverage

2   against anything.  And if he's on the ground, he could

3   still leverage, try to roll, fight or whatever.  I also

4   have some bad knee issues, feet issues and ankle issues.

5   It actually causes me significant pain to squat down.

6        **Q      Okay.  So if he were laying on the ground, you**

7   **would have to be in a squatted position in order to**

8   **complete the pat-down?**

9        A      Right.

10          MS. PARKER:  Okay.  If I could have a break

11   just a second, I just want to step out and make sure I

12   haven't forgotten anything.

13          MR. HOSS:  Sure.

14          MS. PARKER:  I think we're close to being

15   done.

16          MR. HOSS:  Sure.

17          (Whereupon, a short break was had.)

18   BY MS. PARKER:

19        **Q      I just have a couple more questions,**

20   **Sergeant Carson.**

21          **When you were interacting with Phillip Koger**

22   **on March 8th, 2017, did you hear him complaining about**

23   **any certain injuries, pain in any certain areas?**

24        A      I remember him saying he couldn't breathe, but

25   I don't remember hearing any other complaints while he

59

1    was on the scene with us.

2        Q    Okay.  What specific injuries, if any, did you

3    notice that he had?

4        A    There was a pretty nasty laceration to his --

5    to the area of his left eye, I believe.

6        Q    Was there a fair amount of blood on his face?

7        A    Yes.

8        Q    Okay.  Did you notice any bruising or swelling

9    in any other areas?

10       A    I don't remember any.

11            MS. PARKER:  Okay.  I think that's all I have.

12            MS. HAVLIK:  You want to go ahead?

13            MR. EXUM:  Go ahead.

14                    EXAMINATION

15   BY MS. HAVLIK:

16       Q    Sergeant Carson, my name is Gwen Havlik, and I

17   represent Lieutenant Lawson.  He's one of the officers

18   from the Catoosa County Sheriff's Department.  I just

19   have a few questions for you this morning.

20            Do you know Lieutenant Lawson?

21       A    No.

22            Could you even pick him out of a lineup?

23       A    No.

24       Q    Okay.  Do you remember seeing him there that

25   night?

1    A      I remember seeing a county lieutenant out

2    there that night that I assume was him.

3    **Q      And were you -- did you see him on any of the**

4    **videos, Exhibits 1 through 4, that we watched earlier?**

5    A      Not that I can identify.

6    **Q      Do you know whether Lieutenant Lawson was in a**

7    **position to intervene in the pat-down in any way?**

8    A      I don't know if he was or not.

9    **Q      Let's go back.  At the trunk of the car after**

10   **the elbow strikes and after you crouched down to begin**

11   **the pat-down at Koger's ankles, at that point can you**

12   **take me through -- you said he started to kick?**

13   A      No, he didn't start to kick.  As I started on

14   the pat-down on his ankles and started to work my way up,

15   he kind of hipped out a little with his hips trying to

16   create a gap and then started raising his torso up.  And

17   when he did, being in the position I was, I just scooped

18   him up onto the trunk.

19   **Q      And at that point Bennett was on his left-hand**

20   **side?**

21   A      Bennett was on his right-hand side.  I had

22   been on his left-hand side.

23   **Q      So Bennett is on his right-hand side and you**

24   **were -- you started his ankles more towards his left-hand**

25   **side?**

61

1    A    Well, when I pat someone down, since Bennett

2  was holding his right side, I started at the center, but

3  I had started on his left leg with the pat-down, I

4  believe.

5    Q    Now, is this -- I believe there was something

6  said to the effect of let's pat him down?

7    A    Yes.

8    Q    And at that point is when you actually

9  crouched down to start at his ankle?

10   A    Yes.

11   Q    And you hadn't -- did you say anything to the

12 effect that you were going to -- let me just scoop him

13 up?

14   A    No.  It was just kind of a fluid situation,

15 and I reacted to his resistance.

16   Q    And you had to react quickly?

17   A    Yes.

18   Q    And there was no warning given that you would

19 need to do that?

20   A    No.

21        MS. HAVLIK:  Okay.  I think that's all I have.

22                  EXAMINATION

23 BY MR. EXUM:

24   Q    Sergeant Carson, my name is Jim Exum.  I'm the

25 attorney for Todd Cook.

1              When you arrived on the scene, did you see

2    Deputy Cook?

3         A    I knew he was there, but I can't remember if I

4    saw him.

5         Q    Okay.  When Mr. Koger was at the back of the

6    vehicle and you were attempting to search him, did you

7    know where Deputy Cook was?

8         A    I have no idea where he was.

9         Q    Okay.  I know you said earlier that Deputy

10   Cook is not in your chain of command; is that correct?

11        A    Yes.

12        Q    Were you the highest ranking officer on the

13   scene at that point?

14        A    For Hamilton County Sheriff's Office, yes.

15        Q    Okay.  So would you have been in charge of

16   Mr. Cook or Deputy Cook at that point?

17        A    Yes.

18        Q    Okay.  And you detailed this morning that

19   Mr. Koger was trying to raise up and trying to kick his

20   legs out while you were trying to search him; is that

21   right?

