1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

-------------------------------------------------------

PHILLIP WAYNE KOGER,

   Plaintiff,

     vs.

GREGGORY CARSON, Individually;
STEPHEN BAGLEY, Individually;
TODD COOK, Individually;
JAMES DAVIS, Individually;
DYLON FLOYD, Individually; and
ANTHONY LAWSON, Individually,

   Defendants.

CIVIL ACTION FILE
NO. 4:18-CV-00053-HLM

**ORIGINAL**

-------------------------------------------------------

THE DEPOSITION OF
TODD COOK
JUNE 20, 2019

-------------------------------------------------------

DEBRA L. HUNTOON, LCR
ANGEL & ASSOCIATES COURT REPORTERS, INC.
POST OFFICE BOX 1145
HIXSON, TENNESSEE  37343
(423) 876-4435

1    APPEARANCES:
2          FOR THE PLAINTIFF:
                 HEATHER G. PARKER, ESQUIRE
3                MICHAEL HIBDON, ESQUIRE
                 BULLOCH FLY HORNSBY & EVANS
4                302 NORTH SPRING STREET
                 MURFREESBORO TN   37133
5
           FOR DEFENDANT, GREGGORY CARSON:
6                JANIE PARKS VARNELL, ESQUIRE
                 DAVIS & HOSS
7                850 FORT WOOD STREET
                 CHATTANOOGA TN   37403
8
           FOR DEFENDANTS, STEPHEN BAGLEY,
9          JAMES DAVIS, DYLON FLOYD:
                 KEVIN R. STONE, ESQUIRE
10               FREEMAN MATHIS & GARY
                 100 GALLERIA PARKWAY, SUITE 1600
11               ATLANTA GA   30339
12         FOR DEFENDANT, TODD COOK:
                 JAMES F. EXUM, III, ESQUIRE
13               CHAMBLISS BAHNER & STOPHEL
                 605 CHESTNUT STREET, SUITE 1700
14               CHATTANOOGA TN   37450
15         FOR DEFENDANT, ANTHONY LAWSON:
                 GWENDOLYN HAVLIK, ESQUIRE
16               DREW ECKL & FARNHAM
                 303 PEACHTREE STREET NE, SUITE 3500
17               ATLANTA GA   30308
18         ALSO PRESENT:
                 GREGGORY CARSON, DEFENDANT
19
20
21
22
23
24
25

I N D E X

                                                    Page
The Deposition of TODD COOK
    Direct Examination by Ms. Parker............     5
    Cross Examination by Ms. Varnell............    62
    Redirect Examination by Ms. Parker..........    67

E X H I B I T S

Number                   Description              Page

1   Photograph................................    44

2   Photographs (collective)..................    45

3   Photograph................................    50

4   Photograph................................    51

5   Photograph................................    52

6   Photographs (collective)..................    52

7   Photograph................................    53

8   Photograph................................    55

9   Photograph................................    55

10  Photographs (collective)..................    59

11  Defendant Todd Cook's Answers to Plaintiff's
    First Set of Interrogatories and Request for
    Production of Documents...................    69

4

1          The deposition of TODD COOK, the Defendant,

2    called as a witness at the instance of the Plaintiff,

3    for use pursuant to the Federal Rules of Civil

4    Procedure, taken on the 20th day of June, 2019, at the

5    offices of Davis & Hoss, 850 Fort Wood Street,

6    Chattanooga, Tennessee 37403, before Debra L. Huntoon,

7    Licensed Court Reporter and Notary Public, pursuant to

8    the stipulation of counsel.

9          The deposition is being taken by agreement

10   of counsel for the Plaintiff and the Defendants.  It is

11   agreed that the deposition shall be taken in machine

12   shorthand by Debra L. Huntoon, Licensed Court Reporter

13   and Notary Public, that the witness may be sworn by the

14   said Licensed Court Reporter, and that the signature of

15   the witness to the completed deposition is waived.

16         It is further agreed that all formalities

17   as to caption, notice, certificate, and mode of

18   transmission are waived, and that the deposition is

19   taken subject to the usual exceptions as to

20   irrelevancy, incompetency, and immateriality, which are

21   reserved to the hearing of the cause, except as to the

22   form of the question.

23

24

25

5

1                        TODD COOK,

2  the Defendant, called as a witness at the instance of

3  the Plaintiff, having been first duly sworn, was

4  examined and deposed as follows:

5                     DIRECT EXAMINATION

6  BY MS. PARKER:

7      Q.    Officer Cook, I'm going to go over some

8  standard stuff with you first.

9            Have you ever given a deposition before?

10     A.    Yes.

11     Q.    Okay.  So you know to make sure you answer

12 out loud, try not to answer with a head nod, things

13 like that.

14     A.    Yes.

15     Q.    If I ask you a question that you don't

16 understand, just ask me to repeat it or I'll change the

17 way I word it if I need to.  Okay?

18     A.    Okay.

19     Q.    You're not currently under any medicines or

20 drugs or alcohol that would make it where you couldn't

21 answer truthfully today?

22     A.    No.

23     Q.    Would you state your name, please?

24     A.    Todd Cook.

25     Q.    Is it okay if I call you Officer Cook?

1     A.     That's fine.

2     Q.     **Officer Cook, how are you currently**

3  **employed?**

4     A.     Hamilton County Sheriff's Office.

5     Q.     **And how long have you been there?**

6     A.     Twenty-four years.

7     Q.     **And what's your position with the sheriff's**

8  **office?**

9     A.     Traffic investigator.

10    Q.     **What does that mean for, like, your typical**

11 **daily duties?**

12    A.     I investigate wrecks daily and do

13 enforcement, wrecks being parking lot fender-benders to

14 fatals and everything in between.

15    Q.     **As an employee with the Hamilton County**

16 **Sheriff's Office, you've received training, I assume?**

17    A.     In?

18    Q.     **Just generally as a --**

19    A.     Yes.

20    Q.     **-- police officer.**

21    A.     Oh, yes.

22    Q.     **We've learned already that there are certain**

23 **trainings that you have to do every year, is that**

24 **correct?**

25    A.     Correct.

1    Q.    And use of force training is one of those

2  required trainings every year?

3    A.    It's -- we do in-service training.  We don't

4  necessarily train in use of force every year.  We do

5  defensive tactic type stuff every year.

6    Q.    So explain that to me.  What is that?  What

7  is defensive tactic?  What's that like?

8    A.    It's just different types of defensive

9  tactics that we would use, using our hands and

10  intermediate weapons.

11    Q.    Is that something where you typically go,

12  like, hands-on in the training with someone or is it --

13    A.    Yes.

14    Q.    -- like, a written book?

15    A.    Hands-on.

16    Q.    Okay.  Do you have any specialized training

17  or certifications outside of just what the standard --

18    A.    No.

19    Q.    -- training procedures are?

20    A.    (Moves head side to side.)

21    Q.    Are you familiar with Hamilton County's use

22  of force policies?

23    A.    Yes.

24    Q.    Do you know whether or not there's a policy

25  or training instruction that instructs you when you

8

1    should intervene in another officer's use of force?

2    A.    Yes.

3    Q.    And what -- tell me what that policy is.

4    A.    I'm not exactly sure how it's worded.

5    Q.    Okay.  What's your understanding of -- when

6    would it be your job essentially to intervene in

7    someone else's -- in another officer's use of force

8    with a suspect?

9              MR. EXUM:  Object to form.  You may answer.

10             THE WITNESS:  In my opinion, if it's -- if

11   what I'm seeing is inappropriate.

12   BY MS. PARKER:

13   Q.    Have you ever had to do that in your

14   twenty-four years with the sheriff's department?

15   A.    No.

16   Q.    Did you know Phillip Koger before

17   March 8th, 2017?

18   A.    No.

19   Q.    On March 8th, 2017, when did you find out

20   that the suspect that the officers were engaging with

21   was Phillip Koger?

22   A.    After everything was over with, after he was

23   identified.

24   Q.    So after he had been arrested that night?

25   A.    Yes.

1    Q.    Okay.  At what point did you enter the

2  pursuit of Mr. Koger?

3    A.    I'm sorry?  At what point did --

4    Q.    Did you enter the pursuit of Mr. Koger.

5    A.    It was on Highway 41, I believe, in Catoosa

6  County.

7    Q.    Did you see when Mr. Koger's car came to a

8  stop?

9    A.    Yes.

10    Q.    Okay.  When was the first time you

11  physically were able to see Mr. Koger?

12    A.    When I got out of my car and ran up to where

13  he was at.

14    Q.    Where was he whenever you approached the

15  vehicle?

16    A.    He was on the ground.

17    Q.    Okay.  Tell me what it was like.  Who --

18  what officers were there?  What did you see?

19    A.    The other officers that were there were from

20  other agencies.  I don't know them.  But there were

21  four or five or six officers around him trying to

22  subdue him.

23    Q.    Was he already handcuffed when you arrived?

24    A.    No.

25    Q.    Did you assist in putting handcuffs on him?

10

1    A.    No.

2    Q.    At any point when he was -- well, tell me

3  where he was in relation to the vehicles that were on

4  the scene when you first arrived.

5    A.    When I first got there, he was on the ground

6  right outside his vehicle on the driver's side.

7    Q.    Okay.  And that's a white Camaro, is that

8  correct?

9    A.    Correct.

10   Q.    And when you -- could you see that he was

11 resisting the officers who were trying to arrest him at

12 that point?

13   A.    Yes.

14   Q.    What kind of things was he doing to resist?

15   A.    What I could see, he was on his hands and

16 wasn't giving them his hands underneath his body.

17   Q.    So he was laying on top of his --

18   A.    Correct.

19   Q.    -- hands underneath his body after he was

20 laying on the ground, is that correct?

21   A.    Correct.

22   Q.    What's the next thing that you remember

23 doing after you approached the scene?

24   A.    There was a gun on the ground close to

25 where -- kind of in between where he was laying and his

11

1   vehicle.  I let the other officers -- the officers that

2   were trying to gain control of him know that there was

3   a gun on the ground, as if to say he could be -- have

4   another weapon on him.  I was making them aware of

5   that.

6        Q.   And where were you -- were you standing with

7   the officers next to Mr. Koger or where were you?

8        A.   Yes, I was standing behind them.

9        Q.   How far away from Mr. Koger do you think you

10  were at that point?

11       A.   Very close, probably a foot.

12       Q.   Okay.  What's the next thing that you

13  remember?

14       A.   Mr. Koger was -- in a matter of a minute or

15  less, he was placed into handcuffs and was placed on

16  his feet.

17       Q.   Where were you at when you saw him being

18  handcuffed?

19       A.   I was still close in proximity there.

20       Q.   So you may have moved a little bit, but

21  not --

22       A.   Not much.

23       Q.   -- any distance away?

24       A.   No.

25       Q.   Okay.  What did you do next after you saw

12

1    **him being handcuffed?**

2    A.    He was -- what did I do?

3    **Q.    Yes.**

4    A.    Nothing.  I didn't -- he was handcuffed, so

5    there was nothing for me to do.

6    **Q.    Okay.  Did you see him ever be moved from**

7    **the area right there next to his vehicle to some other**

8    **location?**

9    A.    Yes.

10   **Q.    Okay.  Tell me about that.**

11   A.    He was moved from where he was originally at

12   on the ground to the back of one of the patrol cars.

13   **Q.    Do you know whose patrol car it was?**

14   A.    I think it was Deputy Bennett's.

15   **Q.    Do you know Deputy Bennett?**

16   A.    Yes.

17   **Q.    How long have you known him?**

18   A.    As long as he was -- has been at the

19   sheriff's office, which, I'm guessing, is around eight

20   years maybe.

21   **Q.    Okay.  You mentioned earlier seeing a gun on**

22   **the ground near Mr. Koger when he was laying outside of**

23   **his vehicle.  Did you see anyone do a pat-down of**

24   **Mr. Koger to check for weapons near his vehicle --**

25   **while he was near his vehicle?**

13

1    A.    While he was where?

2    Q.    **While he was close to his vehicle laying on**

3    **the ground, did you see anyone do a pat-down, a check**

4    **for weapons after they put him in handcuffs?**

5    A.    While he was still on the ground, I didn't

6    notice anyone pat him down.

7    Q.    **Okay.  Where were you on the scene when you**

8    **saw Mr. Koger at the back of the trunk of what you**

9    **believe was Deputy Bennett's patrol car?**

10    A.    I was standing back behind where they were

11    at.

12    Q.    **When you say "they," are you talking about**

13    **Mr. Koger and -- who else?**

14    A.    Deputy Bennett and the -- however many other

15    officers were there from other jurisdictions that I

16    don't know who they are.

