IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

PHILLIP WAYNE KOGER,

    Plaintiff,

v.

DYLON FLOYD,
JAMES DAVIS,
STEPHEN BAGLEY,
GREGGORY CARSON,
TODD COOK, and
ANTHONY LAWSON,

    Defendants.

CIVIL ACTION FILE NO.
4:18-CV-0053-HLM

ORDER

This case is before the Court on the Motion for Summary Judgment filed by Defendant Greggory Carson ("Defendant Carson") [186].[1]

## I. Background

### A. Initial Matters

As required by the Local Rules, Defendant Carson filed a Statement of Material Facts ("DSMF") in support of his Motion for Summary Judgment.  (DSMF (Docket Entry No. 186).)  As also required by the Local Rules, Plaintiff filed a response to DSMF ("PRDSMF").  (PRDSMF (Docket Entry No. 207-2).)  As

---

[1]     Defendant Anthony Lawson ("Defendant Lawson") also filed a Motion for Summary Judgment.  (Def. Lawson's Mot. Summ. J. (Docket Entry No. 188).)  Similarly, Defendants Stephen Bagley ("Defendant Bagley"), James Davis ("Defendant Davis"), and Dylon Floyd ("Defendant Floyd") filed a joint Motion for Summary Judgment.  (Defs. Bagley, Davis, & Floyd's Mot. Summ. J. (Docket Entry No. 191).)  Finally, Defendant Todd Cook ("Defendant Cook") filed a Motion for Summary Judgment.  (Def. Cook's Mot. Summ. J. (Docket Entry No. 192).)  The Court has addressed those Motions in separate Orders.

permitted by the Local Rules, Plaintiff filed his own Statement of Additional Material Facts ("PSAF") (Docket Entry No. 207-3), to which Defendant Carson responded ("DRPSAF") (Docket Entry No. 220-1). The Court evaluates DSMF, PRDSMF, PSAF, and DRPSAF _infra_.

## B. Factual Background

Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012). This statement does not represent actual findings of fact. Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 530 (11th Cir. 2013). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this case or controversy.

3

### 1.   The Parties

Defendant Carson is a patrol sergeant for the Hamilton County Sheriff's Department (the "HCSO"), and he has been employed by the HCSO for eighteen years.   (DSMF ¶ 1; PRDSMF ¶ 1; PSAF ¶ 9; DRPSAF ¶ 9.)  Plaintiff is currently in the custody of the Federal Bureau of Prisons. (Dep. of Pl. (Docket Entry No. 186-5) at 6.)  Plaintiff is six feet, two inches tall, and he weighs approximately 250 pounds.  (DSMF ¶ 9; PRDSMF ¶ 9.)[2]

---

[2]     The Court agrees with Plaintiff that DSMF ¶¶ 10-15, which relate to Plaintiff's training in Brazilian Jiu Jitsu, his experience as a mixed martial arts fighter, and his gang membership, are largely immaterial because Defendant Carson was not aware of those factors before he interacted with Plaintiff on the night of Plaintiff's arrest.  (PRDSMF ¶¶ 10-15; PSAF ¶ 14; DRPSAF ¶ 14.)  The Court therefore excludes those proposed facts.

## 2. Defendant Carson's Experience and Training

Before Defendant Carson was promoted to the rank of Sergeant, he served as a patrolman, a school resource officer, a corporal on patrol, and a sex crimes investigator with the HCSO's investigations unit.  (DSMF ¶ 2; PRDSMF ¶ 2.) Defendant Carson's duties as a sergeant on patrol include supervising approximately eight officers under his command, making the schedule, reviewing officer reports, and overseeing general day-to-day operations.  (DSMF ¶ 3; PRDSMF ¶ 3.)  As part of his job duties, and as a POST-certified law enforcement officer in Tennessee, Defendant Carson participates in forty hours of in-service training each year, which includes use of force refreshers, defensive tactics, and firearms training and qualification.  (DSMF ¶ 4; PRDSMF ¶ 4; PSAF ¶ 10; DRPSAF ¶ 10.)  That training is taught under

5

the HCSO's use of force policy.  (DSMF ¶ 5; PRDSMF ¶ 5;

PSAF ¶ 10; DRPSAF ¶ 10.)

### 3.   The HCSO's Use of Force Policy

The HCSO's use of force policy states that officers may

use necessary force to accomplish a legal or lawful objective.