22        A    Yes.

23        Q    Okay.  What would have happened to Deputy Cook

24   if he had tried to intervene while you were trying to get

25   compliance from Mr. Koger?  Would there have been any

1  **disciplinary issues?**

2      A    No.  I mean, if he felt that the force wasn't

3  justified and he came over and got in, then, yes, but

4  no --

5      **Q    Okay.  I don't --**

6      A    -- just to come and help.  If there's -- if

7  Bennett had his right side and I had his left side,

8  there's really nowhere for him to go if he did come over.

9      **Q    Okay.  And do you know where he was at that --**

10 **Deputy Cook was at that point?**

11     A    I have no idea.

12          MR. EXUM:  That's all I have.  Thank you.

13                    EXAMINATION

14 BY MR. STONE:

15     **Q    Just a couple here.  My name is Kevin Stone.**

16 **I represent some of the Fort Oglethorpe officers.**

17          **Do you know Officer Floyd?**

18     A    No.

19     **Q    Do you know Officer Davis?**

20     A    No.

21     **Q    Do you know Officer Bagley?**

22     A    Huh-uh.

23     **Q    So you couldn't identify them if you saw any**

24 **of them?**

25     A    No.

64

1    Q     Okay.  So on the videos -- if you saw them on

2    the videos, you couldn't identify them?

3    A     Huh-uh.

4    Q     That's correct?

5    A     Yes, that's correct.

6    Q     Do you know whether any of them, Floyd, Davis

7    or Bagley, were in a position at any time while you were

8    patting down Mr. Koger at the back of the trunk there to

9    intervene?

10   A     No.

11         MR. STONE:  That's all I have.

12                    REEXAMINATION

13   BY MR. EXUM:

14   Q     I want to clarify one thing with you.  You

15   said just a moment ago that if Bennett was on the right

16   side and you were on the left side, there was no place

17   for Deputy Cook to go?

18   A     Yeah.

19   Q     So would there have been any opportunity for

20   Deputy Cook to have intervened?

21   A     No.

22         MR. EXUM:  Okay.  That's all I have.

23                    REEXAMINATION

24   BY MS. HAVLIK:

25   Q     One more just to clarify.  I think off of

1    **Jim's question just a second ago, if you and Bennett are**

2    **on either side, would there have been an opportunity for**

3    **any officer to intervene?**

4        A    No.

5            MS. HAVLIK:  That's all I have, I think.

6            MS. PARKER:  I have a couple of follow-up

7    questions.

8                  REEXAMINATION

9    BY MS. PARKER:

10        **Q    You've been asked several times if there was**

11    **an opportunity for anyone to intervene.  When you're**

12    **asked the question, are you understanding that to mean**

13    **physically intervene, put their hands on Koger in some**

14    **way?  Is that how you're answering that question?**

15        A    Well, I didn't know -- I'm having trouble

16    taking that question, because I think the accusation on

17    some of them is that they didn't intervene me stopping

18    him resisting, if they're being sued for failure to

19    protect Koger.

20        **Q    So, for instance, if someone had -- I don't**

21    **want to call it command -- given a verbal command to you,**

22    **whether it was a command or not, a statement, hey, stop**

23    **or don't do that or calm down, you would have been able**

24    **to hear them; correct?**

25            MS. HAVLIK:  Object to form.

1     A    It depends.  I mean, I was -- quite honestly,

2  I was in a bit of tunnel vision once we went to hands on.

3  That's why I can't say for sure who was where.  When you

4  get into a critical incident, whether it be a fight or

5  getting shot at, time may slow down, speed up for you.

6  You're going to have audio distortion or audio exclusion,

7  which I think that night I had audio exclusion.  I didn't

8  remember Koger saying anything at the back of the trunk.

9  But all the stuff between him and Bennett quit.  And all

10  that that you can hear on the video, I did not hear that

11  night.

12     **Q    (By Ms. Parker) Okay.  But as far as you know,**

13  **there wasn't anything preventing anyone on the scene from**

14  **talking because you --**

15     A    Again, they could have talked or --

16     **Q    Okay.  You had mentioned in response to**

17  **someone's question that you had to react quickly when you**

18  **were referencing putting him on the trunk.  Why is it**

19  **that you had to react quickly?**

20     A    There are a couple of reasons:  One, I've got

21  a -- at that point I'm at a great disadvantage when I'm

22  squatted down at someone ankles that they themself are --

23  I believe he's 6',3" and close to 200 pounds, Mr. Koger.

24  So had he have broke away from Bennett and I'm on the

25  ground, then I'm obviously a good soccer ball for him at

 1    that point.  But on the other hand, when you're going to

 2    move to scoot someone, you're doing it between the legs.