17    Q.    **Okay.  How far behind them do you think you**

18    **were?**

19    A.    Twenty feet maybe.

20    Q.    **Were you in the road, in the median?**

21    A.    I was in the road.

22    Q.    **How did you -- what made you walk to the**

23    **location where you went?**

24    A.    I just walked back there with them.  No

25    particular reason.

14

1      Q.     Well, I guess twenty feet away seems kind of
2   far to me, if you're standing with them.  So did you
3   walk back -- was there a vehicle back where you were
4   standing or --
5      A.     No.  No, there wasn't.
6      Q.     Okay.  Do you recall anything in particular
7   that Mr. Koger was saying as he was being moved from
8   next to his vehicle to the back of the patrol car?
9      A.     No.
10      Q.     Do you recall anything that any officers
11   were saying to him at that point?
12      A.     No.
13      Q.     Tell me what you remember seeing at the back
14   of the patrol car once Mr. Koger got there.
15      A.     Mr. Koger was back there behind the car with
16   Deputy Bennett and two to three other officers, but I
17   don't know who they are.
18      Q.     Okay.  Do you recall what the officers were
19   doing at the back of the trunk with Mr. Koger?
20      A.     They were giving him strikes.
21      Q.     Do you know why he was at the back of the
22   patrol car as opposed to being put inside the patrol
23   car?
24      A.     No.
25      Q.     Did you see who was giving him strikes?

15

1   A.   I saw Deputy Bennett.

2   **Q.   What did you see Deputy Bennett do?**

3   A.   I'm sorry?

4   **Q.   What did you see Deputy Bennett do?**

5   A.   Strike him.  I don't remember with what, but

6   I saw him strike him.

7   **Q.   Do you remember where the strikes landed on**

8   **Mr. Koger?**

9   A.   No, I can't remember where.

10  **Q.   Do you recall whether it was, like, the**

11  **bottom half, his legs, versus his upper body?**

12  A.   I believe upper body.

13  **Q.   Okay.  I'm not trying to trick you, I just**

14  **want to get as specific as you remember.  Okay?**

15  A.   (Moves head up and down.)

16  **Q.   Do you recall Sergeant Carson being at the**

17  **back of the patrol vehicle?**

18  A.   Yes.

19  **Q.   Do you know Sergeant Carson?**

20  A.   Yes.

21  **Q.   How long have you known him?**

22  A.   Ever since I've been with the sheriff's

23  office.

24  **Q.   Okay.  So however long the two of you have**

25  **been there together, that's how long you've known him?**

1    A.    I don't remember if -- I can't remember

2  exactly when he started there, but -- I don't know if

3  he's -- I knew him once I was -- left Corrections and

4  went to Street Patrol.

5    **Q.    Okay.  Do you know him outside of your**

6  **employment?  Were you-all friends before you started**

7  **working at the sheriff's office?**

8    A.    I knew of Gregg.  I don't know him outside

9  of work.

10    **Q.    You-all weren't hanging out on the weekends**

11  **or when you were off work if it wasn't a weekend?**

12    A.    No.

13    **Q.    Do you -- is Sergeant Carson considered your**

14  **superior at work?**

15    A.    He's a patrol sergeant.

16    **Q.    Okay.  You're going to have to tell me**

17  **what -- I don't know what a patrol sergeant is.  Beside**

18  **your job or above it in the hierarchy or totally left**

19  **field?**

20    A.    In what I do, I have a lieutenant and a

21  sergeant.  They weren't on duty at the time.

22    **Q.    Okay.**

23    A.    So if I'm on duty, with the hours I work, I

24  would fall under the direction of a patrol sergeant --

25    **Q.    Okay.**

1     A.    -- or patrol corporal or patrol lieutenant.

2     Q.    **Okay.  So on the scene with Mr. Koger on**

3 **March 8th, 2017, who -- did you have a superior on**

4 **scene?**

5     A.    Me in particular?

6     Q.    **Yes.**

7     A.    One of my supervisors?

8     Q.    **Well, was there anybody on scene in Hamilton**

9 **County that would have been superior to you?**

10    A.    Sergeant Carson and Corporal Baxter were on

11 scene.

12    Q.    **Do you recall when you noticed that Sergeant**

13 **Carson was on scene?**

14    A.    It was a few minutes after Koger had been

15 placed in the cuffs -- handcuffs in behind the car.

16    Q.    **Okay.  So you got on scene before Sergeant**

17 **Carson arrived?**

18    A.    Yes.

19    Q.    **Do you recall seeing Sergeant Carson apply**

20 **any strikes to Mr. Koger?**

21    A.    Yes.

22    Q.    **Where did that occur on the scene?  Was that**

23 **at -- by the Camaro or was that by the trunk?**

24    A.    Behind the car -- patrol car.

25    Q.    **Okay.  Tell me what you saw Sergeant Carson**

1    do.

2        A.    Gave him some strikes.

3        Q.    **And when you say "him," that's Mr. Koger?**

4        A.    Yes.

5        Q.    **Do you remember if that was before or after**

6    **Deputy Bennett had given the strikes?**

7        A.    After, I believe.

8        Q.    **Okay.  Do you remember seeing where those**

9    **strikes landed on Mr. Koger's person?**

10       A.    Upper body and I remember one lower body.

11       Q.    **Do you remember whether the -- are we**

12   **talking about open hand, closed hand?**

13       A.    I don't remember what part Sergeant Carson

14   was using.

15       Q.    **Do you recall what Mr. Koger was doing at**

16   **the time -- or could you see what Mr. Koger was doing**

17   **at the time the strikes were being applied?**

18       A.    I could see.

19       Q.    **Okay.  What was he doing at that time?**

20       A.    He was just screaming.

21       Q.    **Was he resisting the officers that you know**

22   **of?**

23       A.    In my opinion, no.

24       Q.    **If Sergeant Carson or Deputy Bennett had**

25   **requested assistance from other officers, one, do you**

1    think you would have been able to hear them if they had

2    asked for that?

3        A.    If they asked for assistance?

4        Q.    Yes.

5        A.    I was close enough to have heard them.  If

6    they asked for assistance, I could have heard it.

7        Q.    Okay.  Did they ever ask for assistance?

8        A.    Not that I remember.

9        Q.    Other than Sergeant Carson and Deputy

10   Bennett, was there any other officer that you could see

11   that had their hands on Phillip Koger?

12       A.    If there were other officers, I would not

13   know who they were.

14       Q.    Okay.  Do you know a Deputy Smith?

15       A.    Yes.

16       Q.    Did you -- do you recall seeing him there

17   that night?

18       A.    He was involved in the pursuit.  Where he

19   was during this, I don't know.  I don't -- I mean, he

20   was on scene.  But exactly where, I'm not sure.

21       Q.    Okay.  Tell me about -- you said there were

22   upper body and then one lower body.  The lower body

23   strike, do you recall -- tell me what you remember

24   about that.

25       A.    I just remember one strike to Mr. Koger's

1    groin area.

2    Q.    Do you recall how Mr. Koger reacted to that

3    strike?  Do you remember what his reaction was?

4    A.    Just screaming.  I believe he was screaming.

5    Q.    Have you ever had any training that would

6    have instructed you to use a strike to the groin area

7    on a suspect?

8    A.    Personally, no.

9    Q.    Have you ever used a method like that to

10    gain control over a suspect?

11    A.    No.

12    Q.    Maybe this is a differentiation you're not

13    making, but when I say "suspect," a suspect or someone

14    who's already in custody, would that change your

15    answer?

16    A.    No.

17    Q.    Okay.  I'm going to show -- we're going to

18    show you some videos, and I want you to see if you can

19    recognize where you --

20    A.    Okay.

21    Q.    -- if you see yourself in any of these

22    videos.

23    Because there's audio on the video, if

24    you'll just raise your hand or make a motion, we'll

25    pause it and then we can talk about what we're seeing

1    on the screen.  Is that fair?

2         A.    Okay.

3         Q.    **The first video, I believe, is the dash cam**

4    **from your car.  We have previously marked that as**

5    **Exhibit 1 to Sergeant Carson's deposition.  And we are**

6    **going to begin this video at 23:12:30.**

7                   **(Video being played and viewed.)**

8                   THE WITNESS:  That is me there.

9    BY MS. PARKER:

10        Q.    **So we are at 23:13:07 on the video.  And**

11   **that's you that just entered the screen on the**

12   **left-hand side of the screen, is that correct?**

13        A.    Yes.

14                   (Video being played and viewed.)

15   BY MS. PARKER:

16        Q.    **Is this you here that was looking inside the**

17   **vehicle, or where are you?**

18        A.    No, ma'am, I'm right kind of -- my hands are

19   out like this.

20        Q.    **Okay.**

21        A.    You can kind of see my arms out.

22        Q.    **Are you kind of leaning over --**

23        A.    Yes, ma'am.

24        Q.    **-- to see what's going on?**

25        A.    Yes.

22

1      Q.     Okay.   That's at 23:13:24.

2             (Video being played and viewed.)

3   BY MS. PARKER:

4      Q.     Are you still right there in that mix with

5   everybody?

6      A.     Yes.

7      Q.     Okay.

8      A.     I believe that's me kind of in the center

9   standing up, not in the --

10     Q.     Right here?

11     A.     There, yes.

12     Q.     Okay.  So sort of in the middle, looks like

13  there's three people we can see, and you would sort of

14  be the person in the middle, is that correct?

15     A.     Correct.

16     Q.     That's at 23:13:48.

17            (Video being played and viewed.)

18  BY MS. PARKER:

19     Q.     Do you see yourself in this where we stopped

20  it here?

21     A.     In just a few more seconds, I walk back to

22  my car to turn the siren off.

23            (Video being played and viewed.)

24            THE WITNESS:  That's me there, walking back

25  to my car.

1  BY MS. PARKER:

2      Q.    At 23:14:08, we can see you walking towards

3  the camera, is that correct?

4      A.    Correct.

5            (Video being played and viewed.)

6  BY MS. PARKER:

7      Q.    And it looks like you have on long sleeves,

8  is that correct?

9      A.    Uh-huh.

10     Q.    Do you know whether the other Hamilton

11  County officers also would have been wearing that same

12  uniform?

13     A.    I don't remember what they had on that

14  night.

15     Q.    Okay.  Were you going to say something?

16     A.    No, ma'am.

17     Q.    Okay.

18            (Video being played and viewed.)

19            THE WITNESS:  That's me again, walking back

20  up.

21  BY MS. PARKER:

22     Q.    For the record, that's 23:14:26.

23            (Video being played and viewed.)

24  BY MS. PARKER:

25     Q.    From watching this video, can you tell who

24

1    any of the other officers are that you see in this

2    shot?

3         A.    No, ma'am.

4         Q.    Okay.  But I believe that -- just from your

5    knowledge of the night, do you know what Hamilton

6    County officers would have been involved in that?

7         A.    I know Deputy Bennett was there.  Deputy

8    Smith, I'm not sure about.

9         Q.    Okay.

10               (Video being played and viewed.)

11   BY MS. PARKER:

12        Q.    The way that your dash cam works, the audio

13   that we hear, where is that coming from?

14        A.    It's probably -- it's either -- there are

15   microphones -- I have a body mic on, and there are

16   microphones in my car, too.

17        Q.    Okay.

18        A.    So the radio traffic could be from the

19   inside of my car.

20        Q.    Okay.  Voices that appear to be from on

21   scene, though, would be picked up from your body mic,

22   is that correct?

23        A.    Yes.

24        Q.    So that would be near -- at least within the

25   vicinity that your body mic can pick up whatever those

25

1   sounds are?

2       A.     Yes.

3       Q.     Okay.

4              (Video being played and viewed.)

5   BY MS. PARKER:

6       Q.     At this point in the video, we're

7   at 23:15:14.  Can you see from the video whether or not

8   Sergeant Carson has arrived on scene?

9       A.     No.

10      Q.     Where are you, you know, during this time?

11      A.     I'm -- the times I've watched this video

12  before, I believe this is where I lose myself as far as

13  in the mix with the other officers.

14      Q.     Do you think you're still in this big huddle

15  of --

16      A.     Yes.  From what I remember, I'm still there

17  in that vicinity.

18      Q.     Okay.

19             (Video being played and viewed.)

20  BY MS. PARKER:

21      Q.     So in the video, we're at 23:15:37.  Can you

22  see that Mr. Koger was stood up and he started walking

23  to the back of the patrol car?

24      A.     Yes.

25      Q.     So you would be one of these officers who is

26

1    sort of following behind that we see?

2        A.    Yes.

3        Q.    But you don't know exactly which one of

4    those people you are?