(DSMF ¶ 5; PRDSMF ¶ 5.)  The policy outlines the levels of

force that an officer may use in response to a suspect's level

of resistance in order from least amount of force to the most

amount of force (the "use of force continuum").  (DSMF ¶ 6;

PRDSMF ¶ 6.)  The stages of the use of force continuum

include (1) police presence; (2) verbal warning; (3) verbal

commands; (4) soft or empty hand control techniques; (5)

chemical agent; (6) conducted electrical weapon; (7) impact

weapon or impact projectile; (8) hard hands-on control; and

(9) deadly force.  (DSMF ¶ 6; PRDSMF ¶ 6.)  The use of force

policy defines "hard hands-on control" as "physical contact,

6

this includes the use of control holds, striking, to move the subject from one area to another or to gain control of the person when faced with resistance." (DSMF ¶ 7; PRDSMF ¶ 7.) The policy also states that the decision by a deputy to use force and the amount of force used are discretionary decisions of the deputy and should be based on: (1) the deputy's experience; (2) the deputy's training; (3) the level of force that the suspect exhibits; and (4) the complete totality of the circumstances of what a reasonable deputy would deem necessary based on the deputy's knowledge at the time of the incident.   (DSMF ¶ 8; PRDSMF ¶ 8.)   The policy further provides that "when control of . . . a suspect is gained, the force being used should end immediately."   (PSAF ¶ 1; DRPSMF ¶ 1.)[3]

---

[3]   The Court excludes PSAF ¶ 2 as unsupported.

### 4.   The Pursuit

On March 8, 2017, Plaintiff was traveling on Standifer Gap Road in Hamilton County, Tennessee.  (DSMF ¶ 16; PRDSMF ¶ 16.)  Plaintiff possessed multiple firearms and a large quantity of methamphetamine.  (DSMF ¶ 17 (Plaintiff's materiality objection overruled).)

HCSO Deputy Brandon Bennett was on routine patrol at approximately 2300 hours when he noticed Plaintiff's vehicle, a white Camaro.  (DSMF ¶ 18; PRDSMF ¶ 18.)  Deputy Bennett noticed that the license plate on Plaintiff's vehicle was partially obscured, which was a tag violation, and he initiated his blue lights.  (DSMF ¶ 19; PRDSMF ¶ 19.)

Plaintiff pulled into a gas station, and Deputy Bennett pulled in behind him.  (DSMF ¶ 20; PRDSMF ¶ 20.)  As soon as Deputy Bennett's car came to rest behind Plaintiff, Plaintiff

8

hit the accelerator and fled.  (DSMF ¶ 21; PRDSMF ¶ 21.)
After obtaining authorization from his superiors, Deputy
Bennett began pursuing Plaintiff's vehicle.  (DSMF ¶ 22;
PRDSMF ¶ 22.)   The pursuit crossed into Georgia, with
Plaintiff continuing to flee. (DSMF ¶ 23; PRDSMF ¶ 23.)  For
approximately five to seven minutes, Deputy Bennett was the
only law enforcement officer involved in the pursuit before
other deputies and agencies joined it. (DSMF ¶ 24; PRDSMF
¶ 24.) Plaintiff estimates that he traveled approximately ninety
miles per hour during the chase. (DSMF ¶ 25; PRDSMF ¶ 25.)

Plaintiff continued to lead multiple agencies on a high-
speed chase through north Georgia. (DSMF ¶ 26; PRDSMF
¶ 26; PSAF ¶ 3; DRPSAF ¶ 3.) At one point, law enforcement
officers attempted to use spike strips to stop Plaintiff's car;
however, Plaintiff was able to bypass those.  (DSMF ¶ 26;
PRDSMF ¶ 26.)   After spike steps proved unsuccessful,

Deputy Bennett received authorization to use legal intervention to stop Plaintiff's vehicle.  (DSMF ¶ 27; PRDSMF ¶ 27; PSAF ¶ 3; DRPSAF ¶ 3.)

Deputy Bennett then hit Plaintiff's car with the front end of his patrol car.  (DSMF ¶ 28; PRDSMF ¶ 28; PSAF ¶ 3; DRPSAF ¶ 3.)   Deputy Bennett's intervention caused Plaintiff's vehicle to veer into the median of the highway, and then across the oncoming lanes, where it crashed into the guardrail.  (DSMF ¶ 29; PRDSMF ¶ 29; PSAF  3; DRPSAF ¶ 3.) Although Plaintiff refused to admit that he crashed, video evidence shows his vehicle striking the guard rail, the driver's side window of his vehicle shattering, and Deputy Jason Smith's vehicle striking Plaintiff's passenger side door. (DSMF ¶ 30 (Plaintiff's materiality objection overruled); <u>see also</u> Pl.'s Ex. E, Dash Camera Video of Jason Smith, at 23:12:45 (depicting a patrol vehicle hitting Plaintiff's car); Pl.'s

Ex. M, Dashboard Camera Video of Michael Cannon, at 23:10:51 (showing a patrol vehicle colliding with Plaintiff's car and pushing Plaintiff's car into a guardrail).)[4]

### 5.   Plaintiff's Removal from the Vehicle

After Plaintiff's vehicle stopped, officers approached the driver's side of the vehicle. (DSMF ¶ 31 (Plaintiff's materiality objection overruled).)  Plaintiff initially put his hands out the driver's side window, but, as the officers approached, he pulled his arms back into the car and shifted his torso toward the center of the car. (Id. ¶ 32 (Plaintiff's materiality objection overruled); Pl.'s Ex. E at 23:12:47--23:12:49; PSAF ¶ 4;

---

[4]     Plaintiff objected to DSMF ¶¶ 29-33 and 37-47, which relate to events that occurred after Plaintiff's car stopped and before Defendant Carson engaged with Plaintiff, as immaterial. (PRDSMF ¶¶ 29-33, 37-47.) The Court overrules those materiality objections, as the proposed facts provide both background information and context for Defendant Carson's eventual interaction with Plaintiff.