 3    It's actually something that's used commonly in athletic

 4    wrestling, middle school, high school and collegiate

 5    wrestling.  It's called a high crotch lift.  You just

 6    don't slide in there, because people know what's coming,

 7    and they block it, twist or whatever.

 8              He was already blocking and twisting and

 9    trying to do what he could to keep from getting patted

10    down.  So you have to move quickly to get in there

11    undetected or not show your intentions so he can't

12    deflect it.

13         Q     Okay.  I believe Mr. Exum asked a question and

14    characterized it as kicking his legs out.  That wasn't

15    your testimony.  Your testimony was not that he had tried

16    to kick you or anyone with his foot?

17         A     No.  He kicked his hips out.  If I said

18    kicked, I meant kicked his hips out.  He --

19         Q     Okay.  So -- go ahead.

20         A     He would have the potential to kick while I

21    was down there.

22         Q     Before being lifted up onto the trunk, both of

23    his feet stayed on the ground; is that true?

24         A     Yes.

25         Q     Okay.  The high crotch lift that you're

68

1    **talking about in wrestling, is that something you were**

2    **ever taught in any law enforcement training?**

3         A    I can't say.  I've had a lot of defensive

4    tactics and hands-on training in law enforcement.  I will

5    add, it doesn't have anything to do with grabbing

6    testicles.  I know that's part of the accusation here,

7    and you don't do that.  Your hand passes through between

8    the legs and goes up in the upper groin area just for a

9    lift.

10        **Q    Okay.  Earlier you mentioned that you have to**

11   **do that quickly so they don't know what's coming; is that**

12   **right?**

13        A    Yes, ma'am.

14        **Q    And you would agree with me that you have to**

15   **apply some amount of force in order to lift the**

16   **offender's body off the ground; is that true?**

17        A    Yes.

18        **Q    Okay.  And I believe in your report it states**

19   **that -- well, where was your other hand?**

20        A    I grabbed his left hip and balanced him and

21   slid him up on the trunk.

22        **Q    Okay.  So was -- his left hip, was that with**

23   **your left hand, then?**

24        A    Uh-huh.

25        **Q    Did your left hand pick up any of his weight**

1  **off the ground or was it all from the groin area being**

2  **lifted?**

3      A      Probably all from the groin area -- well, no.

4  My left hand would have got some, and then Bennett would

5  have picked up some of the weight too being on his right

6  shoulder.

7      **Q      Okay.   You mentioned about Mr. Koger's**

8  **testicles.   Do you know whether you touched his**

9  **testicles?**

10     A      I know I touched them.   In the pat-down, it's

11  not uncommon to touch them to know, yes, that's testicle;

12  no, there's no dope around them.   It was through his

13  clothing.   I did not squeeze them, but I did touch them.

14     **Q      Okay.   And that would have been while he was**

15  **up on the trunk?**

16     A      Yes, ma'am.

17           MS. PARKER:   That's all I have.

18           MS. HAVLIK:   I don't have anything else.

19           MR. EXUM:   I don't have anything else.

20           FURTHER THIS DEPONENT SAITH NOT.

21                 (Signature reserved.)

22

23

24

25

70

```
 1                        ERRATA PAGE
 2            I, SGT. GREGGORY THOMAS CARSON, the witness
            herein, have read the transcript of my
 3          testimony and affirm the same is true and
            correct, to the best of my knowledge, with
 4          the exception of the following changes noted
            below, if any:
 5
 6     Page/Line                      Change/Reason
 7     _____        _____
 8     _____        _____
 9     _____        _____
10     _____        _____
11     _____        _____
12     _____        _____
13     _____        _____
14     _____        _____
15     _____        _____
16     _____        _____
17     _____        _____
18     _____        _____
19     _____        _____
20     _____        _____
21                     _____
                          Greggory Thomas Carson
22                     Sworn to and subscribed before me,
                       this the _____ day of _____, 2019.
23
                       _____
24                     Notary Public
                       My Comission expires:
25
```

1                    REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE:

3    COUNTY OF HAMILTON:

4                    I, Sue Anne Vaughn, Court Reporter, so

5    hereby certify that the foregoing deposition was

6    stenographically recorded by me as stated in caption;

7    SERGEANT GREGGORY THOMAS CARSON; pages 1 to 71,

8    inclusive, were reduced to typewriting under my direction

9    and supervision and the deposition is a true and correct

10   record, to the best of my ability, of the

11   testimony/evidence given by the deponent.

12                   I further certify that I am not a relative

13   or employee or counsel of any of the parties to the

14   action in which this deposition was taken, and further

15   that I am not a relative or employee of any attorney or

16   counsel employed by the parties hereto, nor financially

17   or otherwise interested in the outcome of the action.

18   All rates charged are usual and customary.

19                   In witness whereof, I have hereunto set my

20   hand this 5th day of July, 2019.

21

22                   *Sue Anne Vaughn*

                     Sue Anne Vaughn, LCR #346

23                   and Notary Public.

                     My commission expires 5/9/2021.

24

25

# EXHIBITS