5        A.    No.

6        Q.    Okay.

7              (Video being played and viewed.)

8    BY MS. PARKER:

9        Q.    We're at 23:15:50.  Do you know, from your

10   memory or on the video, where you would have been at

11   this time?

12       A.    From the video, not memory.  I'm thinking

13   somewhere in -- either in the middle there or in the

14   back.

15       Q.    Okay.

16       A.    I'm thinking, at this point, I'm in the back

17   of the -- where the vehicle is at, the patrol car.

18       Q.    So behind the patrol vehicle?

19       A.    Yes.

20       Q.    So that would be kind of towards the

21   right-hand side of the vehicle?

22       A.    Yeah.  Going from memory, because I lose

23   myself in the video.

24       Q.    Okay.

25             (Video being played and viewed.)

27

BY MS. PARKER:

    **Q.**   **Is this you walking back here?  Can you tell?**

    A.   It's hard to tell, but no, I don't believe so.

    **Q.**   **Okay.**

    A.   I can't say for sure from the video.

    **Q.**   **All right.**

        **(Video being played and viewed.)**

BY MS. PARKER:

    **Q.**   **You would agree, though, that it appears that this person has their back to the camera?**

    A.   Yes.

    **Q.**   **Whether that's you or someone else?**

    A.   Right.

    **Q.**   **Okay.**

        **(Video being played and viewed.)**

BY MS. PARKER:

    **Q.**   **Since the point when you said that you kind of lose yourself in that shuffle there, have you seen -- been able to see yourself anywhere else on the video?**

    A.   Not yet.

    **Q.**   **Okay.  We're at 23:16:50.**

        **(Video being played and viewed.)**

28

1    BY MS. PARKER:

2        Q.    **Do you know who either of these two officers**

3    **are that appear to be walking away from the crash -- or**

4    **the camera?**

5        A.    No, I have no idea.

6        Q.    **Based on what they're wearing, is that a**

7    **uniform that a Hamilton County officer would wear, that**

8    **brownish --**

9        A.    That's the only thing that really helps me

10   distinguish between ourselves.  And when I say

11   "ourselves," in Hamilton County, we wear the blue.

12          A lot of agencies in Georgia wear the tan

13   pants and the lighter tan shirts.  Georgia State Patrol

14   wears the blue pants with the lighter blue shirt.

15          And I think there was an agency down there,

16   possibly Fort Oglethorpe Police, that have on the same

17   type uniform as us, as far as the top and bottom blue.

18       Q.    **Okay -- making it very hard to distinguish**

19   **between you guys and the -- what we believe is Fort**

20   **Oglethorpe on the scene?**

21       A.    Yes.

22       Q.    **Okay.**

23             **(Video being played and viewed.)**

24   BY MS. PARKER:

25       Q.    **Okay.  So it looks like we've reviewed that**

29

1    whole video.

2           You didn't ever see yourself come back on

3    the screen as far as what the video angle showed?

4       A.    No.   The times I've watched it before, I

5    lose myself in it.

6       Q.    Okay.   We're going to play another video.

7    This one, we believe, was from Officer Smith's dash

8    cam, which has been marked already as Exhibit 2 to

9    Sergeant Carson's deposition.

10          The same rules for this one, if you do ever

11   see yourself on this one, please let us know and we'll

12   stop it and mark the time.

13              (Video being played and viewed.)

14          THE WITNESS:   That is me there, bending

15   over.

16   BY MS. PARKER:

17      Q.    Okay.   We're at 23:13:17 on the video.   And

18   at the time stamp paused, we're kind of looking at your

19   back here, is that right?

20      A.    Yes.

21      Q.    Okay.   It doesn't look like we can really

22   see any other officers there, but you're there, from

23   your memory, crouched down just out of view of the

24   camera?

25      A.    Yes, ma'am.

30

1              (Video being played and viewed.)

2    BY MS. PARKER:

3        Q.    **Would that have been in that timeframe when**

4    **you saw the weapon and you were trying to instruct the**

5    **other officers that there was a weapon?**

6        A.    I think, looking at that, that's what I was

7    doing, I think, when I was kind of crouching, because

8    there were some sirens left on, it was loud, we was

9    yelling, Gun, Gun, and kind of motioning to the ground

10   where it was at.

11       Q.    **Okay.  So you were crouching down so that**

12   **you could make sure they could hear -- the officers**

13   **could hear you?**

14       A.    Yes.

15       Q.    **Okay.**

16              **(Video being played and viewed.)**

17              THE WITNESS:  That's me there, kind of

18   before it went grainy.  You can see me there to the

19   left of the screen.

20   BY MS. PARKER:

21       Q.    **Let's back it up a little bit.  We're going**

22   **to back it up and replay it, just so we can try to**

23   **catch some of it.**

24              **We've backed it up to 23:13:56.  Let's see**

25   **if we can restart it.**

31

1           (Video being played and viewed.)

2           THE WITNESS:  I still kind of lose myself

3    again.

4    BY MS. PARKER:

5       Q.    Okay.

6           (Video being played and viewed.)

7           THE WITNESS:  Right there, standing.  I just

8    stood up.

9    BY MS. PARKER:

10      Q.    Okay.  So we're at --

11      A.    My left shoulder is kind of facing this way.

12      Q.    Okay.  We're at 23:14:01, and you're saying

13   your left shoulder is facing the camera?

14      A.    Yes, ma'am, I think.

15      Q.    Of the two officers there, you would be the

16   one on the right that we can see clearly, is that

17   correct?

18      A.    Correct.

19      Q.    Okay.

20           (Video being played and viewed.)

21   BY MS. PARKER:

22      Q.    At any point in here, have you been able to

23   see yourself back in the camera?

24      A.    No.

25      Q.    Okay.  That's at 23:14:51.

32

1              (Video being played and viewed.)

2   BY MS. PARKER:

3      Q.    Do you recognize any of the other officers

4   in this shot?

5      A.    No.

6      Q.    Okay.  That's at 23:15:26.

7              (Video being played and viewed.)

8   BY MS. PARKER:

9      Q.    In this shot, we're at 23:16:19.  The person

10  to the left, is that a trooper?

11     A.    I'm guessing by the hat, yes.

12     Q.    Okay.

13     A.    I'm not sure.

14     Q.    The hat is the only thing that really gives

15  you a clue, is that true?

16     A.    Yes.

17     Q.    Do you recall there being a trooper on

18  scene?

19     A.    I know there was at least one Georgia state

20  Trooper there.

21     Q.    But you weren't familiar with who that

22  trooper was?

23     A.    No.

24     Q.    Okay.

25              (Video being played and viewed.)

33

1    BY MS. PARKER:

2       Q.    This next video we've marked as Exhibit 3 to

3    Sergeant Carson's deposition.

4            The same rules for this, if you see yourself

5    or if you see anyone else that you recognize, let us

6    know and we'll pause it.

7       A.    Okay.

8            (Video being played and viewed.)

9    BY MS. PARKER:

10      Q.    When you were in the pursuit, I think we saw

11   from the other video that you were actually ahead of

12   where the accident occurred -- the cars collided and

13   Mr. Koger's car stopped, is that correct?

14      A.    Yes.

15      Q.    And you kind of turned your vehicle around

16   to come back to it, is that right?

17      A.    Yes.

18      Q.    Okay.

19            (Video being played and viewed.)

20   BY MS. PARKER:

21      Q.    Do you recognize this person that's coming

22   into frame here?

23      A.    No.

24      Q.    Okay.  That's at 23:12:00.

25            (Video being played and viewed.)

34

BY MS. PARKER:

Q.     Can you recognize that voice?

A.     No.

Q.     Can you hear from the video what was said?

A.     Sounded like, Piece of shit.

Q.     When you were -- sorry, let's mark that.
This is at 12: -- I'm sorry, 23:12:56 is where we've
stopped the video.

       Do you recall hearing someone say that when
you were on scene?

A.     No.

Q.     Okay.

       (Video being played and viewed.)

BY MS. PARKER:

Q.     We're at 23:13:20.  Could you hear someone
asking someone else, Are you okay, Do you need a medic?

A.     Uh-huh.

Q.     Did you recognize that voice?

A.     No.

       (Video being played and viewed.)

BY MS. PARKER:

Q.     We're at 23:13:48.  Can you tell me -- were
you able to see -- is this where they kind of are
bringing Mr. Koger around to the back of the vehicle?

A.     Yeah, that's what it looks like to me.

35

1    Q.    Okay.  Do you recall that Mr. Koger was kind

2    of wearing a lighter-colored shirt?

3    A.    I just -- I didn't know it until I saw it on

4    the video.

5    Q.    Okay.

6    A.    I don't remember what he had on that day.

7    Q.    Is that how you were able to distinguish him

8    from an officer on the video?

9    A.    Yes.

10   Q.    Okay.  But that night, you don't remember --

11   have an independent memory of that?

12   A.    Of what he had on?  No.

13   Q.    Okay.

14         (Video being played and viewed.)

15   BY MS. PARKER:

16   Q.    Can you tell who anyone is in this shot from

17   the video?

18   A.    Not from the video.

19   Q.    Okay.  That's 23:13:52.

20         (Video being played and viewed.)

21   BY MS. PARKER:

22   Q.    Can you recall, just from your independent

23   memory, who -- I think you've already testified you

24   remember Deputy Bennett and Sergeant Carson being at

25   the back of the trunk.

36

1    A.    Yes.

2    Q.    But on this video, you can't distinguish

3 which one of them might be who?

4    A.    No.

5    Q.    Okay.

6          (Video being played and viewed.)

7 BY MS. PARKER:

8    Q.    Did you see those strikes on the video?

9    A.    (Moves head up and down.)

10   Q.    We're at 23:14:03.  From your memory, you

11 testified that you saw both Bennett and Carson give

12 strikes.  Do you know who that would have been at that

13 time?

14   A.    If I -- it would be a guess.  I would say

15 Bennett at that time.

16   Q.    But you can't tell from the video who's

17 doing it?

18   A.    No.

19   Q.    Okay.

20         (Video being played and viewed.)

21 BY MS. PARKER:

22   Q.    That is 23:14:20.  And you haven't seen

23 yourself yet on the video that we can distinguish?

24   A.    No.

25   Q.    Based on your memory and from what you are

37

1  seeing on the video, this is the point in time where

2  you say you thought you would have been behind them

3  somewhere?

4      A.    Correct.

5      Q.    Okay.

6            (Video being played and viewed.)

7  BY MS. PARKER:

8      Q.    This is at 23:15:43.  Did you recognize any

9  of those voices recent in time to when we stopped this

10 video that you could hear on the video?

11     A.    No.

12           (Video being played and viewed.)

13 BY MS. PARKER:

14     Q.    Based on your memory, do you recall where

15 Mr. Koger was taken after the incident at the trunk

16 ended?

17     A.    No.

18     Q.    Okay.  From this video, are you able to tell

19 that he's no longer at the trunk of the car?

20     A.    I don't see him on the video.

21     Q.    Okay.  After the incident at the trunk

22 ended, do you know what you did next?

23     A.    Because of what I do, being a traffic

24 investigator, I knew that we had two wrecked cars and

25 Mr. Koger's car.

38

1          Part of my job is to do what we call an
2    inhouse report.  It's an internal document that I have
3    to fill out and photograph what -- the damage to the
4    vehicles, where they are at rest.
5          At some point, I switched into that mode
6    because I knew that I was on the traffic unit on duty
7    that night.  I knew that responsibility was going to
8    lie with me.
9          As far as photographing the damage to the
10   vehicles, all three vehicles, and gathering information
11   for our inhouse document, at some point, I started
12   talking to the Georgia State Patrol that was there to
13   start asking him if he was going to work the wreck,
14   because part of the documentation is who works the
15   wreck, what agency, their case number.  That all goes
16   on our internal report.
17      **Q.     Okay.  So at some point, you kind of -- you
18   stopped being a part of the scene and started
19   documenting the scene?  Would that be correct?**
20      A.     Correct.
21      **Q.     Okay.  Before I do that, do you recall
22   seeing Mr. Koger receiving any medical treatment?**
23      A.     At some point while I was gathering
24   information for -- when I was doing what I was doing,
25   as far as photographing, gathering information for the

1    internal document, I do recall an ambulance showing up

2    and I do recall seeing Mr. Koger being placed in the

3    back of the ambulance, just kind of looking over my

4    shoulder and seeing it while I was focused on what I

5    was doing.

6        Q.    Okay.   So you weren't paying much attention

7    to it because you were doing something else?