11

DRPSAF ¶ 4.)  Deputy Bennett testified that he could clearly

see the backstrap of a pistol in the console.  (DSMF ¶ 33,

Plaintiff's materiality objection overruled).)[5]

Multiple officers pulled Plaintiff out of his car and onto the

ground.    (DSMF  ¶  37  (Plaintiff's  materiality  objection

overruled); PSAF ¶ 5; DRPSAF ¶ 5.)  Several of the officers

testified that Plaintiff immediately began to resist, and that

officers  had  to  use  force  to  get  Plaintiff  to  comply  with

commands and to stop resisting.  (DSMF ¶¶ 38-43 (Plaintiff's

materiality   objections   overruled).)        Specifically,   Fort

---

[5]    During the chase, Plaintiff possessed three handguns in his
vehicle.  (DSMF ¶ 34 (Plaintiff's materiality objection overruled to
this portion of the proposed fact).)    The Court excludes the
remaining portion of DSMF ¶ 34 as immaterial.  Law enforcement
officers located two of those handguns inside Plaintiff's vehicle
after Plaintiff's arrest, and noticed one handgun on the ground
near where the officers eventually handcuffed Plaintiff.  (DSMF ¶
35 (Plaintiff's materiality objection overruled).)    The Court
excludes DSMF ¶ 36 as immaterial.

Oglethorpe Police Deputy Gebelien testified that Plaintiff engaged in a physical altercation with officers outside Plaintiff's car. (Id. ¶ 39 (Plaintiff's materiality objection overruled).) Several officers assisted in handcuffing Plaintiff, and the officers eventually had to double-handcuff Plaintiff because of his level of resistance. (Id. ¶ 44 (Plaintiff's materiality objection overruled); see also PSAF ¶¶ 5-6 (noting that numerous officers were involved in handcuffing Plaintiff); DRPSAF ¶¶ 5-6 (agreeing that the Court may consider PSAF ¶¶ 5-6).) Plaintiff testified that he has no memory of any events that occurred after the officers handcuffed him and before he woke up in the hospital hours later. (DSMF ¶¶ 45-46 (Plaintiff's materiality objection overruled); PSAF ¶ 48; DRPSAF ¶ 48.)[6]

---

[6]     Plaintiff does not challenge the traffic stop, the manner in which the officers stopped his vehicle, his initial detention, baton

13

### 6. Defendant Carson's Interaction with Plaintiff

Defendant Carson arrived at the scene after the officers handcuffed Plaintiff. (DSMF ¶ 48; PRDSMF ¶ 48; PSAF ¶ 15; DRPSAF ¶ 15.) A video depicts Plaintiff lying prone on the ground near the guard rail and near the left front wheel of Plaintiff's car when Defendant Carson arrived at the scene. (DSMF ¶ 49; PRDSMF ¶ 49.)

Defendant Carson and Deputy Brandon Bennett lifted a handcuffed Plaintiff off the ground and used a "high escort" position, in which Plaintiff's body was bent forward, to walk Plaintiff to the rear of a patrol car. (DSMF ¶ 50; PRDSMF ¶

_____

strikes or Taser use that occurred while officers attempted to handcuff him, any strikes prior to the officers handcuffing him, or the manner in which the officers handcuffed him. (DSMF ¶ 47 (Plaintiff's materiality objection overruled).) As such, PSAF ¶ 52, in which Plaintiff asserts that he gave up after the chase and did not resist, is immaterial.

14

50; see also PSAF ¶ 16 (noting that Defendant Carson, aided by another officer, picked Plaintiff up and told him "to get his fat ass up"); DRPSAF ¶ 16 (acknowledging that the Court can consider PSAF ¶ 16).)  The HCSO taught the "high escort" technique, and it is a common technique used by many law enforcement officers.   (DSMF ¶ 51; PRDSMF ¶ 51.) Defendant Carson and Deputy Bennett were the only officers with hands on Plaintiff while escorting him to the rear of the patrol car, and they were in the best position to determine whether Plaintiff was resisting.  (DSMF ¶¶ 56-57; PRDSMF ¶¶ 56-57.)

According to Defendant Carson, he believed it was necessary to search Plaintiff because of officer safety concerns and concerns that Plaintiff might have a weapon. (DSMF ¶ 53 (Plaintiff's materiality objection overruled).)  The HCSO and other law enforcement agencies teach officers to

15

assume that a suspect is armed, and, if a suspect has possession of one weapon, to assume that the suspect has possession of another weapon. (DSMF ¶ 54; PRDSMF ¶ 54.) This rule is commonly known as the "plus-one" rule. (DSMF ¶ 54; PRDSMF ¶ 54.) Plaintiff's expert witness, Patrick Looper, recognizes that officers are to assume that a suspect has a weapon until the suspect is searched. (DSMF ¶ 55; PRDSMF ¶ 55.) Both Mr. Looper and T.E. Vaughn, Defendant Carson's expert, agree that the decision to search a suspect who had just led police on a high speed chase, who had committed multiple felony offenses, who had resisted other officers, requiring the use of batons, hard hand techniques, and a Taser, who possessed multiple guns and drugs, and who resisted officers while being escorted to the rear of a vehicle, is proper police procedure and ensures officer safety. (DSMF ¶ 61; PRDSMF ¶ 61.)