8        A.    No.

9        Q.    Okay.   At this point, we're at 23:15:55.

10   Just based on the quality of the video, you haven't

11   been able to see yourself?

12       A.    I haven't seen myself yet, no.

13       Q.    Okay.   That doesn't mean you weren't there,

14   it's just the quality of the video is pretty bad?

15   Would that be true?

16       A.    It's not the best.

17       Q.    Okay.   I think we can go ahead and stop this

18   one here.   I don't know if there's any other action in

19   this video.   It's quite long.

20            MS. VARNELL:   Since I wasn't here yesterday,

21   can you tell me whose video that was?

22            MR. STONE:   I think it's Cannon's.

23            MS. PARKER:   Yeah, we think it's Cannon's,

24   Sergeant Cannon's.   It's what was marked as Exhibit 3

25   to Sergeant Carson's deposition.   It was already made

1    an exhibit to Sergeant Carson's deposition.

2            MS. VARNELL:  Okay.

3            MR. CARSON:  Is that the one looking at the

4    Georgia car in the back right corner?

5            MS. PARKER:  Right.

6            MR. CARSON:  Yeah.

7            MS. PARKER:  That's Cannon's.

8    BY MS. PARKER:

9        **Q.    There's one more.  This is Exhibit 4 to**

10   **Sergeant Carson's deposition.  This is Officer Davis'**

11   **car, we believe.  We'll start this one at -- 23:11:23**

12   **is where this video is going to begin.**

13           **(Video being played and viewed.)**

14   BY MS. PARKER:

15       **Q.    We're at 23:14:28 on this video.  Officer**

16   **Cook, I know this video is maybe the worst one of all**

17   **of them that we've watched, but can you see anything**

18   **that's going on in this video, whether or not you can**

19   **discern who's who?**

20       A.    No.

21       **Q.    Can you tell that this is the back of the**

22   **patrol car where we've been talking about this incident**

23   **at the trunk?**

24       A.    Yes.

25       **Q.    Okay.  Does it appear that this is the point**

41

1   in time where the officers have moved Mr. Koger to the

2   back of the trunk?

3      A.    Yes.

4      Q.    Okay.  Other than that, are you able to tell

5   me anything specific about the incident from this

6   video?

7      A.    No.

8      Q.    Okay.

9            (Video being played and viewed.)

10  BY MS. PARKER:

11     Q.    This is at 23:14:39.  I think you had

12  mentioned walking to the back of the car with them and

13  maybe being twenty feet away.  From this video shot,

14  can you show me where -- the general area where you

15  think you would have been, or do you think it would

16  have been outside of the view of this camera?

17     A.    From memory, I'm guessing I'm one of those

18  officers.

19     Q.    Sort of that huddle of --

20     A.    Yes.  I haven't picked myself up on this

21  video yet.

22     Q.    Okay.

23            (Video being played and viewed.)

24  BY MS. PARKER:

25     Q.    This is at 23:15:00.  Do you recognize any

42

1    of the voices that you've heard on the video so far?

2       A.    No.

3       Q.    Okay.

4             (Video being played and viewed.)

5    BY MS. PARKER:

6       Q.    This is at 23:17:45.  You haven't been able

7    to see yourself on this video?

8       A.    No.

9       Q.    Or recognize yourself, I guess, on the

10   video?

11      A.    No.

12      Q.    Any of the voices that you've heard on this

13   video, you haven't been able to recognize those voices?

14      A.    No.

15      Q.    Okay.  We'll go ahead and end that one

16   there.

17            Officer Cook, I have some screenshots that

18   we've taken from these videos.  I want to see if you

19   recognize any of the people, including yourself, in any

20   of these screenshots.  But I'll tell you, the quality

21   is not much better than the videos that we've watched.

22            This screenshot shows a time on it

23   of 23:14:15.  Can you -- first, let me -- can you

24   orient me to what I'm looking at there, if you can tell

25   from that, based on what you remember from that night?

43

1     A.    This looks like Deputy Smith's patrol

2  vehicle and the Camaro that Koger was driving.

3     Q.    Okay.  Let me just -- for the record, you're

4  pointing at the right-hand side of the picture --

5     A.    Right.

6     Q.    -- that white patrol car there.  That's

7  Deputy Smith's vehicle?  Is that what you said?

8     A.    Correct.

9     Q.    Okay.

10    A.    That's obviously a patrol vehicle.  From

11  where, I don't know.

12    Q.    Okay.  And that would be the black or

13  dark-colored car?

14    A.    You can see a couple of officers by Koger's

15  vehicle and a larger group of officers to the left of

16  the patrol vehicle you see here.

17    Q.    Okay.  Can you recognize any faces on that

18  vehicle?

19    A.    Recognize any faces on?

20    Q.    I mean, I'm sorry, in the photograph.  Do

21  you recognize who any of the people standing around

22  are?

23    A.    No.

24    Q.    Okay.  Let's mark that one as an exhibit.

25         (Off-the-record discussion.)

44

1                    (The photograph was marked

                     Exhibit No. 1.)

2

3    BY MS. PARKER:

4        Q.    This one is marked 23:14:20.  Can you -- do

5    you recognize any people in that photograph?  Can you

6    tell who anyone is?

7        A.    As far as people, no.

8        Q.    Okay.  Does that appear to be the period in

9    time where the officers have walked to the back of the

10   patrol vehicle where Mr. Koger -- where they took

11   Mr. Koger to the back of the patrol vehicle?

12       A.    I'm guessing yes.  I don't -- in this photo,

13   I do not see Koger.

14       Q.    Okay.  This one is marked as 23:14:21.  Do

15   you see Mr. Koger in that photograph?

16       A.    I see a leg here and what appears to be a

17   white tennis shoe.  I'm going to guess that's Koger.  I

18   don't remember anyone else having on white tennis

19   shoes.

20       Q.    Okay.  The leg there, does it appear, to

21   you, to be off the ground?

22       A.    The foot does.

23       Q.    Okay.

24       A.    Slightly, maybe.  It's hard to tell from

25   this photo.

45

1    Q.    Okay.  There appears to be some other

2  officers kind of standing behind that.

3    A.    Correct.

4    Q.    Is that what you see in that photograph, as

5  well?

6    A.    Yes.

7    Q.    But from this, you just can't discern who

8  those might be?

9    A.    Correct.

10   Q.    It could be you, even, we just can't tell

11  from this photograph, is that true?

12   A.    Correct.

13   Q.    Okay.  Let's just mark both of these

14  together as Collective Exhibit No. 2.

15                        (The photographs were marked

                          Collective Exhibit No. 2.)

16

17  BY MS. PARKER:

18   Q.    This next set -- I think we've determined

19  that this is from Officer Smith's vehicle -- maybe.

20  It's a Hamilton County officer's vehicle.

21           MR. EXUM:  Bennett's vehicle.

22           MS. PARKER:  Bennett's vehicle?  Okay.

23  BY MS. PARKER:

24   Q.    This one has 23:15:59.  Do you recognize

25  either of the officers in that photograph?

46

1    A.    No.

2    Q.    Okay.  This one is 23:16:00.  Do you

3  recognize anyone in that photograph?

4    A.    No.

5    Q.    Okay.  The two officers in the middle of

6  this photograph appear to have on a dark-colored

7  uniform.  Can you tell whether or not that would be

8  Fort Oglethorpe or Hamilton County from this

9  photograph?

10    A.    It's hard to tell the uniform and the patch.

11  I can't -- what agency they're with.  I'm just going by

12  what their faces look like.

13    Q.    Okay.  So this doesn't look like Sergeant

14  Carson or Officer Smith or Officer Bennett to you?

15    A.    No.

16    Q.    Okay -- and I think there was one other

17  person that you mentioned that came on the scene,

18  Baxter?

19    A.    Corporal Baxter.

20    Q.    Okay.  It doesn't look like Corporal Baxter

21  to you, either?

22    A.    It does not.

23    Q.    Okay.  This one is 23:16:04.  Same question

24  on that one, do you recognize either of those people in

25  that photograph?

47

1      A.    I do not.

2      Q.    This one is 23:16:55.  Do you recognize

3   anyone in that photograph?

4      A.    No.

5      Q.    This one is 23:16:57.  Do you recognize

6   anyone in that photograph?

7      A.    No.

8      Q.    Okay.  These officers have on the

9   light-colored tops, is that correct?

10     A.    Yes.

11     Q.    And so that -- they would not be from

12  Fort -- I mean, from Hamilton County, is that correct?

13     A.    No.

14     Q.    Okay.  This one is 23:17:25.  Do you

15  recognize that person?

16     A.    No.

17     Q.    This one is 23:17:49.  Do you recognize

18  anybody in there -- in that photograph?

19     A.    No.

20     Q.    This is 23:18:12.  Do you recognize anybody

21  in that photograph?

22     A.    No.

23     Q.    This is 23:18:33.  Do you recognize anyone

24  in that photograph?

25     A.    No.

1    Q.    Okay.  This person here with the hat, do you

2    think that may be the trooper, just because he has on a

3    hat?

4    A.    It looks like the uniform that the Georgia

5    State Patrol wears.

6    Q.    Okay.  This is 23:19:00.  Do you recognize

7    anybody in that photograph?

8    A.    No.

9    Q.    This is 23:19:19.  Do you recognize anybody

10   in that photograph?

11   A.    No.

12   Q.    This one is 23:19:40.  Do you recognize

13   anyone in that photograph?

14   A.    No.

15   Q.    This one is 23:19:43.  Do you recognize

16   anyone in that photograph?

17   A.    No.

18   Q.    This one is 23:20:15.  Do you recognize

19   anyone in that photograph?

20   A.    No.

21   Q.    Okay.  Let me ask you a question about this

22   one.  The two officers here on your -- to your right

23   side in this photograph both appear to have on the

24   darker-colored uniform, is that true?

25   A.    Yes.

49

1      Q.   Okay.  This car that -- this patrol car that

2  we see here, do you know whose car that was?

3      A.   I believe that's Deputy Smith's.

4      Q.   That would be whoever's car made contact

5  with the passenger's side of Mr. Koger's car, is that

6  correct?

7      A.   Yes.

8      Q.   Does this appear to be Deputy Smith or can

9  you tell?

10     A.   It looks like him, but I can't say it's him

11  for sure.

12     Q.   Can't say for sure?  Okay.  But from your

13  view of these officers, this would have to either be a

14  Fort Oglethorpe or a Hamilton County officer, based on

15  the dark color of the uniforms, is that true?

16     A.   Based off that, yes.

17     Q.   Okay.  This one is 23:20:20.  Do you

18  recognize any of those people?

19     A.   This person to the left -- I'm sorry, to the

20  right looks like -- that looks more like Deputy Smith

21  to me.

22     Q.   Okay.

23     A.   I don't know that it is.  I'm guessing by

24  the uniform that's Georgia State Patrol, but I don't

25  know if it is.

1     Q.    Okay.  Can you put a circle around who you

2   think -- the one person that you could identify in that

3   picture?

4     A.    (Complies.)

5     Q.    Hopefully we can get that to show up on a

6   copy.

7           MS. PARKER:  He just circled the person on

8   the right side of this photograph.

9           Let's go ahead and mark this one.

10                          (The photograph was marked

11                          Exhibit No. 3.)

12  BY MS. PARKER:

13    Q.    This one is 23:22:13.  Do you recognize any

14  of the people in that photograph?

15    A.    The person to the left looks like Deputy

16  Bennett to me, and the person in front of him looks

17  like me, but it's hard to tell.

18    Q.    Okay.  Would you just circle Deputy Bennett,

19  you said, and -- circle him first.

20    A.    (Complies.)

21    Q.    And see if you could put a mark or a B or

22  something above his head.  That way, we'll know --

23    A.    (Complies.)

24    Q.    Okay.  And then the other person who you

25  think might be you -- and the record is going to

1    reflect, obviously, your testimony that you're not

2    exactly sure -- would you circle that person?

3        A.    (Complies.)

4        Q.    And then, I guess -- I was going to say put

5    a C, but there's several people with a C name, so maybe

6    could you just write your name above that person?

7        A.    First name?

8        Q.    Just your last name is fine.

9        A.    (Complies.)

10            MS. PARKER:   Okay.   If we could mark that

11   one as the next exhibit, that will be Exhibit 4.

12                        (The photograph was marked

                          Exhibit No. 4.)

13

14   BY MS. PARKER:

15       Q.    This one is 23:23:24.   Do you recognize

16   anyone in that photograph?

17       A.    The person to the left looks like Corporal

18   Baxter.   I'm judging that, not so much that I can see

19   his face, but if I -- at one point, Corporal Baxter was

20   in K9 for us.   I can see the corporal stripes, it's

21   hard to make out the patch.   I cannot -- I do not

22   remember if he was still in K9 at this point.