16

Defendant Carson and Deputy Bennett testified that, while they were walking Plaintiff to the rear of the patrol car, Plaintiff began to resist their efforts. (DSMF ¶ 58; PRDSMF ¶ 58 (admitting that Defendant Carson and Deputy Bennett gave this testimony).)   According to Defendant Carson, Plaintiff attempted to jerk out of his grip and attempted to "stiff walk," which made it difficult for the officers to control him. (DSMF ¶ 59.)[7][8] Deputy Bennett testified that, as soon as the officers began to walk Plaintiff to the rear of the patrol car, Plaintiff began to stand up straight, in resistance to the high

---

[7]     Plaintiff's expert, Patrick Looper, testified that he had no issues with the high escort position, because it was the correct way to transport Plaintiff. (PSAF ¶ 41; DRPSAF ¶ 41.)

[8]     Plaintiff denied DSMF ¶ 59, arguing that Defendant Cook testified that he did not observe Plaintiff resisting at the rear of the patrol car. (PRDSMF ¶ 59.) This denial is non-responsive, as Defendant Cook's testimony did not address Plaintiff's behavior while walking to the rear of the patrol car. (Dep. of Todd Cook (Docket Entry No. 186-20) at 18.)   The Court therefore deems DSMF ¶ 59 admitted.

escort position that the officers were using. (DSMF ¶ 60.)[9]
According to Deputy Bennett, Plaintiff's sudden movement
almost took Deputy Bennett up to his tiptoes because of
Plaintiff's size, and Defendant Carson had to help bend
Plaintiff back over to continue walking him to the rear of the
patrol car. (Id.)

According to Defendant Carson, Deputy Bennett
attempted to place Plaintiff over the truck of the patrol car to
keep Plaintiff from jerking away or pushing back. (DSMF ¶ 63;
PRDSMF ¶ 63 (admitting that the officers gave this
testimony).) Other officers testified that they heard a struggle

---

[9]    Plaintiff denied DSMF ¶ 60, relying on Defendant Cook's
testimony that Plaintiff did not appear to be resisting at the rear of
the patrol car. (PRDSMF ¶ 60.) This testimony, however, did not
address Plaintiff's behavior while walking to the rear of the patrol
car. (Cook Dep. at 18.)  The Court therefore deems DSMF ¶ 60
admitted.

at the back of the patrol car, due to commands being given and yelling. (DSMF ¶ 64; PRDSMF ¶ 64 (admitting that the officers gave this testimony).)   According to Defendant Carson, Deputy Bennett, and Deputy Smith, Plaintiff raised his body off the patrol car and pushed himself back when Defendant Carson attempted to pat down Plaintiff. (Dep. of Greggory Carson (Docket Entry No. 186-3) at 16-17; Dep. of Brandon Bennett (Docket Entry No. 186-9) at 25; Dep. of Jason Smith (Docket Entry No. 186-14) at 17, 21, 23-25, 44-45.) According to Deputy Bennett, he had to lie over Plaintiff's body to attempt to keep him on the trunk. (Bennett Dep. at 25.)   Deputy Smith heard the commotion and went to assist Defendant Carson and Deputy Bennett.   (DSMF ¶ 89; PRDSMF ¶ 89 (not disputing the testimony cited in DSMF ¶ 89).) Plaintiff, for his part, denies that he resisted, pointing to testimony from Defendant Cook stating that Defendant Cook

19

did not see Plaintiff resisting at the rear of the patrol car. (Cook Dep. at 18.)[10]

Defendant Carson testified that, pursuant to his training, Plaintiff's level of resistance, and Plaintiff's potential threat, he delivered two punches to Plaintiff's back to gain compliance. (Carson Dep. at 16-17; PSAF ¶ 18; DRPSAF ¶ 18.) Defendant Carson, Deputy Bennett, and Deputy Smith all testified that Plaintiff continued to push away, shield his waist area, clinch

---

[10]   In his responses to Plaintiff's Interrogatories, Defendant Cook stated: "After the deputies put [Plaintiff] in handcuffs, they took him to the back of a patrol vehicle.  [Plaintiff] continued to resist and officers present on scene began to hit and strike him." (Docket Entry No. 220-2) at 3.)  At his deposition, Defendant Cook acknowledged making that statement in his interrogatory responses, and he testified that he observed Plaintiff "offering a little resistance." (Cook Dep. at 65-66.)  Defendant Cook further testified that he was approximately twenty feet away from the officers at the back of the car with Plaintiff.  (Id. at 13, 66.) Defendant Cook stated that the officers with hands on Plaintiff were in the best position to judge whether Plaintiff was resisting. (Id. at 67.)