23       Q.    Okay.

24       A.    And the person to the right is -- looks to

25   me to be a Georgia State Patrol.

1    Q.    Okay.  If you would, if you could just write
2    Baxter above that person?
3    A.    (Complies.)
4    Q.    And that's to the right of the photograph,
5    is that correct -- or I guess that would be your -- the
6    left of the photograph.  I'm sorry.  I'm backwards the
7    way you've marked that.
8              MS. PARKER:  Can we make that Exhibit No. 5?
9                        (The photograph was marked
                          Exhibit No. 5.)
10
11   BY MS. PARKER:
12   Q.    This is 23:23:57.  Do you recognize anyone
13   in that photograph?
14   A.    No.
15   Q.    And this is 23:24:04.  Do you recognize
16   anyone in that photograph?
17   A.    No.
18   Q.    And this is 23:24:02.  Do you recognize
19   anyone in that photograph?
20   A.    No.
21             MS. PARKER:  If we could just mark all these
22   other photographs where he didn't recognize anyone, as
23   Collective Exhibit 6?
24                       (The photographs were marked
                          Collective Exhibit No. 6.)
25

53

1          MS. PARKER:  This next set looks like it's

2     from Officer Cook's dash cam.  This should be the last

3     set.

4     BY MS. PARKER:

5       Q.    **This one is marked as 23:13:06.  Do you**

6     **recognize that as being the view that was from your**

7     **vehicle that night?**

8       A.    Yes.

9       Q.    **Okay.  From that photograph, can you**

10    **recognize who any of the officers are?**

11      A.    The officer in the background by the white

12    Camaro, no.

13      Q.    **Okay.**

14      A.    The officer to the left, the one in the

15    foreground, looks like me.

16      Q.    **Okay.  So that would be on the far left**

17    **side, I suppose, of the photograph?**

18      A.    Yes.

19      Q.    **Would you just write your name above that**

20    **person?**

21      A.    (Complies.)

22          MS. PARKER:  If we could mark that as the

23    next exhibit?

24                        (The photograph was marked

25                        Exhibit No. 7.)

54

1    BY MS. PARKER:

2        Q.    This is 23:13:17.  Can you recognize who any

3    of the officers are in that photograph?

4        A.    No.

5        Q.    This is 23:13:47.  Do you recognize any of

6    the officers in that photograph?

7        A.    No.

8        Q.    This is 23:13:48.  Do you recognize any of

9    the officers in that photograph?

10       A.    No.

11       Q.    Okay.  Would it be true that you would think

12   you're one of those officers over there, but you just

13   can't discern which one you are?  I don't want to put

14   words in your mouth, if you don't know if you're over

15   there.

16       A.    Possibly.

17       Q.    Okay.  This one is 23:13:49.  Do you

18   recognize anyone in that photograph?

19       A.    No.

20       Q.    This is 23:13:51.  Can you make out anybody

21   in that photograph?

22       A.    No.

23       Q.    This is 23:14:08.  Can you make out anybody

24   in that photograph?

25       A.    Background, no.  Foreground, yes.  The

55

1  person walking towards the camera view, head turned to

2  the left, looks like me.

3      Q.    Okay.  If you could maybe circle that and

4  write your name above it?

5      A.    (Complies.)

6      Q.    Okay.

7            MS. PARKER:  If we can make that one the

8  next exhibit?

9                          (The photograph was marked

                            Exhibit No. 8.)

10

11  BY MS. PARKER:

12      Q.    This is 23:14:12.  Can you make out anybody

13  in that photograph?

14      A.    Background, no.  Foreground, the person on

15  the left walking towards the camera view looks like me.

16      Q.    Okay.  If you could circle that one and

17  write your name above that person?

18      A.    (Complies.)

19                          (The photograph was marked

                            Exhibit No. 9.)

20

21  BY MS. PARKER:

22      Q.    Would that have been the point in time where

23  you were walking back toward your car, I think you said

24  to turn the siren off?

25      A.    Yes.

1    Q.    This one is 23:14:19.  Can you make out
2  anybody in that photograph?

3    A.    No.

4    Q.    Okay.  The next one is 23:14:35.  Can you
5  make out anybody in that photograph?

6    A.    No.

7    Q.    Okay.  This next one is 23:15:27.  Can you
8  make out anybody in that photograph?

9    A.    No.

10    Q.    In this picture, it appears that most of the
11  officers are still over there by Mr. Koger's car, is
12  that correct?

13    A.    Yes.

14    Q.    That would have been kind of the huddle
15  where everyone was when Mr. Koger was on the ground
16  outside the vehicle, is that correct?

17    A.    Yes.

18    Q.    Okay.  The next one is 23:15:31.  Can you
19  make out anybody in that photograph?

20    A.    No.

21    Q.    The next one is 23:15:34.  Can you make out
22  anyone in that photograph?

23    A.    No.

24    Q.    Okay.  Based on what you remember from the
25  incident and looking at this picture, it appears the

57

1    officers have moved Mr. Koger off the ground.  And this

2    may be the period of time when they're walking him back

3    to the back of the trunk.

4        A.    Yes.

5        Q.    Okay.  And so from your memory during that

6    period of time, you would have been in that same sort

7    of huddle of officers there that appear in the middle

8    of this photograph, is that correct?

9        A.    From my memory, yes.

10       Q.    Okay.  The next one is 23:15:35.  Do you

11   recognize anyone in that photograph?

12       A.    No.

13       Q.    The next one is 23:15:36.  Do you recognize

14   anyone in that photograph?

15       A.    No.

16       Q.    Okay.  If we look here on -- toward the

17   right side of the photograph, that person there appears

18   to have on a lighter-colored shirt, is that correct?

19       A.    It looks like a white shirt, yes.

20       Q.    Okay.  Would that, based on your memory, be

21   Mr. Koger?

22       A.    After what I -- after seeing the video and

23   refreshing my memory about what he had on, I do not

24   remember, but it possibly is Koger.

25       Q.    Okay.  So if that's -- you know, you would

58

1    still be in that group of officers there in that

2    photograph if they're walking him to the back of the

3    trunk in this picture?

4        A.    From memory, yes.

5        Q.    Okay.  This is 23:15:37.  Can you make out

6    anyone in that photograph?

7        A.    I'm going to guess -- to the right of the

8    photo, because of the white shirt, I'm going to guess

9    that's Koger.

10       Q.    Okay.  At that point in time, based on your

11   memory, do you know where you would have been on this

12   photo?

13       A.    No.

14       Q.    Okay.  The next one is 23:15:38.  Can you

15   make out anyone on that photo?

16       A.    No.

17       Q.    The next one is 23:15:39.  Can you make out

18   anyone in that photo?

19       A.    No.

20       Q.    The next one is 23:15:40.  Can you make out

21   anyone on that photograph?

22       A.    No.

23       Q.    The next one is 23:15:41.  Can you make out

24   anyone in that photograph?

25       A.    No.

1    Q.    The next one is 23:15:43.  Do you recognize

2    anyone in that photograph?

3    A.    No.

4    Q.    The next one is 23:15:44.  Do you recognize

5    anyone in that photograph?

6    A.    No.

7    Q.    23:15:45, do you recognize anyone in that

8    photograph?

9    A.    No.

10    Q.    23:15:47?

11    A.    No.

12    Q.    23:15:49?

13    A.    No.

14    MS. PARKER:  We'll mark the rest of these as

15    Collective Exhibit 10.

16                              (The photographs were marked

                                Collective Exhibit No. 10.)

17

18    BY MS. PARKER:

19    Q.    Just a few more questions, Officer Cook.

20    Did any of the other Hamilton County law

21    enforcement that were on the scene that night talk to

22    you about this incident in the days or weeks after it

23    happened?

24    A.    There was attempts made to talk.

25    Q.    Okay.  And who -- which of the officers

60

1    would that have been?

2        A.    Detective Bennett and Sergeant Carson.

3        Q.    When was it that you remember Deputy Bennett

4    trying to talk to you about it?

5        A.    Time-wise, I don't know how much time had

6    gone by.

7        Q.    Was it -- do you think it was the same year?

8        A.    Yes.

9        Q.    Do you recall what -- how many times did he

10   try to talk to you about it?

11       A.    Deputy Bennett once.

12       Q.    Okay.  Tell me how that conversation went.

13       A.    It was at our East Sector in the back

14   parking lot.  He made mention about it, not anything in

15   particular or anyone in particular about it, and I just

16   mentioned that I didn't think it was appropriate for us

17   to talk about it.

18       Q.    And what about Sergeant Carson?  How many

19   times did he try to talk to you about it?

20       A.    Three times that I remember.

21       Q.    Do you recall when any of those happened?

22       A.    No.

23       Q.    Do you think it was within, you know, a few

24   months or a year of when the incident itself happened?

25       A.    Possibly within the year.

61

1      Q.     Okay.   Do you recall whether they happened
2   close together or were they separated by time, the
3   three different incidents?
4      A.     Seemed to be separated by time.
5      Q.     Okay.   What do you recall about your
6   conversations with Sergeant Carson regarding this?
7      A.     Same thing, I just -- he wanted to just talk
8   to me about it.   There again, I didn't think it was
9   appropriate for us to talk about it, so I didn't engage
10  in much conversation about it at all.
11     Q.     Do you recall if any of the conversations
12  with Sergeant Carson were after this lawsuit had been
13  filed?
14     A.     No.
15     Q.     You don't remember or they weren't?
16     A.     I don't remember if they were.
17     Q.     Okay.   Do you remember if he ever mentioned
18  having read your report or statement to the GBI?
19     A.     Yes.
20     Q.     Sergeant Carson mentioned that to you?
21     A.     Yes.
22     Q.     I'm not asking about your attorney, but
23  other than your attorney, have you spoken to anyone
24  else in Hamilton County law enforcement about this
25  incident?

1      A.    I've mentioned a few things about it to a

2  couple of different people, but not in any detail.

3      Q.    **If you had intervened in Sergeant Carson --**

4  **in his use of force that night, would you have been**

5  **subject to discipline within the department?**

6      A.    No.

7      Q.    **Okay.  What about with Officer Bennett?**

8  **Would you have been subject to discipline if you had**

9  **intervened when he was striking Mr. Koger?**

10     A.    No.

11           MS. PARKER:  Okay.  That's all I have.

12           MS. HAVLIK:  I don't have anything.

13           MR. STONE:  I don't have anything.

14           MS. VARNELL:  I do.

15                   CROSS EXAMINATION

16  BY MS. VARNELL:

17     Q.    **Officer Cook, when Sergeant Carson discussed**

18  **this case with you, did he ever show you a video?**

19     A.    Yes.

20     Q.    **Do you remember which video he showed you?**

21     A.    I don't remember which one it was.

22     Q.    **And it was a video you had not seen**

23  **previously?**

24     A.    That I recall.  At the time he showed it to

25  me, I don't remember seeing it before.

1    Q.    I know you testified you didn't engage in

2    much conversation with him, but when he showed you that

3    video, did you have any -- did you make any comments to

4    him?

5    A.    I don't remember making any comments.

6    Q.    Did you tell him that that was a different

7    angle that you had seen before of the encounter with

8    Mr. Koger?

9    A.    I don't remember what I said to him about

10   it.

11   Q.    You don't remember anything you said?

12   A.    No.

13   Q.    Okay.  When you gave your statement to the

14   GBI, they didn't -- the GBI agent did not show you any

15   videos, is that right?

16   A.    I don't remember -- he showed me -- if I

17   remember, he showed me one video, I believe.

18   Q.    One?  And we've seen four today.  You did

19   not see those four when you were interviewed by the

20   GBI, is that right?

21   A.    If I saw them when I was interviewed by the

22   GBI, I don't remember it.

23   Q.    When you -- do you remember drafting

24   interrogatory responses as a part of this case?

25   A.    Yes.

64

1          MS. VARNELL:  I have copies that are ready.

2   I guess we can --

3          MS. PARKER:  I've got a copy here.  Do you

4   want to use mine?

5          MS. VARNELL:  Of his interrogatories?

6          MS. PARKER:  Uh-huh.

7          MS. VARNELL:  Okay.

8   BY MS. VARNELL:

9     Q.   Do you remember filling these out -- I can

10  probably ask a better question than that.

11         If you'll go -- turn to the back, about

12  three pages from the back, is that your signature on

13  the page that says Verification?  It doesn't have a

14  page number on it.

15    A.    Yes.

16    Q.    Is that your signature?

17    A.    Yes.

18    Q.    A notarized signature?

19    A.    Yes.

20    Q.    So did you prepare these documents with your

21  attorney?