his legs together, and twist his body.  (Smith Dep. at 16-18, 21; Carson Dep. at 16-17; Bennett Dep. at 25.)  Defendant Carson testified that he deployed two elbow strikes to Plaintiff's back, which caused Plaintiff's knees to buckle. (Carson Dep. at 16-17; PSAF ¶ 18; DRPSAF ¶ 18.)  Plaintiff, for his part, contends that he was not resisting and that his knees buckled after the first elbow strike.[11]  (Cook Dep. at 18; see also PSAF ¶ 26 (quoting testimony from Defendant Carson indicating that the first elbow strike buckled Plaintiff's knee, and the second strike was from momentum of being in

---

[11]    Defendant Carson contends that his two punches and elbow strikes constituted hard hands-on control under the HCSO use of force policy, which authorizes the use of hard hands-on control techniques to gain control when met with resistance. (DSMF ¶ 70; PRDSMF ¶ 70 (admitting that the HCSO use of policy allows for strikes, but disputing that Defendant Carson's use of force was reasonable in light of Plaintiff's contention that he was not resisting).)

21

a fight); DRPSAF ¶ 26 (agreeing that the Court could consider PSAF ¶ 26).)

Defendant Carson then began to pat down Plaintiff's ankles for weapons. (DSMF ¶ 71.)[12] According to Defendant Carson and Deputy Bennett, Plaintiff immediately began to push himself away from the trunk and attempted to stand. (Carson Dep. at 17-17; Bennett Dep. at 25.) Defendant Carson contends that this maneuver was abrupt and forceful and that it prevented him from completing the search of Plaintiff's person for weapons. (Bennett Dep. at 25; Smith Dep. at 44-45.) Plaintiff, for his part, contends that he was not resisting. (Cook Dep. at 18.)

Defendant Carson contends that, to gain Plaintiff's compliance, he used a lift and put his right hand between

---

[12]   PRDSMF ¶ 71 is non-responsive. (PRDSMF ¶ 71.)  The Court therefore deems DSMF ¶ 71 admitted.

Plaintiff's legs to lift him up off the ground and onto the trunk, effectively getting Plaintiff off his feet. (Carson Dep. at 16-17; Smith Dep. at 18; Bennett Dep. at 26; Dep. of Stephen Bagley (Docket Entry No. 186-12) at 11; Dep. of Dylon Floyd (Docket Entry No. 186-15) at 14; Dep. of James Davis (Docket Entry No. 186-13) at 14; PSAF ¶ 19; DRPSAF ¶ 19.) Defendant Carson contends that this lift is a common wrestling move. (Carson Dep. at 67.) According to Defendant Carson, his other option was to take Plaintiff to the ground, which he believed would be a greater show of force and would pose a greater risk of injuring Plaintiff. (Id. at 61.) Plaintiff, for his part, contends that he was not resisting when Defendant Carson performed the lift maneuver. (Cook Dep. at 18.)[13]

---

[13]   DSMF ¶¶ 79-88 relate to other officers' observations of the purported struggle at the back of the patrol car, the officers' opinions concerning the appropriateness of the lift maneuver, and the officers' training concerning such maneuvers. The Court

According to Defendant Carson, he was able to complete the search of Plaintiff only after the lift maneuver. (Smith Dep. at 44-45.)[14] After the pat down, Plaintiff slid off the other side of the trunk. (PSAF ¶ 23; DRPSMF ¶ 23.) Defendant Carson testified that he did not feel that his life was in danger from Plaintiff during the arrest. (PSAF ¶ 28; DRPSAF ¶ 28.)

---

agrees with Plaintiff that these proposed facts are not material for the instant Motion, and it excludes DSMF ¶¶ 79-88. (PRDSMF ¶¶ 79-88.)   Likewise, the Court excludes PSAF ¶¶ 20-21 as argumentative.

The Court excludes PSAF ¶ 22, which relates to an opinion from Defendant Carson's expert as to whether Plaintiff was resisting, as immaterial.  The Court further excludes PSAF ¶ 27, relating to audio from the stop, as immaterial.  The Court excludes PSAF ¶¶ 29-30, relating to conduct after the incident, as immaterial. The Court also agrees with Defendant Carson that PSAF ¶ 33, which relates to Defendant Cook's training, is immaterial.  Finally, the Court excludes PSAF ¶¶ 35, 37, 42-44, and 46, which relate to testimony from Plaintiff's expert concerning what he observed on the videos, as immaterial because the videos speak for themselves.

[14]    The officers eventually discovered approximately 137 grams of methamphetamine and two firearms in Plaintiff's vehicle. (DSMF ¶ 92, first sentence (Plaintiff's materiality objection overruled).)