22    A.    I'm sorry?

23    Q.    Did you prepare these documents with your

24  attorney?

25    A.    From what I remember, yes, it was with my

65

1  attorney.

2      Q.    Will you turn to page 9?

3      A.    (Complies.)

4      Q.    Are you there with me?

5      A.    Yes.

6      Q.    On page 9, you've got Interrogatory No. 6.

7  And then it's got, in bold, your response to that.  Do

8  you see that?

9      A.    Yes.

10     Q.    That's a narrative of yours that, at the end

11 of the document, has been notarized, is that correct?

12     A.    Yes.

13     Q.    And that is your statement of what occurred

14 on March 8 of 2017, is that right?

15     A.    Yes.

16     Q.    If you'll turn to page 10?

17     A.    (Complies.)

18     Q.    Do you see the second full paragraph from

19 the end of that response that begins, "After the

20 deputies put Mr. Koger in handcuffs"?

21     A.    Yes.

22     Q.    Will you read that for me?

23     A.    "After the deputies put Mr. Koger in

24 handcuffs, they took him to the back of a patrol

25 vehicle.  Mr. Koger continued to resist and officers

66

1    present on scene began to hit him and strike him.  As

2    soon as Sergeant Carson came on the scene, I was

3    finished with my duties related to the pursuit and, as

4    a traffic investigator, I began working to assess the

5    damage to the vehicles and assisting the other law

6    enforcement agencies in assessing -- in assessment of

7    damage to other vehicles.  I had no further interaction

8    with Mr. Koger and I left the scene shortly after."

9        **Q.    So at least in your interrogatory responses,**

10   **you state that Mr. Koger was resisting when he was at**

11   **the back of the patrol car?**

12       A.    Yes.

13       **Q.    And that's when the officers that you**

14   **observed striking him, when he was resisting?**

15       A.    Yes.

16       **Q.    And that's your testimony?**

17       A.    I observed him offering a little resistance.

18       **Q.    And you said in your interrogatories that he**

19   **continued to resist, is that right?**

20       A.    Yes.

21       **Q.    Okay.  You were about twenty feet away from**

22   **the back of the patrol car, is that correct?**

23       A.    A guess.

24       **Q.    A guess?**

25       A.    (Moves head up and down.)

67

1      Q.      You would agree with me that when

2   determining whether somebody is resisting, the officer

3   that actually had hands-on is probably a better judge

4   of resistance?  Would you agree with me on that?

5      A.      Yes.

6      Q.      Okay -- because that officer, of course, is

7   closer than you to the suspect, right?

8      A.      Yes.

9      Q.      That officer had physical hands on the

10  suspect, is that right?

11     A.      Yes.

12     Q.      And you, Officer Cook, your training on --

13  of course, you're not an expert on use of force, right?

14     A.      No.

15          MS. VARNELL:  All right.  I think that's all

16  I have.

17          MS. PARKER:  I have just one follow-up

18  question.

19                  REDIRECT EXAMINATION

20  BY MS. PARKER:

21     Q.      Officer Cook, when you met with the GBI and

22  they asked you questions, was that pretty close in time

23  to when the incident had occurred?

24     A.      It seemed like it was.  It seemed like not

25  much time had gone by before I met with the GBI agent.

1        Q.     Would you agree with me that the statement

2   that you gave closest in time to the incident would

3   probably be the most accurate, as far as what you

4   remembered from your own memory?

5              MR. EXUM:  Object to the form.

6              THE WITNESS:  I don't know that it would be

7   considered the most accurate.  But as it, in time, was

8   closer to the incident, I probably had a better

9   recollection of what happened because of the amount of

10  time that had gone by.  Not as much time had gone by --

11  BY MS. PARKER:

12       Q.     Okay.  So -- go ahead.

13       A.     -- in previous discussions about this.

14       Q.     Okay.  So it would be the best recollection

15  that you would have of the incident itself?

16             MR. EXUM:  Same objection.

17             THE WITNESS:  I don't know if I would

18  describe it as best.  It would probably be, there

19  again, based off my memory because of not much time

20  going by.  It would be a recollection of what happened.

21  BY MS. PARKER:

22       Q.     Okay.  That's what I'm trying to ask.  I'm

23  trying to ask only what your memory is, not necessarily

24  what you've learned from other sources.

25             As far as your memory, did you have the most

1   **memory of the incident at the time you met with the**

2   **GBI --**

3       A.    Yes.

4       **Q.    -- as opposed to your discovery responses**

5   **and as opposed to sitting here today?**

6       A.    Yes.

7           MS. PARKER:  Okay.  That's all.

8           (At the conclusion of another deposition,

9   Todd Cooks's deposition continued as follows.)

10          MS. VARNELL:  I forgot to make the

11  interrogatories an exhibit to the deposition, if I can

12  do that now.

13                          (Defendant Todd Cook's Answers

                            to Plaintiff's First Set of

14                          Interrogatories and Request

                            for Production of Documents

15                          was marked Exhibit No. 11.)

16          FURTHER THIS DEPONENT SAITH NOT

17               (SIGNATURE WAIVED)

18

19

20

21

22

23

24

25

70

1

## REPORTER'S CERTIFICATION

2

3   STATE OF TENNESSEE      :

    :

4   COUNTY OF HAMILTON      :

5

6           I, Debra L. Huntoon, LCR #376, Licensed
    Court Reporter and Notary Public, in and for the State
7   of Tennessee, do hereby certify that the above
    proceeding was reported by me and that the foregoing
8   sixty-nine pages of the transcript are a true and
    accurate record to the best of my knowledge, skills,
9   and ability.

10          I further certify that I am not related to
    nor an employee of counsel or any of the parties to the
11  action, nor am I in any way financially interested in
    the outcome of this case.

12

            I further certify that I am duly licensed
13  by the Tennessee Board of Court Reporters as a Licensed
    Court Reporter as evidenced by the LCR number and
14  expiration date following my name below.

15          IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my notarial seal this 3rd day of
16  July, 2019.

17

18          _Debra L. Huntoon_

            DEBRA L. HUNTOON, LCR #376
19          LCR Expiration Date:  06/30/20
            Notary Public Commission
20          Expiration Date:  02/22/21.

21

22

23

24

25

# EXHIBITS







03/08/17
23:14:21

03/08/2017 23:16:00

2755hs

HCSO

03/08/2017 23:16:55

2755hs

HCSO

03/08/2017 23:16:57

2755hs

HCSO

03/08/2017  23:17:25

2755hs

HCSO

03/08/2017 23:17:49

2755hs

HCSO

03/08/2017 23:18:12

2755hs

HCSO

03/08/2017  23:18:33

2755hs

HCSO

03/08/2017 23:19:00

2755hs

HCSO

03/08/2017  23:19:19

2755hs

HCSO

03/08/2017 23:19:40

2755hs

HCSO

03/08/2017 23:19:43

2755hs

HCSO

03/08/2017 23:20:15

2755hs

HCSO

03/08/2017  23:23:57

2755hs

HCSO

03/08/2017  23:24:04

2755hs
HCSO

03/08/2017 23:24:02

2755hs

HCSO











597
1500hs
W  L  A
03/08/2017 23:13:47



















597
1500hs
W  L A
03/08/2017 23:15:36





597
1500hs
W L A
03/08/2017 23:15:38













597
1500hs
W   L A
03/08/2017 23:15:45



597
1500hs
W   L A
03/08/2017 23:15:47



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| PHILLIP WAYNE KOGER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 4:18-CV-00053-HLM |
| | ) |
| STEPHEN BAGLEY, individually and | ) |
| in his official capacity; | ) |
| GREGG CARSON, individually and in | ) |
| his official capacity; TODD COOK, | ) |
| individually and in his official capacity; | ) |
| JAMES DAVIS, individually and | ) |
| in his official capacity; DYLON FLOYD, | ) |
| individually and in his official capacity; | ) |
| and ANTHONY LAWSON, individually | ) |
| and in his official capacity; | ) |
| | ) |
|     Defendants. | ) |

---

**DEFENDANT TODD COOK'S ANSWERS TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES AND
REQUEST FOR PRODUCTION OF DOCUMENTS**

---

Comes now Defendant, Todd Cook, by and through counsel, pursuant to

Fed. R. Civ. P. 33 and 34 and provides responses to Plaintiff's First Set of

Interrogatories and Request for Production of Documents as follows:



EXHIBIT
11
COOK 6-20-19

# INTRODUCTION

These responses are made solely for the purpose of this action. These responses, including any production of documents, are subject to the terms and conditions of any protective order(s) that may be entered in this action.

Defendant has not yet completed its investigation of the facts relating to this action and has not yet completed its preparation for trial. The following responses are thus given without prejudice to Defendant Cook's right to produce subsequently discovered material. Defendant Cook specifically reserves the right to supplement its responses or any other responses not contained herein pursuant to applicable Rules of Civil Procedure and any local rules of court.

By this production, Defendant Cook does not admit the relevance of any document that is produced. No admission of any nature whatsoever is to be implied or inferred from these responses and/or documents.

Defendant specifically reserves its right to assert privilege for any privileged document that is inadvertently produced in response to these requests. In the event such documents are inadvertently produced, the inadvertent production by Defendant Cook of a document containing attorney-client communication, attorney work-product, or otherwise privileged information shall not constitute a waiver of privilege and such document or documents shall be returned to Defendant Cook immediately upon such request. Included in this reservation are not only

documents promulgated by Defendant Cook but also any documents produced by Defendant Cook that may have been promulgated by others.

## GENERAL OBJECTIONS

1.      Defendant Cook objects to each and every Request for Production to the extent it calls for the production of privileged documents, including documents protected by the attorney-client privilege, investigative privilege, consulting expert exemption, documents containing work product, and documents prepared in anticipation of litigation or trial. Defendant Cook further objects to each and every Request for Production to the extent it seeks the disclosure of the identities of, or any work generated by, non-testifying consulting experts retained by or at the direction of Defendant Cook's attorneys in anticipation or preparation for this and/or other threatened or pending litigation or in connection with the rendering of legal advice to Defendant. No restatement of any specific objection in the context of these answers shall be construed to imply a waiver of any unstated privilege objections addressed by this General Objection.

2.      Defendant Cook objects to each and every Request for Production to the extent it attempts to impose a duty on Defendant Cook to produce documents that are available from other entities not parties in this litigation and to the extent it seeks materials that are available to the public.

3.    Defendant Cook objects to each and every Request for Production to the extent it is overly broad, burdensome and oppressive, and seeks documents neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Defendant is performing a reasonable inquiry and search for documents as required by the applicable Rules of Civil Procedure; however, it is possible that even those Requests that appear reasonable in scope on their face may, in fact, call for the production of information or certain documents that are irrelevant or not reasonably calculated to lead to the discovery of admissible evidence. Defendant Cook preserves its objection to each such Request for Production to the extent it calls for the production of such documents.

4.    Defendant Cook objects to every Request for Production that uses language such as "each and every" or similarly broad language. Such a Request for Production is onerous, burdensome, harassing, prejudicial, and overly broad. Each Request for Production asking "any and all" or "each and every" is objectionable in that such an inquiry, in essence, is a request for evidence and not discoverable information. See, e.g., United States v. Renault, Inc., 27 F.R.D. 23, 26-27 (S.D.N.Y. 1960). Moreover, Defendant Cook has no possible means of making the all-encompassing identification such a broadly worded Request for Production requires.

5.     Defendant Cook is contacting those persons who have knowledge of the location and/or existence of information that may be responsive.  To the extent that Plaintiff's requests or any portion thereof seek to require this Defendant to take any actions other than those enumerated above, such as identifying "all persons" having knowledge or identifying "all documents" concerning the subject of the Request for Production, this Defendant objects to said Request for Production on the grounds that it is unduly burdensome and oppressive.

6.     Defendant Cook objects to each and every Request for Production to the extent that it requires Defendant to produce documents created for it by other parties in that such a Request for Production is vague, ambiguous, and overly broad.  Additionally, such a Request for Production is broad enough to include information protected by the attorney-client privilege, the attorney work product doctrine, investigative privilege, and the consulting expert exemption.

7.     Each Response herein is subject to all objections as to competence, relevance, materiality, propriety, admissibility, and any and all other objections and grounds to which the same statement would be subject if delivered in live testimony in court.  All such objections and grounds are expressly reserved by Defendant and may be interposed at the time of trial or in conjunction with other uses of the Responses.

## INTERROGATORY ANSWERS

1.    As to the person(s) answering these interrogatories, please state your full name, your address, your employer's name and business address, your job title, and the length of time you have been so employed.