The dash camera video from Michael Cannon's vehicle depicts the incident at the back of the patrol car. (Pl.'s Ex. M; PSAF ¶ 60; DRPSAF ¶ 60.) The dash camera video from Jason Smith's vehicle shows a limited view of the incident. (Pl.'s Ex. E; PSAF ¶ 62; DRPSAF ¶ 62.) The dash camera video from Defendant Davis's car depicts the incident from farther away. (Pl.'s Ex. P, Dash Camera Video of Defendant Davis; PSAF ¶ 64; DRPSAF ¶ 64.) Plaintiff also presented the dash camera video from Defendant Cook's vehicle, which depicted Plaintiff's initial takedown and handcuffing, as well as a limited view of the incident at the back of the patrol car. (Pl.'s Ex. N, Dash Camera Video of Defendant Cook; PSAF ¶ 61; DRPSAF ¶ 61.) The videos depict Defendant Carson delivering two punches to Plaintiff, followed by two elbow strikes. (Pl.'s Ex. N at 23:15:47, 23:15:49, 23:15:52, 23:15:55; Pl.'s Ex. P at 23:13:58, 23:13:03; 23:14:07; Pl.'s Ex. M at

25

23:13:56-23:14:04.)  At least one of the videos indicates that

Plaintiff was wriggling when Defendant Carson delivered the

first punch, and that Plaintiff's knees buckled after the first

elbow strike.  (Pl.'s Ex. M at 23:13:56--23:14:04.) The videos

also depict Defendant Carson lifting Plaintiff by some manner

involving grabbing him between his legs and heaving him onto

the patrol car's trunk.  (Pl.'s Ex. N at 23:16:12; Pl.'s Ex. P at

23:14:20; Pl.'s Ex. M at 23:14:21.)  With all due respect to the

Parties, none of the videos clearly depict whether Plaintiff was

resisting when Defendant Carson lifted him onto the trunk.

The  entire  incident  lasted  less  than  a  minute,  with

approximately twenty-five to thirty seconds elapsing between

Defendant Carson's first strike and his heaving Plaintiff onto

the patrol car's trunk.  (Pl.'s Ex. N at 23:15:41--23:16:12; Pl.'s

Ex.  P  at  23:13:53--23:14:20;  Pl.'s  Ex.  M  at  23:13:50--

23:14:21.)

26

### 7. Medical Treatment

Plaintiff was transported to an area hospital and eventually was transferred to Erlanger Medical Center in Chattanooga, Tennessee for treatment. (Def. Carson's Ex. U (Docket Entry No. 186-23); Pl.'s Ex. L (Docket Entry No. 207-11) at 10-12.) Plaintiff complained of various injuries, including blunt chest trauma, contusion to the head, facial fractures, and a scrotal contusion. (DSMF ¶ 93; PRDSMF ¶ 93.) Plaintiff claimed that he sustained injuries to his neck, back, scrotum, and knee. (Pl. Dep. at 160-62; PSAF ¶¶ 55-58.) Plaintiff's medical records do not indicate that he sustained a ruptured testicle or required emergency surgery.[15]

---

[15]    Plaintiff objects to DSMF ¶¶ 96-99, which relate to federal court criminal proceedings against Plaintiff, as immaterial. (DSMF ¶¶ 96-99.) The Court agrees with Plaintiff that those proposed facts are not material for purposes of the instant Motion. The Court excludes the facts other than to note for background purposes that Plaintiff eventually pleaded guilty to a federal

(<u>See</u> Pl.'s Ex. L at 19 (noting that Plaintiff had decreased color flow to his left testicle), 40 (diagnosing Plaintiff with a scrotal contusion and stating that a consultation with urology revealed that Plaintiff did not need emergent surgical intervention for his testicle), 58 (same).)[16]

## C.  Procedural Background

The Court incorporates the procedural background portions of its earlier Orders into this Order as if set forth fully herein, and it adds only those background facts that are relevant to the instant Motion.  (Order of July 5, 2018 (Docket

---

criminal indictment charging him with conspiracy to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking crime, that Plaintiff is currently serving a federal prison sentence related to those charges, and that those charges arose in part from the evidence discovered as a result of the police chase at issue in this case.  (Def. Carson's Ex. D (Docket Entry No. 186-6); Def. Carson's Ex. E (Docket Entry No. 186-7); Def. Carson's Ex. F (Docket Entry No. 186-8); Pl. Dep. at 54.)

[16]     The Court excludes PSAF ¶¶ 52-54 as immaterial.

Entry No. 55); Order of Aug. 23, 2018 (Docket Entry No. 83);

Order of Sept. 17, 2018 (Docket Entry No. 91); Order of Oct.

15, 2018 (Docket Entry No. 96); Order of Dec. 6, 2018 (Docket

Entry No. 112); Order of Mar. 25, 2019 (Docket Entry No. 137);

Order of Nov. 13, 2019 (Docket Entry No. 176).)  On March

27, 2020, Defendant Carson filed a Motion for Summary

Judgment.  (Def. Carson's Mot. Summ. J. (Docket Entry No.

186).)  The briefing process for that Motion is complete, and

the Court finds that the matter is ripe for resolution.