ANSWER:        **Todd Cook**
**Traffic Investigator**
**Hamilton County Sheriff's Department**
**Employed 24 years**

2.    Identify each person, known to you or the defendant, its employees, its agents, its attorney, or its insurance company, who allegedly heard, saw, or claims to have done so, or claims to have any information or knowledge concerning any of the matters set forth in any of the pleadings filed in this lawsuit. **[Please take notice that the plaintiffs will object to the introduction of any testimony from any person testifying on the defendant's behalf who is not identified in the answer to this interrogatory.]**

ANSWER:        **Objection. It is impossible for this Defendant to know each and every person who may have witnessed or have personal knowledge of the events complained of in this matter. Furthermore, discovery is ongoing, and this response may be amended at any time.**

**Without waiving these objections, upon information and belief, the following people have knowledge of this matter:**

- **Phillip Koger**
- **Greggory Carson**
- **Stephen Bagley**
- **James Davis**
- **Dylon Floyd**
- **Anthony Lawson**
- **Jim Hammond**
- **Mike Helton**
- **Gary Sisk**
- **Michael Cannon**
- **John McGrath**
- **Brittany Gilleland**
- **Brandon Bennett**
- **Jason Smith**
- **Ricky Jones**
- **Employees from Cornerstone Medical Center, Puckett EMS, and Erlanger Health Systems.**
- **Any person identified in any other discovery responses by any other party.**

3.      For each person(s) identified in the answer to the foregoing interrogatory, describe in detail the facts that person(s) has or claims to have concerning this case.

**ANSWER:**          **Objection. It is impossible for this Defendant to know facts known of each and every person may have or claims to have concerning this case. Defendant further objects to this Interrogatory on the grounds that it asks this Defendant to speak to others' knowledge. Without waiving said objection, this Defendant refers to the videos produced by the parties in this case, as well as the statements given to**

**the Georgia Bureau of Investigation for which facts
each person claims to have with regard to this matter.**

4.     Identify each police officer, sheriff's deputy, or Highway Patrol officer who was present during the pursuit and resulting arrest of Phillip Koger on March 8, 2017. Include in your response the specific title of each individual. If a person is no longer employed, please state that person's current or last known phone number and address.

**ANSWER:         Please see answer to Interrogatory #4.**

5.     Identify each person known by you who was present or claims to have been present at the scene when Phillip Koger was taken into custody on March 8, 2017, as set forth in the Second Amended Complaint in this matter.

**ANSWER:         Phillip Wayne Koger
Greggory Carson
Stephen Bagley
James Davis
Dylon Floyd
Anthony Lawson
Jim Hammond
Mike Helton
Gary Sisk
Michael Cannon
John McGrath
Brittany Gilleland
Brandon Bennett
Jason Smith**

6.      Describe in detail the acts and events which took place on March 8, 2017, from the beginning of your knowledge of or involvement with Phillip Koger up until you concluded your work related to your interaction with Phillip Koger on that date, including any information as to the initial call that necessitated your involvement in the case. If there is more than one version of events known to you, describe each version separately and its source.

ANSWER:           **Objection.  This Interrogatory could seek information protected by the attorney-client privilege. Without waiving this objection, the defendant states as follows:**

**On March 8, 2017, I was in my patrol unit on Highway 58 in Chattanooga, Tennessee. I was speaking with Deputy Jason Smith in another patrol unit at the same location. While we were conversing, a call came over the radio from Deputy Bennett that he was attempting to pull over a vehicle, but the vehicle was not stopping, and he was requesting assistance. We immediately left our position and proceeded toward Deputy Bennett.**

**We picked up Deputy Bennett in the pursuit in East Ridge, Tennessee on Ringgold Road. We were instructed to go ahead and lay down spike strips in order to stop Mr. Koger's vehicle.  After we did so, Mr. Koger approached the spike strips and went around them and proceeded into the State of Georgia. I rejoined the pursuit and up in front of me an accident occurred between a Hamilton County Sheriff's vehicle and Mr. Koger. I could not stop immediately and had to proceed passed the accident, but I turned around and came back.**

Upon my return to the scene of the accident, I exited my vehicle and proceeded to assist the other deputies with Hamilton County and officers from Tunnel Hill and Catoosa County.  I witnessed them attempting to remove Mr. Koger from his vehicle while Mr. Koger resisting.

I also noticed on the ground that there were two firearms which I made the other deputies at the scene aware of. They had Mr. Koger on the ground and were attempting to place him in handcuffs.  I put my foot on Mr. Koger's right shoulder in order to assist the other deputies and to minimize his movements.

After the deputies put Mr. Koger in handcuffs, they took him to the back of a patrol vehicle.  Mr. Koger continued to resist and officers present on scene began to hit and strike him.  As soon as Sgt. Carson came on the scene, I was finished with my duties related to the pursuit and, as a traffic investigator, I then began working to assess the damage to the vehicles and assisting the other law enforcement agencies in assessment of damage to other vehicles.

I had no further interactions with Mr. Koger and I left the scene shortly thereafter.

7.      Describe in detail what acts and events you or any other defendant or any other person, took on March 8, 2017, to ensure that Mr. Koger was promptly afforded medical treatment.

**ANSWER:**       **Objection. This interrogatory calls for speculation and knowledge not within my purview to speak to the actions of others.  Without waiving this objection, this Defendant only has knowledge that an ambulance was**

**called for Mr. Koger and he was taken from the scene. My responsibilities after insuring that he was in handcuffs was to work as a traffic investigator and assess damage to the Hamilton County vehicles.**

8.     Have you ever been involved in any claim or proceeding involving a claim for excessive force or other constitutional violations and describe in detail the nature of each proceeding, the allegations against you in said proceeding and the outcome of said proceeding(s). **[An objection based on undue burden should include how the request is unduly burdensome (i.e. number of hours, actual cost, etc...) and whether there is a less burdensome way to obtain this information.]**

> **ANSWER:**       **Objection. Any prior proceedings or claims have no relevance in this matter and are unlikely to lead to discoverable information. However, without waiving this objection, I was involved in a claim of excessive force approximately four (4) years ago in Hamilton County involving _William D. Sholts vs. Shane Rominger, Todd Cook, Larry Posey, & Hamilton County, Tennessee_ Docket No. 15-C-761. I was cleared by Internal Affairs but the attorney representing Mr. Sholts sued me. It is my belief that Hamilton County settled that matter out of court.**

9.     Identify all communications between you and any other defendant, its agents, or its employees and any other person or entity concerning the events

involving Phillip Koger on March 8, 2017, including any communications before,

during, or after any of the incidents described in the Second Amended Complaint.

> **ANSWER:** **Objection. This interrogatory is overly broad and unduly burdensome to recall all conversations regarding this matter. Furthermore, this could implicate attorney/client privilege as I have had discussions with my attorneys about this incident.**
>
> **Without waiving this objection, I cannot recall all the people at the scene with whom I had a conversation regarding this matter. The dashcam video provided along with this discovery speaks for itself and will show to whom I spoke.**
>
> **After this incident, Sgt. Greggory Carson has attempted to engage me in conversation regarding this matter on two separate occasions. I cannot remember the exact dates.**

10.    State whether or not, following the arrest of Phillip Koger on March 8,

2017, a statement, interview, report, or a stenographic, mechanical, electrical,

audio, video, motion picture, photograph, or other recording, or transcription

thereof, of you or any other individual present at the scene of the shooting, or of a

statement made by you or any other individual present at the scene and

contemporaneously recorded, has been secured from or taken of said individuals

and, if so, for each such item, state the following:

a.    Name of the individual giving the statement, interview, report,

or  other recording related to the incident.

b.     Date, place, and time taken;

c.     Name and address of the person or persons connected with taking it;

d.     Names and addresses of all persons present at the time it was taken;

e.     Whether the statement was oral, written, shorthand, recorded, taped, or memorialized by other means;

f.     Whether or not the statement was signed; and

g.     Names and addresses of the persons or organizations under whose direction and upon whose behalf it was taken or made.

Please attach at request for Production of Document Number 3, an exact copy of the original of the statement, interview, report, film or tape referred to in this Interrogatory.

**ANSWER:**     **Objection, on the grounds that this request mischaracterizes the incident at issue in this cause of action, alleging there was a shooting, when there was not a shooting involved in this incident.   Without waiving said objection, Defendant refers to the Georgia Bureau of Investigation file.   See Attached <u>Exhibit A</u>.**

11.   Identify any person(s) who has possession or knowledge of any photographs, estimates, reports, statements, documents, drawings, imprints, letter(s) or any other tangible evidence which in any way relates or pertains to this

litigation, whether or not you intend to use the same. As a part of your identification describe what item each person so identified has or may have in that person's possession.

Please attach, at Request for Production of Documents Number 4, an exact copy of the original of any item identified in this Interrogatory.

> **ANSWER:** **Objection. This interrogatory requests information which I do not have, and which is not within my purview and ability to receive. Without waiving this objection, there was an accident report created, but any other statements or report are not in my possession. In addition, please refer to the Georgia Bureau of Investigation file. See Attached <u>Exhibit A</u>.**

12.    If you, your attorney, or anyone acting on your behalf has obtained a statement(s) in any form from any person(s) regarding any of the matters set forth in the complaint or your answer to the complaint, then as to each statement identify: (a)   the person(s) from whom the statement(s) were taken and the person(s) who took the statement; (b) whether such statement(s) were written, preserved by recording device, by court reporter, by stenographer, or otherwise, and if so, the present location of each such recording, writing, or notes; and (c) the date and substance of each such statement.

Please attach, at Request for Production of Documents Number 5, an exact copy of the original of any item identified in this Interrogatory.

ANSWER:                    **Objection on the grounds that this request seeks
                           information that is protected under the work product
                           privilege. Without waiving said objection, Defendant
                           refers to the statement given to the Georgia Bureau of
                           Investigation file. See Attached Exhibit A.**

13.    Other than the defendant, to whom these interrogatories have been

sent, identify anyone else (including the Plaintiff or any non-party) you claim is or

may be at fault for the injury(s), damage, and loss sustained by the Plaintiff as

alleged in the Second Amended Complaint.   Include in your identification the

percentage of fault you assign as to each person so identified and detail the reasons

why you claim anyone else may be at fault for the injury(s), damage, and loss

sustained by the Plaintiff as alleged in the Second Amended Complaint.

ANSWER:                    **Objection. This interrogatory calls for legal conclusions
                           which are the providence of the court and the jury in
                           this matter. Furthermore, discovery in this matter is
                           still ongoing and, therefore, new people may become
                           known to this defendant at a later date.**

                           **Without waiving this objection, this defendant places
                           100% of the fault for this incident on the plaintiff
                           Phillip Koger. Mr. Koger ran from the police during
                           a traffic stop and then resisted and assaulted other
                           officers. His behavior and actions led to his injuries
                           which were necessary in order to protect the officers
                           that were on the scene.**

                           **In the alternative, the video in this matter shows other
                           officers which may have had contact with the
                           plaintiff. To the extent that video shows which officers
                           had contact with the plaintiff, those officers would be
                           at fault. This Defendant did not have any physical
                           contact with the plaintiff but for placing his foot on**

- 15 -

the plaintiff's shoulder to subdue him when he was on the ground.  Therefore, this Defendant has no fault in this matter for any of the plaintiff's injuries.

14.    State whether or not the location where Mr. Koger was arrested and assaulted were monitored by any surveillance and/or video camera, including any in-car video or audio recording device. If so, identify the type of surveillance and state whether any record was made of the assault on Phillip Koger, and if so, the location of such record or what disposition was made of said record.

Please attach, at Request for Production of Documents Number 6, an exact copy of the original of any item identified in this Interrogatory.

**ANSWER:**        **Defendant is not aware of any surveillance from a private party and, therefore, is not aware of any videos that demonstrate the subject matter of this suit.**

**However, this Defendants' dash camera did pick up the incident in this matter.  See attached video.**

15.    Identify each and every expert with whom you have discussed any aspect of this case, whether or not the expert has been retained to render any advice, assistance, and/or testimony relative to the issues of this case and whether or not the expert was retained to advise or consult even though not contemplated to testify at trial.

**ANSWER:**          **Objection. It is too early in this matter to determine which experts, if any, will be used at trial in this matter. To the extent an expert is used, it will be disclosed in accordance with any scheduling order and/or Federal Rules of Civil Procedure.**

16.    As to each expert witness who is expected to give testimony, please state the following additional information:

(a)    The qualifications of the expert;

(b)    The subject matter on which the expert is expected to testify;

(c)    The substance of all facts and opinions about which the expert is or may be expected to testify;

(d)    A summary of the grounds relied upon by the expert in support of each opinion on which that expert may be expected to testify;

(e)    A list of all publications authored by the expert in the previous ten years;

(f)    A list of all other cases in which, during the previous four years, the expert testified as an expert in depositions, trials, or otherwise; and

(g)    A statement of the compensation to be paid for the study and/or testimony in the case.