## II.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) allows a court to

grant summary judgment when "there is no genuine dispute

as to any material fact and the movant is entitled to a judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking

summary judgment bears the initial burden of showing the

Court that summary judgment is appropriate and may satisfy

this burden by pointing to materials in the record. <u>Jones v. UPS Ground Freight</u>, 683 F.3d 1283, 1292 (11th Cir. 2012). Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial. <u>Id.</u>

When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion. <u>Morton v. Kirkwood</u>, 707 F.3d 1276, 1280 (11th Cir. 2013); <u>Strickland</u>, 692 F.3d at 1154. The Court also must "resolve all reasonable doubts about the facts in favor of the non-movant." <u>Morton</u>, 707 F.3d at 1280 (internal quotation marks and citations omitted). Further, the Court may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, or assess the quality of the

evidence presented.  <u>Strickland</u>, 692 F.3d at 1154.  Finally, the Court does not make factual determinations. <u>Rich</u>, 716 F.3d at 530.

## III.   Discussion

"As relevant here, the Fourth Amendment protects against 'unreasonable . . . seizures." <u>Hinson v. Bias</u>, 927 F.3d 1103, 1117 (11th Cir. 2019) (alteration in original) (quoting U.S. Const. amend. IV).   "The use of excessive force in executing an arrest is a species of unreasonable seizure, so the Fourth Amendment prohibits it."   <u>Id.</u>   "The Fourth Amendment's objective reasonableness standard governs" the inquiry as to whether force was excessive. <u>Id.</u> Under that standard, a court "must consider whether the officer's conduct is objectively reasonable in light of the facts confronting the officer."   <u>Id.</u> (internal quotation marks and citation omitted). When conducting this analysis, a court "must do so from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and it must "acknowledge that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Id. (internal quotation marks and citation omitted).[17]

When evaluating a Fourth Amendment excessive force claim, "a court must carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1305 (11th Cir. 2009) (internal quotation marks and citation omitted). "To balance the necessity of the use of force used against the arrestee's

---

[17]   Because the test "asks whether an officer's actions in using force were objectively reasonable," the Court does not consider an officer's subjective intent in applying force.  Hinson v. Bias, 927 F.3d at 1117 n.9.

constitutional rights, a court must evaluate several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 1305-06 (internal quotation marks and citations omitted); see also Hinson, 927 F.3d at 1117 (noting that, when determining whether the amount of force used is reasonably proportionate to the need for that force, courts consider factors such as "(1) the severity of the crime; (2) whether the individual poses an immediate threat to the safety of the officers or others; (3) whether the individual actively resists or tries to evade arrest by flight; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury" (internal quotation marks, citations, and footnote omitted)). "Whether the use of force was reasonable must be

33

determined from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 1306 (internal quotation marks and citation omitted).

"[W]here an arrest is supported by probable cause, the application of de minimis force as needed to effect the arrest, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Williams v. Sirmons, 307 F. App'x 354, 360 (11th Cir. 2009) (per curiam). "This is the case because the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, and [courts] recognize that the typical arrest involves some force and injury." Id. at 361 (internal quotation marks and citation omitted).

Under Plaintiff's version of the facts, he was handcuffed and was not resisting when Defendant Carson delivered the

34

second elbow strike and when Defendant Carson grabbed him between his legs and threw him on the trunk of the patrol car. (Cook Dep. at 18.)  Under those circumstances, a jury could find that Defendant Carson used excessive force against Plaintiff.  See Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) ("Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."); see also Johnson, 725 F. App'x at 877 (noting that a jury dispute remained as to excessive force where the plaintiff's evidence indicated that he did not resist); Dyksma v. Pierson, Case No. 4:17-CV-41 (CDL), 2018 WL 3430684, at *5 (M.D. Ga. July 16, 2018) (concluding that an officer used excessive force where he jammed his knee onto the neck of an arrestee who was clearly handcuffed, restrained, and incapacitated).  This is not a situation in which the Court can clearly determine that Plaintiff was resisting or was

35

noncompliant.  As such, the cases that Defendant Carson

cites are not controlling.[18]

Defendant Carson argues that Plaintiff has selectively

quoted from Defendant Cook's deposition, and that Defendant

Cook stated in his interrogatory responses that Plaintiff was

resisting the officers.  Defendant Carson further argues that

Defendant Cook was twenty feet away from the back of the

---

[18]    In Callwood v. Jones, 727 F. App'x 552 (11th Cir. 2018), the evidence demonstrated that an arrestee resisted officers' attempts to stop him, ignored commands to calm down, appeared to suffer from excited delirium, and continued to struggle and kick even after officers restrained him.  727 F. App'x at 560-61.  The Eleventh Circuit found that "[a] reasonable officer could have believed that [the arrestee] continued to resist arrest and that he posed a danger to the officers and himself by resisting." Id. at 561. The court concluded that it could not find "that the officers' use of force was so utterly disproportionate that any reasonable officer would have recognized that his actions were unlawful."  Id. (internal quotation marks and citation omitted).
      In Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288 (11th Cir. 2009), the Eleventh Circuit found that officers did not violate clearly established law by restraining an arrestee with a hobble and tightening it to a hogtie, where the arrestee continued to struggle and resist.  561 F.3d at 1292.

patrol car when the events occurred.  All of those arguments

essentially ask the Court to weigh evidence or make credibility

determinations, which the Court simply cannot do at this stage

of the proceedings.  Defendant Cook testified at least once

that Plaintiff did not appear to be resisting when Defendant

Carson used force against him, and the videos do not clearly

indicate that Plaintiff was resisting the officers when

Defendant Carson gave Plaintiff the second elbow strike or

lifted Plaintiff onto the patrol car.  As such, a genuine dispute

remains as to whether Defendant Carson used excessive

force against Plaintiff.