**[Please take notice that the plaintiffs will object to the introduction of any evidence from any expert offering evidence on the defendant's behalf who is not identified in the answer to this interrogatory.]**

**ANSWER:**          See response to Interrogatory No. 15.


17.     Identify and describe any and all demonstrative evidence you intend

to use at trial or is related to the allegations at issue in this lawsuit and describe

how you contend that any disclose demonstrative evidence supports your case.

Please attach, at Request for Production of Documents Number 7, an exact

copy of the original of any item identified in this Interrogatory.

**ANSWER:**          **Objection. It is too early in this matter to identify
what demonstrative evidence will be used at trial in
this matter.  To the extent any demonstrative evidence
is used, such will be disclosed in accordance with the
Scheduling Order, Local Rules of Practice and
Federal Rules of Civil Procedure.**


18.     List any and all items you intend to offer as exhibits at trial and

describe each and explain how it supports your case.

Please attach, at Request for Production of Documents Number 8, an exact

copy of the original of any item identified in this Interrogatory.

**ANSWER:**          **Objection. It is too early in this matter to identify
what demonstrative evidence will be used at trial in
this matter.  To the extent any demonstrative evidence
is used, such will be disclosed in accordance with the
Scheduling Order, Local Rules of Practice and
Federal Rules of Civil Procedure.**

19.    Identify each person with whom you have discussed this case in order to determine whether or not that person could offer an opinion or testimony as to any element of the case.

     **ANSWER:**     **Objection. It is too early in this matter to identify what demonstrative evidence will be used at trial in this matter.  To the extent any demonstrative evidence is used, such will be disclosed in accordance with the Scheduling Order, Local Rules of Practice and Federal Rules of Civil Procedure.**

20.    Identify all communications, not already identified, which you, your agent, or attorney, have had with any person(s), including any insurance company, their agents, employees, or attorneys, regarding any of the matters contained in any of the pleadings filed in this lawsuit.

Please attach, at Request for Production of Documents Number 9, an exact copy of the original of any item identified in this Interrogatory.

     **ANSWER:**     **Objection.  This Interrogatory calls for discussions that will be protected by attorney/client privilege and the work product doctrine.  Such will not be disclosed absent a court order.**

                         **Without waiving this objection, this Defendant has not had any conversations with anyone outside of his attorneys.**

21.    Have you, your agent, your attorneys, insurance company or anyone on your behalf requested and/or received any information from any database or

information source or center concerning Mr. Koger. If so, please state the name, address and job title of the person in possession or control of this information, the date the information was ordered, and the name, address, job title of the person so ordering the information, and the name of the information source or center used.

Please attach, at Request for Production of Documents Number 10, an exact copy of the original of any item identified in this Interrogatory.

**ANSWER:**        **There is nothing responsive to this interrogatory.**

22.    Identify each person, not already identified, likely to have discoverable information about the claims and defenses in this case, even if you do not intend on calling that person as a witness.

**ANSWER:**        **Please see responses to Interrogatories #2 and #5.**

23.    Do you agree to supplement and/or amend your answers to these interrogatories and the requests for production of documents by timely (seasonably) serving plaintiff's counsel with supplemented/amended answer(s) and/or response(s)?

**ANSWER:**        **Yes.**

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.       Any pictorially preserved image, video tapes, slides, motion pictures, and audio recording, whether physical or electronic, of any person, place, or thing which relates to the matters set forth in any of the pleadings filed in this matter.

**RESPONSE:**       **See attached Exhibit A.**

2.       All documents relied upon or identified in answering plaintiff's first set of interrogatories.

**RESPONSE:**       **The pleadings filed and documents produced by other parties in this case, along with the attached Exhibit A.**

3.       All documents identified in Interrogatory Number 11 above.  If no documents were identified, then all statements, recordings, transcripts, or reports taken of or secured from any individual present during any of the events described in the Second Amended Complaint in this matter.

**RESPONSE:**       **Please refer to the Georgia Bureau of Investigation file.  In addition, see attached Exhibit A.**

4.       All documents identified in Interrogatory Number 12 above.  If no documents were identified, then all photographs, estimates, reports, statements, documents, drawings, imprints, letter(s), or any other tangible evidence which in any way relates or pertains to this litigation, whether or not you intend to use the same at any stage in these proceedings.

**RESPONSE:**    **Please refer to the Georgia Bureau of Investigation file. In addition, see attached <u>Exhibit A</u>.**

5.    All documents identified in Interrogatory Number 13 above. If no documents were identified, then all statements, recordings, transcripts, or reports taken of or secured from any person.

**RESPONSE:  See attached <u>Exhibit A</u>.**

6.    All documents identified in Interrogatory Number 15 above. If no documents were identified, then all video or photographs depicting the pursuant, use of force, arrest, interrogation, or other interaction with Phillip Koger regarding the events of March 8, 2017, including the any search of his vehicle.

**RESPONSE:**    **Objection. To the extent an expert is used, such documents will be disclosed in accordance with any scheduling order and/or Federal Rules of Civil Procedure.**

7.    All documents identified in Interrogatory Number 18 above. If no documents were identified, then all demonstrative evidence you intend to use at trial.

**RESPONSE:**    **Objection. To the extent any demonstrative evidence is used, such documents will be disclosed in accordance with any scheduling order, Local Rules of Practice, and/or Federal Rules of Civil Procedure.**

8.    All documents identified in Interrogatory Number 19 above. If no documents were identified, then all items you intend to offer as exhibits at trial.

> **RESPONSE:** **Objection. To the extent any demonstrative evidence is used, such documents will be disclosed in accordance with any scheduling order, Local Rules of Practice, and/or Federal Rules of Civil Procedure.**

9.   All documents identified in Interrogatory Number 21 above. If no documents were identified, then all communications which you, your agent, or attorney, have had with any person(s) or entities, including any insurance company, their agents, employees, or attorneys, regarding any of the matters contained in any of the pleadings filed in this lawsuit.

> **RESPONSE:** **A Westlaw Report was generated by a Hamilton County Attorney and is considered to be work product.**

10.   All documents identified in Interrogatory Number 22 above. If no documents were identified, then information from any database or information source or center concerning Mr. Phillip Wayne Koger. This request includes criminal background checks, prior claim history, credit reports, and any similar data or information.

> **RESPONSE:** **Defendant refers to the Georgia Bureau of Investigation file. In addition, see attached Exhibit A (*Bates Stamped Cook_000561-Cook_000692*).**

11.   All accident or incident reports and investigations prepared as a result of the facts described in the Second Amended Complaint filed in this matter.

**RESPONSE:**     **Defendant refers to the Georgia Bureau of Investigation file. In addition, see attached <u>Exhibit A</u> (*Bates Stamped Cook_000561-Cook_000692*).**

12.   If you, your attorney, or anyone acting on your behalf has obtained a statement(s) in any form from any person(s) regarding any of the matters set forth in any of the pleadings in this case, then please produce a copy of each statement.

**RESPONSE:**     **N/A**

13.   If any party or anyone acting on behalf of any party made any representation, gave any statement, reported any admission, or made any other statement whatsoever to you, your agent, your attorney or representative, or to any third-party, then please produce a copy of each statement.

**RESPONSE:**     **Defendant refers to the Georgia Bureau of Investigation file. In addition, see attached <u>Exhibit A</u> (*Bates Stamped Cook_000561-Cook_000692*).**

14.   If any party or anyone acting on behalf of any party made any representation, gave any statement, reported any admission, or made any other statement whatsoever to you, your agent, your attorney or representative, or to any third-party, then with respect to each, please produce any document concerning the statement whether or not the document is written, or in the form of notes or otherwise. **[Please note that this request relates to, but is different from, the preceding request.]**

**RESPONSE:**     Defendant refers to the Georgia Bureau of Investigation file. In addition, see Response to Request #13 and attached <u>Exhibit A</u>.

15.   Any document, photograph, witness statement, federal act, state statute, local ordinance, or regulation of any agency, any written standard, or any other document or thing whatsoever which may corroborate or tend to support any part of Phillip Koger's claim or your defense to this action.

**RESPONSE:**     Defendant refers to the Georgia Bureau of Investigation file.  In addition, see Response to Request #13 and attached <u>Exhibit A</u>.

16.   Any document, photograph, witness statement, federal act, state statute, local ordinance, or regulation of any agency, any written standard, or any other document or thing whatsoever which may corroborate or tend to support any part of any other party's claim or defense to this action.

**RESPONSE:**     Defendant refers to the Georgia Bureau of Investigation file.  In addition, see Response to Request #13 and attached <u>Exhibit A</u>.

17.   Your personnel file covering your employment with the Hamilton County Sheriff's Department, including but not limited to any and all training certificates and disciplinary citations you received.

**RESPONSE:**     Defendant refers to the Georgia Bureau of Investigation file.  See attached <u>Exhibit A</u> (*Bates Stamped Cook_000001-Cook_000507*).

18.    Any radio traffic, dispatch records, or audio/video recordings made by you, or any of your employees or agents in the hours leading up to, during, and after Mr. Koger's arrest on March 8, 2017.

**RESPONSE:**    **Defendant refers to the Georgia Bureau of Investigation file.  In addition, see attached <u>Exhibit A</u>.**

19.    A copy of any use of force policy under which you were trained as an employee of Hamilton County Sheriff's Department.

**RESPONSE:**    **See attached <u>Exhibit A</u> (*Bates Stamped Cook_000508-Cook_000560*).**

20.    All documents, not already produced, which relate in any way to any matter contained in any pleadings filed in this matter.

**RESPONSE:**    **None in Defendant's possession.**

## VERIFICATION:

I, _Todd Cook_, state that the answers to the foregoing *Interrogatories* and the responses to the foregoing *Requests for Production of Documents* are true except as to those matters stated on information and belief, and as to those I believe them to be true to the best of my knowledge, information, and belief.

_____

TODD COOK

STATE OF _Tennessee_ )
                     )
COUNTY OF _Hamilton_ )

Sworn to and subscribed before me this the 11th day of _April_, 2019.

Notary Public: _Jennifer Ellis_

My Commission Expires: _6·10·20__

Respectfully submitted,

**LEITNER, WILLIAMS, DOOLEY**
**& NAPOLITAN, PLLC**


By:       */s/ James F. Exum*
          **JAMES F. EXUM, GA BAR #954516**
          Attorneys for Defendant, Todd Cook
          Tallan Building – Suite 500
          200 W. M.L. King Blvd.
          Chattanooga, TN 37402-2566
          Phone: (423) 265-0214
          Fax:    (423) 266-5490

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing Answers to Plaintiffs' First Set of Interrogatories and Request for Production of Documents to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants. Counsel of record are:

| | |
|---|---|
| Luke A. Evans, Esq.<br>Heather G. Parker, Esq.<br>BULLOCK, FLY, HORNSBY & EVANS<br>302 North Spring Street<br>PO Box 398<br>Murfreesboro, TN 37133-0398<br><br>Christopher R. Stanford, Esq.<br>Christina S. Stanford, Esq.<br>THE STANFORD LAW FIRM, PLLC<br>103 West High Street<br>Manchester, Tennessee 37355<br><br>*Attorneys for Plaintiff* | Erin S. Corbett, Esq.<br>BULLARD & WANGERIN, LLP<br>2960 Riverside Drive, Suite 280<br>P.O. Box 18107<br>Macon, Georgia 31209<br>*Local counsel for Plaintiff*<br><br>Gwendolyn D. Havlik, Esq.<br>Stevan A. Miller, Esq.<br>DREW ECKL & FARNHAM – ATL<br>303 Peachtree Street NE, Suite 3500<br>Atlanta, GA 30308<br>*Attorneys for Defendant Anthony Lawson* |
| Dana K. Maine, Esq.<br>FREEMAN MATHIS & GARY, LLP<br>100 Galleria Parkway<br>Suite 1600<br>Atlanta, Georgia 30339-5948<br>(770) 818-0000 (telephone)<br>(770) 937-9960 (facsimile) | Bryan H. Hoss, Esq.<br>DAVIS & HOSS, P.C.<br>850 Fort Wood Street<br>Chattanooga, TN 37403<br>*Attorney for Defendant Greggory Carson, individually* |

This 15th day of April, 2019.

_/s/ James F. Exum_____