## B.   Qualified Immunity

Alternatively, Defendant Carson asserts the defense of

qualified immunity.  Qualified immunity protects government

officials performing discretionary functions from suits for

damages brought against them in their individual capacities.

Morris v. Town of Lexington, Ala., 748 F.3d 1316, 1321 (11th Cir. 2014).  The Eleventh Circuit applies a two-part analysis to determine whether a defendant is entitled to qualified immunity.  Id. at 1322.

Under the qualified immunity analysis used in this Circuit, the defendant first must prove that the allegedly unconstitutional conduct occurred while the defendant official was acting within the scope of the official's discretionary authority.  Penley v. Eslinger, 605 F.3d 843, 849 (11th Cir. 2010).  To determine whether the defendant acted within her discretionary authority, the Court asks "whether the [defendant] was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [the defendant's] power to utilize."

38

<u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004).[19]

Once a defendant shows that he or she acted within his or her discretionary authority, the burden shifts to the plaintiff to demonstrate that (1) the defendant's conduct violated the plaintiff's constitutional rights and (2) that the constitutional rights violated were "clearly established when the defendant committed the act complained of."  <u>Morris</u>, 748 F.3d at 1322 (internal quotation marks and citation omitted); <u>see also</u> <u>Penley</u>, 605 F.3d at 849 ("Once the defendant establishes that

---

[19]    In making this determination, the Court does not inquire "whether it was within the defendant's authority to commit the allegedly illegal act." <u>Holloman ex rel Holloman</u>, 370 F.3d at 1266 (internal quotation marks omitted).  Instead, the Court must "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." <u>Id.</u>

he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." (internal quotation marks and citation omitted)). The qualified immunity inquiry can begin with either prong. Morris, 748 F.3d at 1322.  If the plaintiff fails to make either of those showings, however, then the defendant is entitled to qualified immunity.  Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010); see also Smith ex rel. Smith v. Siegelman, 322 F.3d 1290, 1298 (11th Cir. 2003) (finding that defendants were entitled to qualified immunity based on plaintiff's failure to allege constitutional violation).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [individual in the defendant's position] that his conduct was unlawful in the situation he confronted." Morris, 748 F.3d at 1322 (emphasis in original) (internal quotation

40

marks and citation omitted).  Although a plaintiff "need not demonstrate that there is case-law specifically addressing his factual scenario, existing precedent must have placed the statutory or constitutional question beyond debate."  Id. (internal quotation marks and citation omitted).  A plaintiff may demonstrate that a right is clearly established by proceeding in one of three ways:

> First, [the plaintiff] may show that "a materially similar case has already been decided."  Second, [the plaintiff] can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation."  Finally, the conduct involved in the case may "so obviously violate[] th[e] constitution that prior case law is unnecessary."  Under controlling law, [the plaintiff] must carry [his] burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [Georgia] Supreme Court.

Id. (some alterations in original) (quoting Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012)).

41

Here, Defendant Carson acted in his discretionary authority during the events that gave rise to this lawsuit. See Johnson v. White, 725 F. App'x 868, 878 (11th Cir. 2018) (per curiam) (concluding that "deputies were clearly operating under their discretionary authority" during the course of arresting a suspect). The Court next determines whether Defendant Carson violated clearly established law.

In this Circuit, it is clearly established that the use of force against a restrained and unresisting suspect is impermissible. See Hadley, 526 F.3d at 1333 ("[A] handcuffed, non-resisting defendant's right to be free from excessive force was clearly established in February 2002."); Lee v. Ferrarro, 284 F.3d 1188, 1198 (11th Cir. 2002) (concluding that slamming a non-resisting criminal suspect's head onto the hood of a car constituted excessive force); Dyksma, 2018 WL 3430684, at *6 ("By August 2015, it had long been clearly established that

42

after a suspect is arrested, handcuffed, and completely secured, and after the risks of danger and flight have passed, significant force that is wholly unnecessary to any legitimate law enforcement purpose is excessive." (internal quotation marks and citation omitted)). The evidence, viewed in the light most favorable to Plaintiff, indicates that Plaintiff was handcuffed and was not resisting when Defendant Carson used force against him. Under those circumstances, Defendant Carson is not entitled to qualified immunity, and the Court denies Defendant Carson's Motion for Summary Judgment.

## IV. Conclusion

ACCORDINGLY, the Court **DENIES** Defendant Carson's Motion for Summary Judgment [186]. The Court **ORDERS** Plaintiff and Defendant Carson to file their proposed

43

consolidated pretrial order **WITHIN THIRTY (30) DAYS AFTER THE DATE OF THIS ORDER.**

IT IS SO ORDERED, this the ___ day of May, 2020.

_____

SENIOR UNITED STATES DISTRICT JUDGE

44